## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| In re: | Chapter 11 - Subchapter V |
| CITE LLC, | Bankruptcy No. 21-13730 |
| Debtor. | Judge Janet S. Baer |
| Robert Handler, not in any capacity other than the Subchapter V Trustee for the CITE, LLC Bankruptcy Estate, | |
| Plaintiff, | Adversary No._____ |
| v. | |
| Lake Point Tower Condominium Association, | |
| Defendant. | |

## CLAIM OBJECTION AND COMPLAINT TO
## AVOID LIEN AND FOR OTHER RELIEF

Robert Handler, not in any capacity other than as the Subchapter V Trustee and/or Plan Administrator for the Cite, LLC Bankruptcy Estate (hereinafter referred to as the "Trustee" or "Plaintiff"), for his complaint against Lake Point Tower Condominium Association (hereinafter referred to as "Claimant" or "Defendant") and for his objection to proof of claim number 9-1 filed by Claimant, states as follows.

## NATURE OF THE CASE

1. Plaintiff seeks judgment against Defendant avoiding Defendant's lien on the Debtor's real estate and reducing the amount Defendant claims it is owed.

{00230687}

## JURISDICTION AND VENUE

2. This adversary proceeding arises in the captioned chapter 11 bankruptcy case, pending before this Court as case number 21-13730 (the "**Case**").

3. Pursuant to 28 U.S.C. § 1334(b), this Court has subject matter jurisdiction over this proceeding, which is referred here pursuant to 28 U.S.C. §157(a) and Local Rule 40.3.1(a) of the United States District Court for the Northern District of Illinois.

4. This is a core proceeding under 28 U.S.C. § 157(b)(2) and this Court has constitutional authority to enter final judgments and orders thereon. If it is determined that any portion of this proceeding is not a core proceeding or that a bankruptcy judge does not have the constitutional authority to enter final judgments in this proceeding, the Trustee consents, under 28 U.S.C. § 157(c)(2), to a bankruptcy judge hearing and finally determining the proceeding and entering all appropriate orders and judgments on a final basis.

5. This Court is the proper venue for this adversary proceeding under 28 U.S.C. § 1409.

## PARTIES

6. Plaintiff is the duly appointed Subchapter V Trustee for the bankruptcy estate created on December 3, 2021 (the "Petition Date") when the Debtor, Cite, LLC (the "Debtor"), filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code (11 U.S.C. §§ 101, *et seq*., the "**Bankruptcy Code**"), thereby commencing the captioned Chapter 11 case (the "Case").

7. On March 25, 2022, the Court entered an order under 11 U.S.C. § 1185 that removed the Debtor as debtor-in-possession and provided that under 11 U.S.C. § 1183(b)(5), the Debtor's duties under 11 U.S.C. §§ 704(a)(8) and 1106(a)(1), (2), and (6) will be performed by Plaintiff.

8. Under the Debtor's Plan of Reorganization, Plaintiff has the standing to file this action against Defendant and to seek the relief requested.

9. On information and belief, Defendant is a not-for-profit corporation incorporated under the laws of the State of Illinois.

## BACKGROUND

10. The Debtor's largest secured creditor is Republic Bank. On October 8, 2019, Republic Bank Bank filed a complaint in the Circuit Court of Cook County to foreclose its mortgages on the Debtor's real property. As part of that litigation, on November 9, 2019, the Circuit Court appointed a receiver (the "**Receiver**") with respect to the real property at 505 N. Lake Shore Drive, also known as Lake Point Tower, consisting of units 207, 209, 209-A, 224, and 7000 (the "**Real Property**").

11. On information and belief, the Debtor stopped paying the mortgages in favor of Republic Bank starting in November 2019.

12. On December 10, 2020, the Receiver filed a Forcible Entry and Detainer Complaint in the Republic Bank foreclosure suit. On or about October 8, 2021, the Circuit Court entered an order indicating that the Debtor would be evicted from the Real Property it occupied but that such eviction would be stayed until October 31, 2021.

13. The Debtor alleges the Receiver caused the Cook County Sheriff to take possession of a portion of the Debtor's premises on December 1, 2021, thus interfering with the Debtor's ability to operate its business.

14. As a result of having been evicted, the Debtor filed a petition for relief under chapter 11 of the Bankruptcy Code on the Petition Date.

15. The Debtor's bankruptcy petition designated the Debtor as a small business debtor eligible for relief under what is called "Subchapter V" of Chapter 11.

16. As of the Petition Date and after the Petition Date, the Debtor's assets consisted of the Real Property. The Debtor also owned and operated the Cite' restaurant on the 70th floor of Lake Point Tower.

17. One hundred percent (100%) of the Debtor's equity interests are owned by Evangeline Gouletas.

18. On the Petition Date, the United States Trustee appointed Robert Handler as the Subchapter V Trustee in the Case.

19. Shortly after the Case was filed, Republic Bank and the Debtor both asserted their rights to be in possession of the Real Property. Republic Bank did so by filing a motion to allow the Receiver to remain in possession of the Real Property pursuant to §543 and a motion to modify the automatic stay. The Debtor did so by filing an adversary proceeding to require the Receiver to turn over the Real Property.

20. On December 21, 2021, the Court held an evidentiary hearing on the competing motions filed by the Debtor and Republic Bank. The Court subsequently denied Republic Bank's request to keep the receiver in possession of the Real Property. The Court also entered an order authorizing the Debtor to use cash collateral to operate.

21. On March 3, 2022, the United States Trustee moved to dismiss or Convert the Debtor's Case under 11 U.S.C. § 1112(b) ("Motion to Dismiss"). On March 16, 2022, the United States Trustee moved to remove the Debtor in Possession ("**Motion to Remove**").

22. On March 25, 2022, the Court granted the Motion to Remove. [Dkt. No. 137] Among other things, that order removed Cite LLC as debtor-in-possession under 11 U.S.C. § 1185 and provided that under 11 U.S.C. § 1183(b)(5), the Debtor's duties under 11 U.S.C. §§ 704(a)(8) and 1106(a)(1), (2), and (6) will be performed by Robert Handler, the Subchapter V Trustee. The Motion to Dismiss was withdrawn on that date.

## COUNT I:
## AVOIDANCE OF LIEN

23. Plaintiff alleges in this Count of the Complaint all of the foregoing allegations as if specifically set forth below.

24. On February 7, 2022, Defendant filed in the Case Proof of Claim No. 6-1, stating that as of December 3, 2021, it was owed $ 219,828.70 (the "**Proof of Claim**" or "**POC**," a copy of which is attached as Exhibit 1).

25. The POC further alleges the Defendant is a party and subject to that certain: (i) restrictive-easement agreement titled the *Amended and Restated Declaration of Covenants, Conditions, Restrictions and Easements* dated July 7, 1992 and (ii) the amendment thereto titled the *First Special Amendment to Amended and Restated Declaration of Covenants, Conditions, Restrictions and Easements* dated December 21, 1995 and that these documents were recorded with the Cook County Recorder of Deeds (these documents are collectively, the "**REA**").

26. The Debtor is not a signatory to the REA.

27. The POC alleges that the REA grants the Defendant a lien on the Debtor's property to secure amounts owed under the REA, including amounts owed for common area and maintenance charges ("**CAM**").

28. The POC alleges that the Debtor owed CAM of $219,828.70 as of the Petition Date and that Defendant has a lien on the Debtor's Property to secure payment of this amount.

29. The POC alleges that the Defendant filed with the recorder's office a notice of lien on December 17, 2019, which recited the amount owing was $138,163.91, through November 11, 2019. The POC states that Defendant's secured claim is based upon language in the REA that provides that the unpaid CAM is secured by liens on the Real Property.

30. Under Illinois law, a document purporting to grant a lien or a mortgage on real estate that does not contain sufficient information to determine the amount of indebtedness that is secured is not valid as to a bona fide purchaser.

31. Under Illinois law, when a document purporting to grant a lien or a mortgage on real estate lacks certain essential terms, including the maturity date of the obligation or the interest rate applicable to the debt, the document may not have priority over rights held by a bona fide purchaser.

32. Under Illinois law, a document purporting to grant a lien or a mortgage that on real estate that is not signed by the owner of the real estate is not valid and does not have priority over rights held by a bona fide purchaser.

33. Pursuant to Section 544(a)(3) of the Bankruptcy Code, the Plaintiff has the status of a bona fide purchaser with respect to any encumbrances on the Real Property and may avoid any mortgage or encumbrance on the Real Property that is subordinate or subject to the rights of a bona fide purchaser.  11 U.S.C. § 544.

34. The alleged mortgage or lien asserted by Defendant upon the Debtor's Real Property is subject to the Plaintiff's strong arm powers under Section 544(a)(3) and such mortgage or lien is avoidable by Plaintiff.

35. Section 550 of the Bankruptcy Code provides, in pertinent part, that to the extent that a transfer is avoided under Section 544 of the Bankruptcy Code, the trustee may recover, for the benefit of the estate, the property transferred or the value of such property.

36. Section 551 of the Bankruptcy Code provides, in pertinent part, that a lien avoided under Section 544 is preserved for the benefit of the estate.

WHEREFORE, for all of the foregoing reasons, Plaintiff seeks a judgment on this Count in his favor and against the Defendant, that, among things:

(1) Avoids any mortgage or lien held by Defendant upon the Debtor's Real Property.

(2) Preserves the value of any lien held by Defendant for the benefit of the Bankruptcy Estate.

(3) Determines that any claim in favor of Defendant is an unsecured claim.

(4) Provides such other and further relief as is proper.

## COUNT II:
## CLAIM OBJECTION – UNENFORCEABILITY OF CLAIM

37. Plaintiff alleges in this Count of the Complaint all of the foregoing allegations as if specifically set forth below.

38. Section 502(b)(1) of the Bankruptcy Code provides that a proof of claim is allowed except to the extent it is unenforceable under applicable non-bankruptcy law.  11 U.S.C.A § 502(b)(1) (claim disallowed if "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured.").

39. Some or all of the POC is unenforceable under applicable non-bankruptcy law.

40. On information and belief, the POC seeks recovery of certain amounts of CAM that are not owed.  Among other things and on information and belief, in calculating the CAM, Defendant did not apply the proper allocations for determining the portion of expenses attributable to the Debtor's Real Property.  On information and belief, had Defendant applied the proper formula, the amount of the CAM would have been less.

41. To the extent Defendant applied an improper formula for calculating the amount of CAM set forth in the POC, the POC should be reduced by the amount that should not have been allocated to the Debtor.

42. To the extent Defendant applied the improper formula for calculating the amount of CAM for amounts the Debtor already paid, Defendant is obligated to return such overpayments to Plaintiff.

43. If the Debtor overpaid Defendant for CAM as a result of any misallocations or for any other reasons, Defendant should repay such amounts.

WHEREFORE, for all of the foregoing reasons, Plaintiff requests the entry of judgment in its favor and against Defendant, that, among things:

(1) Reduces the POC in an amount equal to the CAM that the Debtor did not owe.

(2) Orders Defendant to repay any CAM that the Debtor paid, but

that the Debtor did not owe.

(3) Provides such other and further relief as is just and proper.

Respectfully submitted,

Robert Handler, not in any capacity other
than as Subchapter V Trustee for CITE,
LLC.

By: /s/William J. Factor

Dated:  December 28, 2022                    One of His Attorneys

William J. Factor (6205675)
FACTORLAW
105 W. Madison Street, Suite 1500
Chicago, IL 60602
(312) 878-6146
wfactor@wfactorlaw.com

# Exhibit 1

**Fill in this information to identify the case:**

| | |
|---|---|
| Debtor 1 | Cite LLC |
| Debtor 2 (Spouse, if filing) | |
| United States Bankruptcy Court for the: | Northern District of Illinois |
| Case number | 21-13730 |

## Official Form 410

# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. **Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.** That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

Lake Point Tower Condominium Association
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

Attn: Jim Stecko
Name

505 N Lake Shore Drive
Number        Street

Chicago                    IL        60611
City                        State      ZIP Code

Contact phone   312.645.8808

Contact email   jim.stecko@fsresidential.com

Where should payments to the creditor be sent? (if different)

_____
Name

_____
Number        Street

_____
City          State      ZIP Code

Contact phone _____

Contact email _____

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

__ __ __ — __ __ __ __ — __ __ __ __ — __ __ __ __

**4. Does this claim amend one already filed?**

☑ No
☐ Yes. Claim number on court claims registry (if known) _____

Filed on _____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing? _____

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No
☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___

**7. How much is the claim?**

$_____219,828.70 . **Does this amount include interest or other charges?**

☐ No
☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Common Area Maintenance (Restrictive Easement Agreement)

**9. Is all or part of the claim secured?**

☐ No
☑ Yes. The claim is secured by a lien on property.

**Nature of property:**

☑ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.
☐ Motor vehicle
☐ Other. Describe: _____

**Basis for perfection:** Lien on Numerous Parcels, See attached Rider
Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $ 4,175,000.00
**Amount of the claim that is secured:** $ 219,828.70
**Amount of the claim that is unsecured:** $_____0.00 (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $ 219,828.70

**Annual Interest Rate** (when case was filed) 0.00 %
☐ Fixed
☐ Variable

**10. Is this claim based on a lease?**

☑ No
☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

**11. Is this claim subject to a right of setoff?**

☑ No
☐ Yes. Identify the property: _____

Official Form 410                                   Proof of Claim                                   page 2

12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check one:*

| | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |

\* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3:   Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  2 / 7 / 2022
MM / DD / YYYY

Signature

**Print the name of the person who is completing and signing this claim:**

| Name | Jim Stecko | | |
|---|---|---|---|
| | First name | Middle name | Last name |
| Title | General Manager - Finance / Operations | | |
| Company | | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 505 N Lake Shore Drive | | |
| | Number     Street | | |
| | Chicago | IL | 60611 |
| | City | State | ZIP Code |
| Contact phone | 312.645.8808 | Email jim.stecko@fsresidential.com | |

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CITE LLC, | ) | Case No. 21-13730 |
|  | ) |  |
|  | ) |  |
| Debtor. | ) | Honorable Janet S. Baer |
|  | ) |  |

### RIDER TO PROOF OF CLAIM

1.      Lake Point Tower Condominium Association (the "<u>Association</u>"), is a not-for-profit corporation incorporated under the laws of the State of Illinois.  The Association is a party and subject to that certain: (i) restrictive-easement agreement titled the *Amended and Restated Declaration of Covenants, Conditions, Restrictions and Easements* dated July 7, 1992, and recorded in the Cook County Recorder of Deeds as Document No. 92616148 (the "<u>Amended and Restated REA</u>," a copy of which is attached hereto as <u>Exhibit A</u>); and (ii) the amendment thereto titled the *First Special Amendment to Amended and Restated Declaration of Covenants, Conditions, Restrictions and Easements* dated December 21, 1995, and recorded in the Cook County Recorder of Deeds as Document No. 95898506 (the "<u>Amendment</u>," a copy of which is attached hereto as <u>Exhibit B</u>) (unless otherwise stated, the Amended and Restated REA and Amendment are collectively referred to as the "<u>REA</u>").[1]

2.      Cite LLC (the "<u>Debtor</u>"), is a limited-liability company organized under the laws of the State of Illinois and is a party to the REA.  By quit-claim deed dated April 27, 2015, and recorded in the Cook County Recorder of Deeds as Document No. 1512619082 on May 6, 2015,

---

[1]      Capitalized terms used but not defined herein shall have the meaning set forth in the REA.

the Debtor acquired the following properties within the commercial parcel of the Building: Suite 207, Suite 209, Suite 209-A, Suite 224, and Suite 7000 (collectively, the "Debtor Parcel").

3.　　　The REA is an agreement that runs with the land. REA at § 27.7, p. 57. Section 27.7 provides as follows:

> All the Easements, covenants, restrictions and conditions herein contained shall run with the land and shall inure to the benefit of and be binding upon Declarant and each subsequent holder of any interest in any portion of the Total Property and their grantees, mortgagees, heirs, successors, personal representatives and assigns with the same force and effect for all purposes as though set forth at length in each and every conveyance of the Total Property or any part thereof.

Id.

4.　　　As the owner of the Debtor Parcel, the Debtor holds an interest in the Total Property. Among other things, the Debtor is responsible for: (a) Operating Expenses (Amendment, § 27.18); (b) utility expenses (Id., § 27.18(b)); insurance expenses (Id., § 27.18(c)); and elevator expenses (Id., § 27.18(d)).

5.　　　Article 13, "Liens, Rights and Remedies," provides that where a Defaulting Owner fails to pay a Creditor Owner within 10 days amounts due and owing, the Creditor Owner shall have a "lien against the portion of the Total Property owned by the Defaulting Owner, to secure the repayment of such sum of money and all interest on such sum accruing pursuant to the provisions of this Article 13 or to secure performance of a covenant or obligation." Amended and Restated REA at § 13.1, p. 36. Section 13.1 further states that the

> liens provided for in this Section 13.1 shall be superior to and take precedence over any mortgage, trust deed or other encumbrance constituting a lien on a portion of the Total Property or other interest of the Defaulting Owner, other than a bona fide mortgage or trust deed which is a first mortgage or trust deed against such portion of the Total Property at the time of the recording of the notice of lien.

Id.

2

6.    The Association maintains a lien against the Debtor Parcel pursuant to section 13.1 of the Amended and Restated REA and has a right to foreclose such lien.  The Association recorded a lien against the Debtor Parcel dated December 17, 2019, and recorded in the Cook County Recorder of Deeds as Document No. 1935110055, a copy of which is attached hereto as <u>Exhibit C</u>.

7.    As of December 3, 2021, the delinquency of expenses owed by the Debtor to the Association totaled $219,828.70, excluding late fees, interest, and attorneys' fees.  <u>See</u> <u>Exhibit D</u>.

8.    The filing of this Proof of Claim is not: (i) a waiver or release of any rights of the Association against any person, entity, or property; (ii) consent by the Association to the jurisdiction of this Court, or to its exercise of the judicial power or to its entry of final orders and judgments, with respect to the subject matter of this claim, any objections or other proceedings commenced with respect thereto or any other proceedings commenced in this case or otherwise involving the Association; or (iii) a waiver of the right of the Association to move to withdraw the reference, or otherwise to challenge the jurisdiction of, or the exercise of the judicial power by, this Court with respect to the subject matter of this claim, any objections or other proceedings commenced with respect thereto or any other proceedings commenced in this case against, or otherwise involving, the Association.

# EXHIBIT A

AUG 19 1992

RECORDING FEE $247.00
DATE 8-19-92 COPIES
OR

EXHIBIT
1

926161.18

AMENDED AND RESTATED
DECLARATION OF COVENANTS, CONDITIONS,
RESTRICTIONS AND EASEMENTS

DATED AS OF JULY 7, 1992

BY

AMERICAN NATIONAL BANK AND TRUST
COMPANY OF CHICAGO
AS TRUSTEE UNDER TRUST AGREEMENT
DATED JANUARY 7, 1988
AND KNOWN AS TRUST NO. 1043-99-09

AND

LAKE POINT TOWER
CONDOMINIUM ASSOCIATION,
AN ILLINOIS NOT-FOR-PROFIT CORPORATION

This instrument was prepared by:
Herbert A. Kessel
Rudnick & Wolfe
203 North LaSalle Street, Suite 1800
Chicago, Illinois 60601
and after recording should be
returned to Cook County, Illinois
Recorder's Box No. 416.

Box 416

926161.18

HAK0430 08/07/92 1547

9 2 , 1 , 1 1 3

## INDEX TO AMENDED AND RESTATED DECLARATION
## OF COVENANTS, CONDITIONS, RESTRICTIONS AND EASEMENTS

**ARTICLE**                                                          **PAGE**

1  INCORPORATION OF RECITALS . . . . . . . . . . . . . . . . . . .   2

2  DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . .   2

3  EASEMENTS IN FAVOR OF RESIDENTIAL PROPERTY . . . . . . . . .   6

4  EASEMENTS IN FAVOR OF CONDOMINIUM PROPERTY . . . . . . . .   10

5  EASEMENTS IN FAVOR OF COMMERCIAL PROPERTY . . . . . . . . .   12

6  EASEMENTS IN FAVOR OF GARAGE PROPERTY . . . . . . . . . . .   15

7  SERVICES TO OWNER OF CONDOMINIUM PROPERTY,
   RESIDENTIAL PROPERTY, COMMERCIAL PROPERTY
   AND GARAGE PROPERTY . . . . . . . . . . . . . . . . . . . . .   18

8  STRUCTURAL SUPPORT . . . . . . . . . . . . . . . . . . . . . .   22

9  COMPLIANCE WITH LAWS; REMOVAL OF LIENS; ZONING . . . . . .   23

10 REAL ESTATE TAXES . . . . . . . . . . . . . . . . . . . . . . .   26

11 INSURANCE . . . . . . . . . . . . . . . . . . . . . . . . . . .   28

12 MAINTENANCE AND REPAIR; DAMAGE TO THE IMPROVEMENTS . .   32

13 LIENS, RIGHTS AND REMEDIES . . . . . . . . . . . . . . . . . .   36

14 ARBITRATION . . . . . . . . . . . . . . . . . . . . . . . . . .   39

15 UNAVOIDABLE DELAYS . . . . . . . . . . . . . . . . . . . . . .   39

16 CONDEMNATION . . . . . . . . . . . . . . . . . . . . . . . . .   40

17 ARCHITECT . . . . . . . . . . . . . . . . . . . . . . . . . . . .   42

18 DEPOSITARY . . . . . . . . . . . . . . . . . . . . . . . . . . .   43

19 DISBURSEMENTS OF FUNDS BY DEPOSITARY . . . . . . . . . . . .   46

20 ESTOPPEL CERTIFICATES . . . . . . . . . . . . . . . . . . . . .   47

21 CONDOMINIUM ASSOCIATION ACTING FOR UNIT OWNERS . . . . . .   49

HAK0430 08/07/92 1547                   i

FILED DATE: 2/11/2020 2:20 PM   2020CH01705

| **ARTICLE** | | **PAGE** |
|---|---|---|

| 22 | PARKING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 49 |
| 23 | ALTERATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 50 |
| 24 | NOTICES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 52 |
| 25 | CONDOMINIUM CONSOLIDATION . . . . . . . . . . . . . . . . . . . . | 53 |
| 26 | LIMITATION OF LIABILITY . . . . . . . . . . . . . . . . . . . . . . . . | 54 |
| 27 | GENERAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 54 |

Mortgagee's Consent

Exhibits

HAK0430 08/07/92 1547                    ii

9261614S

FILED DATE: 2/11/2020 2:20 PM   2020CH01705

9 2 2 1 5 1 4 8

## LIST OF EXHIBITS TO AMENDED AND RESTATED DECLARATION
## OF COVENANTS, CONDITIONS, RESTRICTIONS AND EASEMENTS

| Exhibit Letter | Description |
| --- | --- |
| A | Total Parcel |
| B | Depiction of relative locations of Condominium Property, Commercial Property, Garage Property and Residential Property |
| C | Legal Description of Parcel 1 |
| D | Legal Description of Parcel 2 |
| E | Legal Description of Parcel 3 |
| F | Legal Description of Parcel 4 |
| G | Billing - Payment |
| H | Proposed Budget |

HAK0430  08/07/92  1547                     iii

92616148

## LAKE POINT TOWER
## AMENDED AND RESTATED
## DECLARATION OF COVENANTS, CONDITIONS,
## RESTRICTIONS AND EASEMENTS

THIS DECLARATION is made and entered into as of the 7th day of July, 1992, by AMERICAN NATIONAL BANK AND TRUST COMPANY OF CHICAGO, a national banking association, not personally, but solely as Trustee under Trust Agreement dated January 7, 1988 and known as Trust Number 1043-99-09 ("Declarant") and Lake Point Tower Condominium Association, an Illinois not-for-profit corporation ("Association").

## R E C I T A L S:

A.    Declarant executed a certain Lake Point Tower Declaration of Covenants, Conditions, Restrictions and Easements concerning property legally described in Exhibit A attached hereto and by this reference made a part hereof, which document was recorded on July 14, 1988 in the office of the Recorder of Deeds of Cook County, Illinois as Document No. 88309160, and re-recorded as Document No. 88446237 ("Declaration"); all undefined terms used herein shall have the meanings set forth in the Declaration.

B.    Subsequent to the recording of the Declaration, all of the Residential Property, excluding Residential Property located on the 67th, 68th, 69th and 70th floors, has been added to the condominium regime pursuant to Article 25 of the Declaration.    The Declarant is presently the owner of record of the Garage Property, the Residential Property (except for those portions which have already been submitted to the Act, as hereinafter defined) and the Commercial Property.

C.    The site plan attached as Exhibit B hereto and made a part hereof illustrates the Total Parcel and the relative locations of the Commercial Property, Condominium Property, Garage Property and Residential Property, as originally defined.

D.    Subsequent to the conveyance of the Condominium Property to the Condominium Property Trustee, neither the Condominium Improvements nor the Non-Condominium Improvements were functionally independent of the other and each will depend upon the other, to some extent, for structural support, enclosure, ingress and egress, utility services or other facilities and components necessary to the efficient operation and intended use of the Condominium Improvements and the Non-Condominium Improvements.

E.    The Declarant desires by this Amended and Restated Declaration to provide for the efficient operation of each respective portion, estate and interest in the Total Property, to assure the harmonious relationship of the Owners of each such respective portion, estate or interest in the Total Property, and to protect the respective values of each such portion, estate and interest in the Total Property, by providing for, declaring and creating (i) certain easements, covenants and

HAK0430 08/07/92 1547

restrictions against and affecting the Condominium Property which will be binding upon each present and future Owner of the Condominium Property, or of any portion thereof or interest or estate therein, and which will inure to the benefit of each present and future Owner of the Non-Condominium Property, or of any portion thereof or interest or estate therein, to the extent provided herein, and (ii) certain easements, covenants and restrictions against and affecting the Non-Condominium Property, which will be binding upon each present and future Owner of the Non-Condominium Property, or of any portion thereof or interest or estate therein, and which will inure to the benefit of each present and future Owner of the Condominium Property, or of any portion thereof or interest or estate or Unit therein, to the extent provided herein.

NOW, THEREFORE, the Declarant and Association hereby agree that the Total Property and any part thereof is and shall be owned, held, mortgaged, leased or otherwise encumbered, transferred, assigned, sold, conveyed and accepted subject to this Declaration, and agree that each of the following easements, covenants, conditions, restrictions, burdens, uses, privileges and charges created hereunder shall exist at all times hereafter amongst, and be binding upon and inure, to the extent provided herein, to the benefit of, all parties having or acquiring any right, title or interest in or to any portion of, or interest or estate in, the Total Property and each of the foregoing shall run with the land subject to this Declaration.

## ARTICLE 1

## INCORPORATION OF RECITALS

The foregoing Recitals are hereby incorporated by reference in the body of this Declaration as if fully set forth herein.

## ARTICLE 2

## DEFINITIONS

2.1   "Act" means the Condominium Property Act of the State of Illinois in effect on the date hereof, as amended from time to time.

2.2   "Architect" shall have the meaning set forth in Article 17 hereof.

2.3   "Commercial Improvements" means all improvements constructed within and upon Parcel 1, as legally described on Exhibit C attached hereto and by this reference made a part hereof. In the event of any reconstruction of the Commercial Improvements pursuant to Article 12 or Article 16, the Commercial Improvements shall include any such improvements reconstructed on Parcel 1. The Commercial Improvements shall include that portion of the outdoor swimming pool located on the third and roof levels of the Garage and the pool equipment located on the third level of the Garage, together with the lavatory facilities located on the third level of the Garage.

2.4   "Commercial Property" means Parcel 1 and the Commercial Improvements.

HAK0430 08/07/92 1347                    2

FILED DATE: 2/11/2020 2:20 PM   2020CH01705

2.5   "Common Elements" means all portions of the Total Property submitted from time to time to the Act pursuant to the Condominium Declaration except the Units.

2.6   "Condominium Association" means an Illinois not-for-profit corporation to be formed for the purpose of administering the Condominium Property and any portion of the Residential Property (if added on pursuant to Condominium Consolidation so as to submit any portion of the Residential Property to the same condominium regime as the Condominium Property) pursuant to Act.

2.7   "Condominium Consolidation" means the adding-on of all or any portion of the Residential Property to the terms of the Condominium Declaration submitting the Condominium Property to the provisions of the Act so as to submit the Residential Property to the same condominium regime as the Condominium Property.

2.8   "Condominium Declaration" means any declaration of condominium ownership and of easements, restrictions, covenants and by-laws which submits any portion of the Total Property to the provisions of the Act.

2.9   "Condominium Improvements" means all improvements constructed within and upon Parcel 2, as legally described on Exhibit D attached hereto and by this reference made a party hereto.  In the event of any reconstruction of the Condominium Improvements pursuant to Article 12 or Article 16, the Condominium Improvements shall include any such Improvements reconstructed on Parcel 2.

2.10   "Condominium Property" means Parcel 2 and the Condominium Improvements, together with such additional portions of the Residential Property as may, from time to time, be submitted to the Act.

2.11   "Creditor Owner", except where otherwise defined hereunder in a specific context, means an Owner to which a payment of money or other duty or obligation is owed under this Declaration by another Owner which has failed to make such payment or to perform such duty or obligation as and when required hereunder.  The Management Company, as hereinafter defined, shall also be deemed a "Creditor Owner" in the event payment of Operating Expenses, as hereinafter defined, are not made in accordance with the terms of this Declaration.

2.12   "Declarant" means American National Bank and Trust Company of Chicago, as Trustee under Trust Agreement dated January 7, 1988 and known as Trust Number 1043-99-09, its successors and assigns.

2.13   "Declaration" means this Lake Point Tower Amended and Restated Declaration of Covenants, Conditions, Restrictions and Easements, including all exhibits, amendments and supplements thereto.

2.14   "Default Rate" means the interest rate applicable to any sums owed by a Defaulting Owner to a Creditor Owner pursuant to this Declaration as further described in Section 13.6 hereof.

HAK0430 08/07/92 1547·                    3

2.15  "Defaulting Owner", except where otherwise defined hereunder in a specific context, means an Owner which has failed to make a payment of money owed under this Declaration to another Owner or to perform any of its duties or obligations as and when required hereunder.

2.16  "Depositary" means the person or entity from time to time acting pursuant to Article 18 of this Declaration.

2.17  "Easements" means all easements granted, reserved, provided for, declared or created pursuant to or in accordance with the terms and provisions of this Declaration.

2.18  "Emergency Situation" means a situation impairing or imminently likely to impair structural support of the Improvements or causing or imminently likely to cause bodily injury to persons or substantial physical damage to the Total Property or any property in, on, under, within, upon or about the Total Property. The duration of an Emergency Situation shall be deemed to include the time reasonably necessary to remedy the Emergency Situation.

2.19  "Facilities" means all components, and any replacements or substitutions therefor, of the mechanical, elevator systems, plumbing, electrical, heating, air conditioning, alarm, television, telephone and other utility systems forming a part of the Improvements and designed or utilized to furnish utility or any other services to any portion of the Improvements, including, without limitation: annunciators, antennae, boxes, brackets, cabinets, cables, coils, computers, conduits, controls, control centers, cooling towers, couplers, devices, ducts, elevator cars, equipment, fans, fixtures, generators, hangers, heat tracers, indicators, junctions, lines, machines, meters, motors, outlets, panels, pipes, pumps, radiators, risers, shafts, starters, switches, switchboards, systems, tanks, transformers, valves, wiring and the like.

2.20  "Garage" means the four (4) level parking structure constructed upon and within Parcel 3.

2.21  "Garage Improvements" means all improvements constructed within and upon Parcel 3, as legally described on Exhibit E attached hereto and by this reference made a part hereof. In the event of any reconstruction of the Garage Improvements pursuant to Article 12 or Article 16, the Garage Improvements shall include any improvements reconstructed on Parcel 3.  The Garage Improvements shall not include that portion of the outdoor swimming pool located on the third and roof levels of the Garage and the pool equipment located on the third level of the Garage, together with the lavatory facilities located on the third level of the Garage.

2.22  "Garage Property" means Parcel 3 and the Garage Improvements.

2.23  "Improvements" means the Condominium Improvements, Residential Improvements, Garage Improvements and Commercial Improvements.

FILED DATE: 2/11/2020 2:20 PM   2020CH01705

92516148

FILED DATE: 2/11/2020 2:20 PM   2020CH01705

2.24   "Maintenance" means and includes operation, maintenance, repair, reconditioning, refurbishing, reconfiguration, inspection, testing, cleaning, painting, installation and replacement when necessary or desirable of Facilities or of such other portions of the Improvements and includes the right of access to and the right to remove from the Improvements portions of such Facilities for any of the above purposes, subject, however, to any limitations set forth elsewhere in this Declaration.

2.25   "Non-Condominium Property" means any portion of the Total Property, from time to time, not submitted to the Act.

2.25(a)"Non-Condominium Improvements" means the Residential Improvements, Garage Improvements and Commercial Improvements.

2.26   "Owner" means either the Owner of the Residential Property, the Owner of the Condominium Property, the Owner of the Commercial Property or the Owner of the Garage Property, as the context requires.   "Owners" means the Owner of the Residential Property, the Owner of the Condominium Property, the Owner of the Garage Property and the Owner of the Commercial Property, as the context may require.

2.27   "Owner of the Commercial Property" means the person or entity (or persons or entities if more than one) at any time in question, holding fee simple title to the Commercial Property.   If at any time the Commercial Property is submitted to the provisions of the Act, the Owner of the Commercial Property shall mean all of the fee simple Unit Owners therein collectively and not individually.

2.28   "Owner of the Condominium Property" means the person or entity (or persons or entities if more than one) at any time in question, holding fee simple title to the Condominium Property.   If and so long as the Condominium Property has been submitted to and remains subject to the provisions of the Act, the Owner of the Condominium Property shall mean collectively all of its Unit Owners in and to the Condominium Property and not individually.

2.29   "Owner of the Garage Property" means the person or entity (or persons or entities if more than one) at any time in question, holding fee simple title to the Garage Property.   If at any time the Garage Property is submitted to the provisions of the Act, the Owner of the Garage Property shall mean all of the fee Unit Owners therein collectively and not individually.

2.29(a)"Owner of the Non-Condominium Property" means the Owner of the Residential Property, Owner of the Garage Property and Owner of the Commercial Property, individually or collectively, as the context may require.

2.30   "Owner of the Residential Property" means the person or entity (or persons or entities if more than one) at any time in question holding fee simple title to the Residential Property.   If and so long as the Residential Property, or any portion thereof, has been submitted to and remains subject to the provisions of the Act, the Owner of the Residential Property shall mean collectively all of the Unit Owners in and to the Residential Property and not individually.

HAK0430 08/07/92 1347                    5

2.31  "Recorder" means the Recorder of Deeds of Cook County, Illinois.

2.32  "Residential Improvements" means all improvements constructed upon and within Parcel 4, as legally described on Exhibit F attached hereto and made a party hereof, excluding those improvements located upon or within Parcel 4 which have been submitted to the Act pursuant to Article 25 hereof.  The Residential Improvements shall also mean any improvements on Parcel 4 which may be reconstructed on Parcel 4 pursuant to Article 12 or Article 16 of this Declaration excluding those improvements located upon or within Parcel 4 which have been submitted to the Act pursuant to Article 25 hereof.

2.33  "Residential  Property"  means  Parcel  4  and  the  Residential Improvements.

2.34  "Secured Property Lenders" mean the holder of any mortgage or trust deed in the nature of a mortgage (as the same may be amended and/or replaced from time to time) on any portion of the Total Property, excluding, however,- any mortgage or trust deed in the nature of a mortgage securing a loan to any Unit Owner.

2.35  "Total Parcel" means the parcel of real estate legally described on Exhibit A attached hereto.

2.36  "Total Property" means the Residential Property, the Condominium Property, the Commercial Property and the Garage Property.

2.37  "Unavoidable Delay" means those events described in Article 13 hereof which excuse the timely performance of any obligation created hereunder.

2.38  "Unit" means any portion of the Total Property submitted to the Act described as a "Unit" in the applicable Condominium Declaration.

2.39  "Unit Owner" means the person or persons whose estates or interests, individually or collectively, aggregate fee simple ownership of a Unit Ownership.

2.40  "Unit Ownership" means a part of any portion of the Total Property submitted to the Act consisting of one Unit and the undivided interest in the Common Elements attributable thereto.

## ARTICLE 3

## EASEMENTS IN FAVOR OF RESIDENTIAL PROPERTY

3.1   The following perpetual easements in, to, under, over, upon, through and about portions of the Commercial Property, Condominium Property and Garage Property,  as the case may be, in favor of the Residential Property are hereby granted, reserved, declared and created (the term "Granted" or "granted" as hereinafter used in describing easements shall be deemed to mean "granted, reserved, declared and created").

HAK0430 08/07/92 1547                    6

(a)     An Easement in and to all structural members, footings, caissons, foundations, columns and beams and any other supporting components located in or constituting a part of the Commercial Property, Condominium Property and Garage Property, for the support of (i) the Residential Improvements and (ii) any Facilities located in the Commercial Property, Condominium Property and Garage Property with respect to which the Owner of the Residential Property is granted an Easement under this Declaration.

(b)     An Easement for the use of their intended purposes of all Facilities located in the Commercial Property, Condominium Property and Garage Property and connected to Facilities located in the Residential Property (and any replacements thereof) which provide or shall be necessary or desirable to provide the Residential Property with any utilities or other services or which may otherwise be necessary or desirable to the operation and use and enjoyment of the Residential Property.

(c)     An Easement permitting encroachments in the event and to the extent that, by reason of the original construction or any reconstruction or replacement authorized by the terms of this Declaration of any part of the Improvements or the subsequent settlement or shifting of any part of the Improvements, any part of the Residential Improvements encroaches or shall hereafter encroach upon any part of the Commercial Property, Condominium Property or Garage Property. Such Easement permitting encroachments shall exist only as long as the encroaching portion of the Improvements continues to exist; provided, however, that in no event shall an Easement for any encroachment be created in favor of the Residential Property if such encroachment unreasonably interferes with the reasonable use and enjoyment of or materially lessens the available light and air of the Commercial Property, Condominium Property or Garage Property by any Owner of the Commercial Property, Owner of the Condominium Property or Owner of the Garage Property.

(d)     A non-exclusive Easement for pedestrian and vehicular ingress and egress in an Emergency Situation to and from, over, on, across and through the Commercial Property, Condominium Property and Garage Property.

(e)     A non-exclusive Easement for ingress and egress (and, where reasonably necessary, use) for persons, material and equipment over, on, across and through the Commercial Property, Condominium Property and Garage Property to the extent reasonably necessary to permit the construction, maintenance, repair, replacement, restoration or reconstruction of the Residential Property as required or permitted pursuant to this Declaration, or to the extent reasonably necessary to exercise the Easements set forth in this Section 3.1 or to provide structural support required by Article 8 hereof or to assist in providing the services required under Article 7 hereof.

HAK0430 08/07/92 1547                    7

(f)    A non-exclusive Easement for the use of the elevator shafts and rails attached thereto located in the Condominium Property and Commercial Property, which elevator shafts and rails house and guide those elevators which are owned by the Owner of the Residential Property and connect the Residential Improvements with the first floor of the Building and for pedestrian ingress and egress over, upon and through the lobby of the first floor of the Building, and any hallways located within the Commercial Property, and any walkways or driveways located in or adjacent to the Building, to the extent reasonably necessary for access to and from the public roadways.

(g)    A non-exclusive Easement for ingress, egress and access to, and the use of, any loading docks, service areas and delivery entrances located in, on or about the Condominium Property or Commercial Property.

(h)    A non-exclusive Easement for the use of such parking spaces in the Garage pursuant to the provisions of Article 22 hereof, and for pedestrian and vehicular ingress and egress from and to public roadways and the Garage over, on, across and through the Garage Property, Condominium Property or Commercial Property as may be necessary in connection therewith.

(i)    A non-exclusive Easement for use for bicycle storage purposes of the bicycle storage room located on the ground level of the Garage or such other portions of the Garage as may be provided for bicycle storage.

(j)    A non-exclusive Easement for the use of the rubbish storage, rubbish room and rubbish chutes located in the first floor of the Building and any rubbish chutes located in any portion of the Condominium Property or Commercial Property.

(k)    A non-exclusive Easement for pedestrian ingress and egress over, across and upon the Commercial Property and Condominium Property to the extent reasonably necessary to visit the commercial facilities located within and upon the Commercial Property.

(l)    A non-exclusive Easement for the use of the applicable mailboxes located on the first floor of the Building or such other areas of the Total Property to which they may be relocated.

(m)    A non-exclusive Easement for the use of the house telephone service located on the first floor of the Building.

(n)    A non-exclusive Easement for the use of park facilities located on the third floor of the Building, over and above the Garage and the Commercial Property.

(o)    A non-exclusive Easement for pedestrian ingress and egress over any hallways located on the 68th floor adjacent to the elevator which connects the 68th floor to the 70th floor of the Building to the extent necessary for such use.

HAK0430 08/07/92 1547                    8

FILED DATE: 2/11/2020 2:20 PM   2020CH01705

92616148

(p)    A non-exclusive Easement for the use of certain storage lockers located on the third level of the Garage.

3.2    Each Easement created under this Article 3 which provides or requires, for its enjoyment, ingress and egress on, over, across or through the Commercial Property, Condominium Property or the Garage Property shall be subject (except in an Emergency Situation) to such reasonable limitations as the applicable Owner of the Commercial Property, Owner of the Condominium Property or Owner of the Garage Property affected by such Easement may, from time to time after consultation with the Owner of the Residential Property, impose with respect to the establishment of limited paths of ingress and egress and limited hours of the day or days of the week during which such Easements may be used to prevent any unreasonable interference with the use and operation of the applicable portion of the Commercial Property, Condominium Property or Garage Property and in order to assure the reasonable security of the applicable portion of the Commercial Property, Condominium Property or Garage Property; provided, however, that any such limitations shall not preclude or unreasonably restrict enjoyment or exercise of any Easement and provided further that Section 3.1(d) shall not be subject to any such limitation.

3.3    Easements provided for, declared or created under this Article 3 shall be binding upon the Commercial Property, Condominium Property and Garage Property and each Owner of the Commercial Property, Owner of the Condominium Property and Owner of the Garage Property and shall run in favor of and inure to the benefit of and be appurtenant to the Residential Property and each portion thereof.

3.4    In the event of the occurrence of Condominium Consolidation, then all Easements granted under Section 3.1 hereof shall inure to the benefit of the Condominium Property.

3.5    The grantee of any Easement hereunder affecting the Total Property or any portion thereof shall perform any construction, installation, maintenance, operation, replacement and/or removal of such Easement in a manner as to cause as little disturbance in the use and enjoyment of the affected portion of the Total Property and surrounding areas as may be practical under the circumstances. Notwithstanding anything to the contrary herein, the grantee of any Easement affecting the Total Property or any portion thereof shall restore or replace, at its sole cost and expense, the adversely affected portion of the Total Property to substantially the same condition as immediately prior to such construction, maintenance, operation, replacement and/or removal. In the event any grantee of an Easement does not perform the foregoing restoration or replacement within sixty (60) days after written notice from any Owner, such Owner can perform, or cause to be performed, the necessary restoration or replacement and shall obtain a lien against that portion of the Total Property owned by the nonperforming grantee or its agents.

## ARTICLE 4

### EASEMENTS IN FAVOR OF CONDOMINIUM PROPERTY

4.1   The following perpetual (except as otherwise provided) Easements in, to, under, over, upon, through and about portions of the Residential Property, Garage Property and Commercial Property, as the case may be, in favor of the Condominium Property are hereby Granted:

(a)   An Easement in and to all structural members, columns and beams, footings, caissons and foundations, and any other supporting components located in or constituting a part of the Residential Property, Commercial Property and Garage Property for the support of (i) the Condominium Improvements and (ii) any Facilities located in the Residential Property, Commercial Property and Garage Property with respect to which the Owner of the Condominium Property is granted an Easement under this Declaration.

(b)   An Easement for the use for their intended purposes of all Facilities located in the Residential Property, Commercial Property and Garage Property and connected to Facilities located in the Condominium Property (and any replacement thereof) which provide or shall be necessary or desirable to provide the Condominium Property with any utilities or other services or which may otherwise be necessary or desirable to the operation and use and enjoyment of the Condominium Property.

(c)   An Easement permitting encroachments to the extent that, by reason of the original construction or any reconstruction or replacement authorized by the terms of this Declaration or the Improvements or the subsequent settlement or shifting of any part of the Improvements, any part of the Condominium Improvements encroaches or shall hereafter encroach upon any part of the Residential Property, Commercial Property and/or Garage Property. Such Easement permitting encroachments shall exist only as long as the encroaching portion of the Improvements continues to exist; provided, however, that in no event shall an Easement for any encroachment be created in favor of the Condominium Property if such encroachment unreasonably interferes with the reasonable use and enjoyment of or materially lessens the available light and air of the Residential Property, Commercial Property or Garage Property by the respective Owners thereof.

(d)   A non-exclusive Easement for ingress and egress (and, where reasonably necessary, use) by persons, material and equipment over, on, across and through the Residential Property, Commercial Property and the Garage Property to the extent reasonably necessary to permit the construction, maintenance, repair, replacement, restoration or reconstruction of the Condominium Property as required or permitted pursuant to this Declaration, or to the extent reasonably necessary to exercise the Easements set forth in this Section 4.1 or to provide structural support required by Article 8 hereof or to assist in providing the services required under Article 7 hereof.

HAK0430 08/07/92 1547                    10

FILED DATE: 2/11/2020 2:20 PM   2020CH01705

92616148

(e)   A non-exclusive Easement for use for bicycle storage purposes of the bicycle storage room located on the ground level of the Garage or such other portions of the Garage as may be provided for bicycle storage.

(f)   A non-exclusive Easement for pedestrian ingress and egress over, across and upon the Commercial Property to the extent reasonably necessary to visit the commercial facilities located within and upon the Commercial Property.

(g)   A non-exclusive Easement for the use of the elevators and elevator shafts located within the Residential Property and Commercial Property which connect the Condominium Improvements with the first floor of the Building and for pedestrian ingress and egress over, upon and through the lobby of the first floor of the Building, and any hallways and stairways located within the Building, and any walkways or driveways located in or adjacent to the Building, to the extent reasonably necessary for the access to and from the public roadways.

(h)   A non-exclusive Easement for ingress, egress and access to, and the use of, any loading docks, service areas and delivery entrances located in, on or about the first floor of the Building.

(i)   A non-exclusive Easement for the use of such parking spaces in the Garage pursuant to the provisions of Article 22 hereof, and for pedestrian and vehicular ingress and egress from and to public roadways and the Garage over, on, across and through the Garage Property, Residential Property and Commercial Property as may be necessary in connection therewith.

(j)   A non-exclusive Easement for pedestrian and vehicular ingress and egress in an Emergency Situation to and from, over, on, across and through the Residential Property, Commercial Property and Garage Property.

(k)   A non-exclusive Easement for the use of certain storage lockers located on the third level of the Garage or of such other portions of the Garage as may be provided for storage lockers.

(l)   A non-exclusive Easement for the use of the rubbish storage, rubbish room and rubbish chute located on the first floor of the Building and in any portion of the Residential Property or Commercial Property.

(m)   A non-exclusive Easement for the use of the applicable mailboxes located on the first floor of the Building or of such other areas of the Property to which they may be relocated.

(n)   A non-exclusive Easement for the use of park facilities located on the third floor of the Building, over and above the Garage and the Commercial Property.

HAK0430 08/07/92 1547                    11

FILED DATE: 2/11/2020 2:20 PM   2020CH01705

92516148

4.2   Each Easement created under this Article 4 which provides or requires, for its enjoyment, ingress and egress on, over, across or through the Residential Property, Commercial Property and Garage Property, shall be subject (except in an Emergency Situation) to such reasonable limitations as the applicable Owner of the Residential Property, Owner of the Commercial Property and Owner of the Garage Property affected by such Easement may, from time to time after consultation with the Owner of the Condominium Property, impose with respect to the establishment of paths of ingress and egress and hours of the day or days of the week during which such Easements may be used to prevent any reasonable interference with the use and operation of the Residential Property, Commercial Property or Garage Property and in order to assure the reasonable security of the Residential Property, Commercial Property or Garage Property; provided, however, that any such limitations shall not preclude or unreasonably restrict enjoyment or exercise of any such Easement and provided further that the Easements granted in Section 4.1(j) shall not be subject to any such limitations.

4.3   Easements provided for, declared or created under this Article 4 shall be binding upon the Residential Property, Commercial Property and Garage Property and the Owner of the Residential Property, Owner of the Commercial Property and Owner of the Garage Property and shall run in favor of and inure to the benefit of and be appurtenant to the Condominium Property and shall be part of the Common Elements attributable to the Condominium Property if and so long as the Condominium Property is subject to the Act.

4.4   The grantee of any Easement hereunder affecting the Total Property or any portion thereof shall perform any construction, installation, maintenance, operation, replacement and/or removal of such Easement in a manner as to cause as little disturbance in the use and enjoyment of the affected portion of the Total Property and surrounding areas as may be practical under the circumstances. Notwithstanding anything to the contrary herein, the grantee of any Easement affecting the Total Property or any portion thereof shall restore or replace, at its sole cost and expense, the adversely affected portion of the Total Property to substantially the same condition as immediately prior to such construction, maintenance, operation, replacement and/or removal. In the event any grantee of an Easement does not perform the foregoing restoration or replacement within sixty (60) days after written notice from any Owner, such Owner can perform, or cause to be performed, the necessary restoration or replacement and shall obtain a lien against that portion of the Total Property owned by the nonperforming grantee or its agents.

## ARTICLE 5

## EASEMENTS IN FAVOR OF COMMERCIAL PROPERTY

5.1   The following perpetual Easements in, to, under, over, upon, through and about portions of the Residential Property, Condominium Property and Garage Property in favor of the Commercial Property are hereby granted:

HAK0430 08/07/92 1547                    12

FILED DATE: 2/11/2020 2:20 PM   2020CH01705

(a)   An Easement in and to all structural members, footings, caissons, foundations, columns and beams and any other supporting components located in or constituting a part of the Residential Property, Condominium Property and Garage Property for the support of (i) the Commercial Improvements and (ii) any Facilities located in the Residential Property, Condominium Property and Garage Property with respect to which the Owner of the Commercial Property is granted an Easement under this Declaration.

(b)   An Easement for the use for their intended purposes of all Facilities located in the Residential Property, Condominium Property and Garage Property and connected to Facilities located in the Commercial Property (and any replacements thereof) which provide or shall be necessary or desirable to provide the Commercial Property with any utilities or other services or which may otherwise be necessary or desirable to the operation and use and enjoyment of the Commercial Property.

(c)   An Easement permitting encroachments in the event and to the extent that, by reason of the original construction or any reconstruction or replacement authorized by the terms of this Declaration of the Improvements or the subsequent settlement or shifting of any part of the Improvements, any part of the Commercial Improvements encroaches or shall hereafter encroach upon any part of the Residential Property, Condominium Property and/or Garage Property. Such Easement permitting encroachments shall exist only as long as the encroaching portion of the Improvements continues to exist; provided, however, that in no event shall an Easement for any encroachment be created in favor of the Commercial Property if such encroachment unreasonably interferes with the reasonable use and enjoyment of or materially lessens the available light and air of the Residential Property, Condominium Property or Garage Property by the respective Owners thereof.

(d)   A non-exclusive Easement for pedestrian and vehicular ingress and egress in an Emergency Situation to and from, over, on, across and through the Residential Property, Condominium Property and Garage Property.

(e)   A non-exclusive Easement for ingress and egress (and, where reasonably necessary, use) for persons, material and equipment over, on, across and through the Residential Property, Condominium Property and Garage Property to the extent reasonably necessary to permit the construction, maintenance, repair, replacement, restoration or reconstruction of the Commercial Property as required or permitted pursuant to this Declaration, or to the extent reasonably necessary to exercise the Easement set forth in this Section 5.1 or to provide structural support required by Article 7 hereof or to assist in providing the services required under Article 7 hereof.

(f)   A non-exclusive Easement for the use of the rubbish storage, rubbish room and rubbish chutes located on the first floor of the Building.

HAK0430 08/07/92 1547          13

9216148

(g)   A non-exclusive Easement for the use of the elevators and elevator shafts located within the Residential Property which connect the Residential Improvements to the first floor of the Building and for pedestrian ingress and egress over, upon and through the lobby of the Building, and any hallways, stairways, walkways or driveways located within or adjacent to the Building, to the extent reasonably necessary for access to and from the public roadways.

(h)   A non-exclusive Easement for ingress, egress and access to, and the use of, any loading docks, service areas and delivery entrances located in, on, or about the first floor of the Building.

(i)   A non-exclusive Easement for the use of such parking spaces in the Garage pursuant to the provisions of Article 22 hereof, and for pedestrian and vehicular ingress and egress from and to the public roadways over, across, on and through the Garage Property or Residential Property as may be necessary in connection therewith.

(j)   A non-exclusive Easement for pedestrian and vehicular ingress and egress from and to public roadways over, on, across and through the driveways, sidewalks, ramps, curbs and roadways contained in the Residential Property, Condominium Property and Garage Property as may be necessary for the use of the Commercial Improvements.

(k)   A non-exclusive Easement for ingress and egress over, in, across and through such portions of the third floor of the Building necessary for the use of the swimming pool located on the roof of the Garage and comprising a portion of the Commercial Property.

(l)   A non-exclusive Easement for the use of house telephone service located on the first floor of the Building.

(m)   A non-exclusive Easement for the use of the park facilities located on the third floor of the Building, over and above the Garage and the Commercial Property.

5.2   Each Easement created under this Article 5 which provides or requires, for its enjoyment, ingress and egress on, over, across or through the Residential Property, Condominium Property and Garage Property shall be subject (except in an Emergency Situation) to such reasonable limitations as the applicable Owner of the Residential Property, Owner of the Condominium Property and Owner of the Garage Property affected by such Easement may, from time to time after consultation with the Owner of the Commercial Property, impose with respect to the establishment of limited paths of ingress and egress and limited hours of the day or days of the week during which such Easements may be used to prevent any unreasonable interference with the use and operation of the Residential Property, Condominium Property or Garage Property and in order to assure the reasonable security of the Residential Property, Condominium Property or Garage Property; provided, however, that any such limitations shall not preclude or unreasonably restrict enjoyment or

HAK0430 08/07/92 1547                    14

exercise of any such Easement and provided further that Section 5.1(d) shall not be subject to any such limitation.

5.3    Easements provided for, declared or created under this Article 5 shall be binding upon the Residential Property, Condominium Property and Garage Property and the Owner of the Residential Property, Owner of the Condominium Property and Owner of the Garage Property and shall run in favor of and inure to the benefit of and be appurtenant to the Commercial Property.

5.4    The Owner of the Commercial Property is hereby reserved an Easement for the purpose of installing and maintaining an elevator within that portion of the Commercial Property located on the first and second floor of the Building, together with that portion of the Residential Property located in the basement of the Building.

5.5    The grantee of any Easement hereunder affecting the Total Property or any portion thereof shall perform any construction, installation, maintenance, operation, replacement and/or removal of such Easement in a manner as to cause as little disturbance in the use and enjoyment of the affected portion of the Total Property and surrounding areas as may be practical under the circumstances. Notwithstanding anything to the contrary herein, the grantee of any Easement affecting the Total Property or any portion thereof shall restore or replace, at its sole cost and expense, the adversely affected portion of the Total Property to substantially the same condition as immediately prior to such construction, maintenance, operation, replacement and/or removal.  In the event any grantee of an Easement does not perform the foregoing restoration or replacement within sixty (60) days after written notice from any Owner, such Owner can perform, or cause to be performed, the necessary restoration or replacement and shall obtain a lien against that portion of the Total Property owned by the nonperforming grantee or its agents.

## ARTICLE 6

## EASEMENTS IN FAVOR OF GARAGE PROPERTY

6.1    The following perpetual Easements in, to, under, over, upon, through and about portions of the Residential Property, Commercial Property and Condominium Property in favor of the Garage Property are hereby granted:

(a)    An Easement in and to all structural members, footings, caissons, foundations, columns and beams and any other supporting components located in or comprising a part of the Residential Property, Commercial Property and Condominium Property for the support of (i) the Garage Improvements and (ii) any Facilities located in the Residential Property, Commercial Property and Condominium Property with respect to which the Owner of the Garage Property is granted an Easement under this Declaration.

(b)    An Easement for the use for their intended purposes of all Facilities located in the Residential Property, Commercial Property and Condominium Property and connected to Facilities located in the Garage

HAK0430  08/07/92  1547                    15

Property (and any replacements thereof) which provide or shall be necessary or desirable to provide the Garage Property with any utilities or other services or which may otherwise be necessary or desirable to the operation and use and enjoyment of the Garage Property, including such water from the sanitary and storm sewer lines as may be located therein.

(c)   An Easement permitting encroachments in the event to the extent that, by reason of the original construction or any reconstruction or replacement authorized by the terms of this Declaration of the Improvements or the subsequent settlement or shifting of any part of the Improvements, any part of the Garage Improvements encroaches or shall hereafter encroach upon any part of the Residential Property, Commercial Property and Condominium Property.  Such Easement permitting encroachments shall exist only as long as the encroaching portion of the Improvements continues to exist; provided, however, that in no event shall an Easement for any encroachment be created in favor of the Garage Property if such encroachment unreasonably interferes with the reasonable use and enjoyment of or materially lessens the available light and air of the Residential Property, Commercial Property or Condominium Property by the respective Owners thereof.

(d)   A non-exclusive Easement for pedestrian and vehicular ingress and egress in an Emergency Situation to and from, over, on, across and through the Residential Property, Commercial Property and Condominium Property.

(e)   A non-exclusive Easement to be used only in common with the Owner of the Residential Property, Owner of the Condominium Property and Owner of the Commercial Property, for ingress and egress (and where reasonably necessary, use) for persons, materials and equipment over, on, across and through the Residential Property, Commercial Property and Condominium Property to the extent reasonably necessary to permit the construction, maintenance, repair, replacement, restoration or reconstruction of the Garage Property as required or permitted pursuant to this Declaration, or to the extent reasonably necessary to exercise the Easements set forth in this Section 6.2 or to provide structural support required by Article 8 hereof or to assist in providing the services required under Article 7 hereof.

(f)   A non-exclusive Easement for pedestrian and vehicular ingress and egress from and to public roadways over, on, across and through the driveways, sidewalks, ramps, curbs and roadways contained in the Residential Property, as may be necessary for the use and enjoyment of the Garage Improvements and of the Easement rights described in this Section 6.1.

(g)   There is situated within the Building adjacent to the boundary line between the Garage Property and the first and second floors of the commercial and residential portions of the Building a wall.  This wall acts as the West wall of the first and second floors of the commercial and residential portions of the Building and provides for the enclosure for the East face to all levels of the Garage.  An Easement is declared and created

HAK0430  08/07/92  1547          16

FILED DATE: 2/11/2020 2:20 PM   2020CH01705

for the use of the said wall to provide enclosure for the East face of the Garage.

6.2    Each Easement created under this Article 6 which provides or requires, for its enjoyment, ingress and egress on, over, across or through the Residential Property, Commercial Property or Condominium Property shall be subject (except in an Emergency Situation) to such reasonable limitations as the applicable Owner of the Residential Property, Owner of the Commercial Property  or Owner of the Condominium Property affected by such Easement may, from time to time after consultation with the Owner of the Garage Property, impose with respect to the establishment of limited paths of ingress and egress and limited hours of the day or days of the week during which such Easements may be used to prevent any unreasonable interference with the use and operation of the Residential Property, Commercial Property or Condominium Property and in order to assure the reasonable security of the Residential Property, Commercial Property or Condominium Property; provided, however, that any such limitations shall not preclude or unreasonably restrict enjoyment or exercise of any such Easement and provided further that Section 6.1(d) shall not be subject to any such limitation.

6.3    Easements provided for, declared or created under this Article 6 shall be binding upon the Residential Property, Commercial Property and Condominium Property and the Owner of the Residential Property, Owner of the Commercial Property and Owner of the Condominium Property and shall run in favor of and inure to the benefit of and be appurtenant to the Garage Property.

6.4    With regard to any portion of the Total Property over which Easements have been granted pursuant to Articles 3, 4, 5 and 6 hereof, the Owner of that portion of the Total Property burdened by such Easement shall have the right to relocate any such Easements in the event alternative means can be substituted to insure the continuation of the benefit granted.

6.5    With regard to any portion of the Total Property over which Easements have been granted pursuant to Articles 3, 4, 5 and 6 hereof for pedestrian ingress and egress in an Emergency Situation, such Easements shall not be deemed to include any portion of a dwelling unit.

6.6    The grantee of any Easement hereunder affecting the Total Property or any portion thereof shall perform any construction, installation, maintenance, operation, replacement and/or removal of any such Easement in such a manner as to cause as little disturbance in the use and enjoyment of the affected portion of the total Property and surrounding areas as may be practical under the circumstances. Notwithstanding anything to the contrary herein, the grantee of any Easement affecting the Total Property or any portion thereof shall restore or replace, at its sole cost and expense, the adversely affected portion of the Total Property to substantially the same condition as immediately prior to such construction, maintenance, operation, replacement, and/or removal.   In the event any grantee of an Easement does not perform the foregoing restoration or replacement within sixty (60) days after written notice from any Owner, such Owner can perform, or cause to be performed, the necessary restoration or

HAK0430 08/07/92 1547              17

replacement and shall obtain a lien against that portion of the Total Property owned by the nonperforming grantee or its agents.

## ARTICLE 7

### SERVICES TO OWNER OF CONDOMINIUM PROPERTY, RESIDENTIAL PROPERTY, COMMERCIAL PROPERTY AND GARAGE PROPERTY

7.1    In order to maximize the benefits to be achieved by a unitary administration of the Building, the Owner of the Condominium Property shall appoint a management company ("Management Company") selected by the Board of Directors of the Condominium Association (the "Board") elected at the first annual meeting and subsequent annual meetings of the Condominium Association to serve under and pursuant to the provisions of this Declaration. The Management Company shall be experienced in the management of a high-rise residential or multi-use structure. Such appointment shall be made on behalf of all of the Owners by their aforementioned Board and shall be binding on all of the Owners.  The Board and Management Company shall execute an agreement consistent with the Declaration. Notwithstanding anything contained herein to the contrary, no other parties to the Declaration shall have any authority in connection with the decision to appoint the Management Company; provided, however, that the Owner of the Commercial Property shall have the authority to employ the services of a separate management company solely in connection with the management of the Commercial Property.

7.2    The Management Company shall be responsible for the management of the improvements on a unified basis.  It is the intention of this Declaration that while certain services will be performed by and furnished to the Building by certain Owners or their agents, costs associated in connection with these services shall be borne by, except as otherwise provided, all of the Owners.

7.3    (a)    On or before sixty (60) days prior to the commencement of each fiscal year on the 30th of June during the term hereof, the Board, or a subcommittee thereof, shall cause a proposed budget ("Proposed Budget") to be furnished to the Board for its approval, which approval shall not be unreasonably withheld, enumerating the estimated operating expenses relating to services provided for under Article 7 ("Operating Expenses"), excluding (i) all premiums paid for property (multi-peril) or other insurance coverage and (ii) any and all amounts deemed to be reasonable reserves for capital expenditures or replacement of the Common Elements for the forthcoming fiscal year.  The Board agrees to approve or disapprove the Budget within forty-five (45) days from the day of receipt thereof.  The Proposed Budget and notice of any Board meeting concerning the adoption of the Proposed Budget shall indicate estimated Operating Expenses in connection with the provisions of all Article 7 services.  Copies of the Proposed Budget shall be distributed to all Owners and each Unit Owner not less than ten (10) nor more than thirty (30) days prior to any such meeting by the Board.

(b)    If the Board disapproves the Proposed Budget for a given fiscal year, until such time as a revised budget is approved, the Total Property

shall be operated on the basis of an interim budget (hereinafter referred to as the "Temporary Budget"). The total amount of budgeted expenditures of the Temporary Budget shall not exceed one hundred fifteen percent (115%) of the total budgeted expenditures set forth in the most recently approved budget, unless an actual expenditure for the prior fiscal year was greater than 115% of the budgeted expenditure, in which case the actual approved expenditure shall be used.

(c)  The Proposed Budget, after approval by the Board (the "Budget"), shall be subject to periodic revisions as may be approved by the Board.

(d)  Payment of the actual Operating Expenses shall be made in accordance with Exhibit G hereof. During the term of this Declaration, each Owner shall pay to the Management Company that portion of the actual Operating Expenses set forth in the Budget pursuant to the following formula:

| | |
|---|---|
| Condominium/Residential Property | 98.43% |
| Commercial Property | 1.57% |

The aforementioned 98.43% shall be shared (except as otherwise hereinafter provided) by the Owner of the Condominium Property and the Owner of the Residential Property on a pro rata basis, based upon the proportionate square footage of the Residential Property to the total square footage of the Building, excluding the square footage of the Garage Property until such time as the Residential Property shall be completely added to the condominium regime, if ever. All actual Operating Expenses are being allocated to the Commercial Property at 1.57% except for elevator expense, which is allocated at 5.28% since there will be more commercial usage of certain elevators. Notwithstanding the foregoing, no allocation shall be made to the Commercial Property for legal and audit expenses which are solely attributable to the operation of the Condominium Property. The 1.57% is based on the appraised value of the Commercial Property compared to the total value of the Building. In addition, in order to make a determination regarding the value of the Commercial Property and its applicable share of the actual Operating Expenses, since certain utility expenses such as electricity are not entirely subject to segregation, the share of the actual Operating Expenses to be borne by the Owner of the Commercial Property shall include, in addition to the above-described percentage, an amount equal to $49,557 per annum, as adjusted, beginning on July 15, 1988, and for each year thereafter, by the increase in the Consumer Price Index since July 15, 1988. The Consumer Price Index shall have the same meaning as contained in Article 14 hereof.

Notwithstanding anything contained herein to the contrary, all costs and expenses incurred by the Owner of the Condominium Property in connection with any insurance policy pertaining, in whole or part, to the Residential Property, Commercial Property or Garage Property shall be allocated to the Owner of the Non-Condominium Property at 5.688% of such total costs and expenses. The 5.688% is determined in accordance with the following formula:  the amount to be paid by the Owner of the Non-Condominium

HAK0430 08/07/92 1547                    19

FILED DATE: 2/11/2020 2:20 PM   2020CH01705

Property shall equal the insurance premiums multiplied by the ratio of the aggregate total square footage of the Non-Condominium Property divided by the aggregate square footage of the Total Property.

7.4    The Owners shall cooperate with the other Owners and the Management Company in securing and providing the following services to the Building, through the Management Company, to the extent required:

(a)    Roof; Storm Drains, Parapet.   Maintenance and repair of the roofs of the Building, the storm drains and parapet in a manner consistent with the operation of a first-class, mixed-use building;

(b)    Scavenger Services; Maintenance of Service Area and Trash Chute.  Scavenger service from the service area located on the first floor of the Building and maintenance and repair of the trash chute, service area and loading dock in a manner consistent with the operation of a first-class, mixed-use building;

(c)    Street Level.  All landscaping maintenance necessary for upkeep of the street level exterior of Building, remove snow from sidewalks leading to the street level entrances to the Building, and keep such sidewalks and street level entrances to the Building free from debris and obstructions to pedestrian and vehicular traffic, as applicable;

(d)    Exterior Maintenance.  Maintenance of the exterior of the Building in a good state of repair, including street level exterior and sidewalks contiguous thereto;

(e)    Security.  Provide security at the entrance to the lobby of the Building and at the loading dock in a manner consistent with the standards of a first-class, mixed-used building;

(f)    Elevators.  Maintenance, repair, inspection and replacement of all elevators and all shafts, equipment and other components related thereto, in a manner consistent with the standards of a first-class, mixed-use building, except for any elevators which will become either part of a Unit or a limited common element appurtenant thereto or become solely a part of the Commercial Property or solely for the benefit of the seventieth floor of the Building;

(g)    Window Cleaning.  Washing and cleaning of all exterior windows of the Building in a manner consistent with the standards of a first-class, mixed-use building;

(h)    Heating System.  Through the heating system, the heating requirements in a manner consistent with the operation of a first-class, mixed-use building;

FILED DATE: 2/11/2020 2:20 PM   2020CH01705

(i)   **Air Conditioning System.**  Through the air conditioning system, the air conditioning requirements in a manner consistent with the operation of a first-class, mixed-use building;

(j)   **City Water Supply System.**  All city water required from city mains through the water supply systems located in the Building;

(k)   **Sanitary Waste System.**  Maintenance, repair and replacement of the drain lines and risers in a manner consistent with the operation of a first-class, mixed-use building;

(l)   **Electrical Supply System.**  Electrical requirements for use in the Condominium Property, Residential Property and Commercial Property; and

(m)   Such additional services as may be contained in a proposed Budget attached hereto as Exhibit H or a Budget adopted pursuant to the terms hereof.

7.5   Each Owner shall make a good-faith effort to operate its Facilities and cooperate to secure and furnish all services, including, but not limited to, the temperature condition, (a) at the lowest possible costs reasonably available without degrading the quality of any services furnished and (b) in a manner so as to provide each Owner with comfortable occupancy and enjoyment of the Commercial Property for its intended use as a commercial office facility, of the Condominium Property and Residential Property for their intended use as an apartment or condominium building, respectively, and Garage Property for its intended use as a garage facility, but in no event shall any Owner be obligated to use more than reasonable diligence in performing the services required of such Owner as set forth in Article 7 of this Declaration.

7.6   Statements for services rendered pursuant to Article 7 hereof, provisions for payment thereof and provisions for additional payments incurred in connection with such services shall be made in accordance with the terms and provisions of Exhibit E attached hereto and made a part hereof.

7.7   If any Owner shall fail to perform as required by the terms and conditions of Sections 7.1, 7.2, 7.3 or 7.4 of this Declaration (except when such failure is caused by another Owner, Unavoidable Delay or an Owner is entitled to discontinue such service pursuant to Section 7.8 hereof) and such failure shall continue for a period of ten (10) days after written notice thereof to the Owner obligated to cooperate in securing and providing such service, the non-defaulting Owner shall have the right to take possession and control of and to operate, maintain, repair and replace the Facilities (whenever located) required for the furnishing of such service until such time as the defaulting Owner cures its failure to perform.  Such notice shall not be required in an Emergency Situation resulting from such failure.  For any period in which a Creditor Owner is performing pursuant to Section 7.7, the Defaulting Owner shall pay the Creditor Owner the actual out-of-pocket costs and expenses paid or incurred by the Creditor Owner in connection with such performance.

FILED DATE: 2/11/2020 2:20 PM   2020CH01705

7.8    If, at any time, any Owner ("Defaulting Owner") shall fail to pay to any other Owner ("Creditor Owner") any sum of money payable to the Creditor Owner pursuant to the provisions of Section 7.7 hereof for ten (10) days after written notice from the Creditor Owner demanding payment of said sum of money, then the Creditor Owner may discontinue furnishing of the services for which payment has not been received until said sum of money is paid; provided, however, that if the Defaulting Owner in good faith disputes the Defaulting Owner's obligation to pay said sum of money and diligently contests any action or proceeding brought to collect said sum of money or to enforce any lien therefor, the Defaulting Owner shall not be deprived of any such services unless and until it shall finally be determined by unreviewable court proceedings, arbitration or otherwise that the Defaulting Owner is obligated to pay said sum of money and thereafter said sum of money remains unpaid.

## ARTICLE 8

## STRUCTURAL SUPPORT

8.1    No Owner shall do or permit any act which would adversely affect the structural safety or integrity of the Improvements on any other portions of the Total Parcel.

8.2    Except in the case in which Article 12 is applicable, if substitute or additional structural support is required in any portion of the Improvements in which the structural support shall have been reduced or the structural safety of any portion of the Improvements is endangered, then the following provisions shall apply:

(a)    In the event the Owner or Owners responsible for the reduction or endangerment cannot be determined, which determination shall be made by the Architect, then the Owner benefited by the structural support shall be responsible for construction in accordance with plans and specifications approved by (except insofar as the provisions of Article 23 would not require such approval) the Owners of the portion of the Total Property affected thereby, the Architect and Secured Property Lenders with respect to any portions of the Total Property affected thereby and, subject to the provisions of Article 13 hereof, shall pay all costs and expenses, including any architect's and other fees, in connection with construction of substitute or additional support.

(b)    In the event the Owner or Owners responsible for the reduction or endangerment can be determined, either by the agreement of the Owners or the determination of the Architect, then the responsible Owner or Owners shall perform such construction in accordance with plans and specifications approved by (except as otherwise provided in Article 23 hereof) the Owners of the portions of the Total Property affected thereby, the Architect and Secured Property Lenders with respect to the portion of the Total Property affected thereby and, subject to the provisions of Article 13 hereof, shall pay all costs and expenses, including any architects' or other fees, in connection with the construction of substitute or additional support.

HAK0430  08/07/92  1547                22

92545148

8.3   The responsible Owner or Owners shall commence, within thirty (30) days after notice from any other Owner, or in the event the matter is submitted to the Architect, within thirty (30) days after the Architect's determination, the construction of such substitute or additional support within a reasonable time under the circumstances free of all mechanic's lien claims and having commenced such construction shall proceed diligently to cause the completion of such construction.

8.4   If delay in constructing substitute or additional support would endanger the structural safety or integrity of any portions of the Improvements, then, without regard to which Owner or Owners in accordance with Section 8.2 shall be determined as responsible for such construction, any Owner shall, upon not less than thirty (30) days' advance written notice to the others Owners (except that such advance written notice shall not be required in an Emergency Situation), provide substitute or additional structural support as and wherever may be required, or any Owners may jointly undertake to provide substitute or additional structural support; provided, however, the responsible Owner shall be liable for and pay all costs and expenses incurred us a result of any Owner's provisions of any required substitute or additional support.  If the Owners cannot within thirty (30) days agree on the allocation of responsibility among the Owners, then the dispute shall be submitted to the Architect for a determination.  Notwithstanding anything herein to the contrary, no Owner shall be responsible for nor have any liability in connection with the loss of use of the other portion of the Total Property during any period of reconstruction.

## ARTICLE 9

## COMPLIANCE WITH LAWS; REMOVAL OF LIENS; ZONING

9.1   The Owner of the Residential Property, the Owner of the Condominium Property, the Owner of the Commercial Property and the Owner of the Garage Property:

(a)   shall each comply with all laws, statutes, codes, rules, orders, decrees, ordinances, regulations and requirements now or hereafter enacted or promulgated by the United States of America, State of Illinois, County of Cook, City of Chicago and any other entity or agency now or hereafter having jurisdiction of the Total Property or any portion thereof, if noncompliance by it with respect to its portion of the Total Property or any part thereof would subject any other Owner to civil or criminal liability, or would jeopardize the full force or effect of any certificate of occupancy issued to any other Owner or for the Improvements itself or would jeopardize any other Owner's right to occupy or utilize beneficially its portion of the Total Property or any part thereof, or would result in the imposition of a lien against any of the property of any other Owner or would increase costs of insurance of any other Owner or would impose any threat or danger to any person or property; and

(b)   shall each comply with all rules, regulations and requirements of any insurance rating bureau having jurisdiction of the Total Property or any portion thereof or the requirements of any insurance policy affecting

HAK0430 08/07/92 1547                    23

FILED DATE: 2/11/2020 2:20 PM   2020CH01705

FILED DATE: 2/11/2020 2:20 PM   2020CH01705

insurance coverage on any other Owner's portion of the Total Property if noncompliance by it with respect to its portions of the Total Property or any portion thereof would (i) increase the premiums of any policy of insurance maintained by any other Owner or the premiums of any policy of insurance maintained by all Owners, or (ii) render any other Owner's portion of the Total Property uninsurable, or (iii) create a valid defense to any other Owner's right to collect insurance proceeds under policies insuring any other Owner's portion of the Total Property; provided further, however, that if such compliance is hereafter required solely because of the nature of the use, possession or management of or activities in any other Owner's portion of the Total Property, such other Owner shall be liable for the cost and expense of such compliance. If at any time any Owner so obligated to comply shall not proceed diligently with any such compliance and such failure to proceed shall adversely and materially affect any other Owner, then the Creditor Owner may give written notice to the Defaulting Owner specifying the respect or respects in which the cure of such noncompliance is not proceeding diligently and if upon expiration of ten (10) days after the receipt of such notice, any such cure of the noncompliance is still not proceeding diligently, then the Creditor Owner may cause such compliance to occur by taking all appropriate steps to carry out the same. The Creditor Owner shall be entitled to reimbursement upon demand from the Defaulting Owner for all costs and expenses incurred by the Creditor Owner in connection with causing any such compliance to occur, together with interest at the Default Rate (as herein-after defined) from the date of payment of such costs and expenses by Creditor Owner to the date of reimbursement to the Creditor Owner.

9.2    Any Owner shall remove, within thirty (30) days after the filing thereof, any mechanic's, materialmen's or any other like lien on any other Owner's portion of the Total Property, or on its portion of the Total Property, arising by reason of its act or any work or materials which it has ordered. Notice of the filing of any such lien shall be served upon the Secured Property Lenders. Any Owner which has caused such a lien to be filed shall be deemed a Defaulting Owner hereunder. In the event any Defaulting Owner fails to remove any such lien within such thirty (30) day period, any Creditor Owner may (but is not required to) take such action as the Creditor Owner may deem necessary to remove such lien. The Creditor Owner shall be entitled to reimbursement from the Defaulting Owner for all costs and expenses incurred by the Creditor Owner in removing or attempting to remove such lien, plus interest at the Default Rate from the date of payment of such costs and expenses by Creditor Owner to the date of reimbursement to the Creditor Owner. However, the Defaulting Owner shall not be required to remove such lien within thirty (30) days after the filing thereof (and the Creditor Owner shall not be entitled to remove such lien), provided that (i) the continuance of such lien shall not constitute a default under the documents securing the Secured Property Lenders; (ii) within said thirty (30) day period foreclosure proceedings relating to such lien cannot be completed; and (iii) the Defaulting Owner (A) shall in good faith diligently proceed to contest the same by appropriate proceedings and shall give written notice to the Creditor Owner, and to the Secured Property Lenders if required by applicable loan documents, of its intention to contest the validity or amount of such lien and (B) shall deliver to the Creditor Owner or, if loan documents so provide, to the Secured Property Lenders, either: (i) cash or a

925161148

surety bond from a responsible surety company acceptable to the Creditor Owner and the Secured Property Lenders, if applicable, in an amount equal to one hundred fifty percent (150%) of the lien claim and all interest and penalties then accrued thereon or such greater amount as may reasonably be required to assure payment in full of the amount claimed, plus all penalties, interest and costs which may thereafter accrue by reason of such lien claim or (ii) other security reasonably acceptable to the Creditor Owner and the Secured Property Lenders, if applicable. The rights of the Defaulting Owner under the preceding sentence to contest such lien without discharging the same shall terminate if (i) the Defaulting Owner fails to contest diligently and continuously, (ii) final judgment is entered on behalf of the lien claimant or (iii) the existence of such liens shall constitute a default under the document securing the Secured Property Lenders, and in such event the Defaulting Owner shall cause such lien to be discharged or removed within five (5) days after the occurrence of either of the events in clauses (i), (ii) or (iii) in this sentence and the Creditor Owner shall have the right (but not the obligation) at any time to remove such lien and in such event be entitled to reimbursement in accordance with the applicable provisions hereunder.

9.3    Each Owner (hereinafter in this Section 9.3, the "Indemnifying Owner") covenants and agrees, at its sole cost and expense, to indemnify and hold harmless the other Owners (hereinafter in this Section 9.3, the "Indemnitee") from and against any and all claims against the Indemnitees for losses, liabilities, damages, judgments, costs and expenses and any actions or proceedings arising therefrom, by or on behalf of any person, firm, corporation or governmental authority, other than the Indemnitee, arising from the Indemnifying Owner's use, possession or management of the Indemnifying Owner's portion of the Total Property or activities therein or arising out of the Indemnifying Owner's use, exercise or enjoyment of an Easement and from and against all costs, attorneys' fees, expenses and liabilities incurred with respect to any such claim, action or proceeding arising therefrom. In case any action or proceeding is brought against the Indemnitee by reason of any such claim, Indemnifying Owner, upon notice from the Indemnitee, covenants to resist or defend such action or proceeding with attorneys reasonably satisfactory to the Indemnitee and to pay all fees and expenses of such counsel. Any counsel for the insurance company providing insurance against such claim, action or proceeding shall be presumed reasonably satisfactory to Indemnitee. Indemnitee shall have the right to employ separate counsel in any such actions brought against Indemnitee, and the fees and expenses of such counsel shall be paid by Indemnitee.

9.4    Without limiting the provisions of Section 9.1(a), neither the Owner of the Residential Property nor the Owner of the Condominium Property nor the Owner of the Commercial Property nor the Owner of the Garage Property shall make any Alterations (as that term is hereinbelow defined in Section 23.1) or allow any use of their respective portions of the Total Property or take or fail to take any action which would violate the provisions of the Chicago Zoning Ordinance or the Chicago Lakefront Protection Ordinance, as said ordinances may be amended from time to time, or any similar or successor ordinances in effect from time to time hereafter and applicable to the Total Property or any portions thereof. The Residential Property, Condominium Property, Commercial Property, and Garage Property shall continue to be combined and treated as one zoning lot for the purposes of complying with the Chicago Zoning Ordinance. No Owner shall have

FILED DATE: 2/11/2020 2:20 PM   2020CH01705

92516148

FILED DATE: 2/11/2020 2:20 PM   2020CH01705

thu right to request or obtain any amendment to the Chicago Zoning Ordinance as applicable to any portions of the Total Property without the consent of the other Owners, which consent shall not be unreasonably withheld, except that no Owner shall be required to consent to any change in the Chicago Zoning Ordinance as applicable to any portions of the Total Property which (i) increases density, (ii) increases maximum height in any portion of the Total Property, or (iii) changes the character or permitted use of any portion of the Total Property.

## ARTICLE 10

### REAL ESTATE TAXES

10.1   The Owners shall make good faith efforts and cooperate with each other so that the Condominium Property and Non-Condominium Property shall, when and as soon as possible, be assigned separate real estate tax index numbers and receive separate real estate tax bills from the Assessor ("Assessor") of Cook County, Illinois.   From and after submission of the Condominium Property to the Act, separate real estate tax bills and real estate tax index numbers will be applied for with respect to each Unit of the Condominium Property.  The Owner of the Non-Condominium Property shall pay the real estate taxes levied upon the Non-Condominium Property, and the Owner of the Condominium Property shall pay the real estate taxes levied upon the Condominium Property.  The Owner of the Non-Condominium Property shall also have the right to divide the Non-Condominium Property into three (3) separate tax parcels attributable to the Residential Property, Commercial Property and Garage Property.

10.2   At such time as the Non-Condominium Property and Condominium Property are separately assessed and taxed, each Owner shall pay its respective portion of such real estate taxes and special assessments.  The assessed valuation respecting the "land" and "improvements" (as hereinafter defined) and the taxes computed thereon shall be allocated between the Owners and paid by the respective Owners as set forth in this Section 10.2.  Allocations of assessments set forth herein are based upon information contained in the official real estate tax record cards ("cards") of the Assessor, which cards show assessed valuations of land and improvements.  Since the terminology used in the Assessor's cards may vary from the terms used in this Declaration, for purposes of this Section 10.2 the following definitions shall apply:  "land" shall mean Total Parcel; "improvements" shall mean Improvements; "condominium improvements" shall mean Condominium Improvements; "non-condominium improvements" shall mean Non-Condominium Improvements.

(a)   **Allocation of Assessed Valuation of Land.** The assessed valuation of the land shall be allocated as follows:

(1)   Allocation of assessed valuation of land to Condominium Property equals:

Value of condominium improvements   x   Assessed
Value of improvements                       valuation
                                                       of land

(2)   Allocation of assessed valuation of land to Non-Condominium Property equals:

Assessed valuation of land minus assessed valuation of land allocated to Condominium Property (under Section 10.2(a)(1)).

(b)   **Allocation of Assessed Valuation of Improvements.** The assessed valuation of the improvements shall be allocated as follows:

(1)   Allocation of assessed valuation of improvements to Condominium Property equals:

Value of condominium improvements   x   Assessed
Value of improvements                       valuation of
                                                       improvements

(2)   Allocation of assessed valuation of improvements to Non-Condominium Property equals:

Assessed valuation of improvements minus assessed valuation of improvements allocated to Condominium Property (under Section 10.2(a)(1)).

(c)   **Allocation of Payments of Taxes.** The Owner of the Non-Condominium Property shall pay the combined tax bill or bills for the Total Property prior to their due date. The Owner of the Condominium Property shall be responsible for and shall pay or reimburse the Owner of the Non-Condominium Property (within ten (10) days after the demand of the Owner of the Condominium Property therefor) for its share of the total real estate taxes levied in the combined tax bill or bills for the Total Property, which share shall be calculated as follows:

Condominium Property share equals:

Total assessed valuations allocated
to Condominium Property, under
Sections 10.2(a) and 10.2(b) hereof     x   Total real
Assessed valuation of land and                 estate taxes
improvements

10.3    If any Owner (the "Defaulting Owner") shall fail to pay any tax or other charge, or share thereof, which is due and which such Defaulting Owner is obligated to pay pursuant to this Article 10, then any other Owner (the "Creditor Owner") may, after at least ten (10) days' written notice to the Defaulting Owner, pay such tax or charge, or share thereof, together with any interest and penalties thereon, and the Defaulting Owner shall, upon demand, reimburse the Creditor Owner for the amount of such payment, including the amount of any interest or penalty payments thereon, and shall also have a lien against the portion of the Total Property owned by the Defaulting Owner in accordance with Article 13 hereof.

10.4    Any Owner may, if it shall so desire, endeavor at any time or times, to obtain a lowering of the assessed valuation upon the Property for the purpose of reducing taxes thereon ("Protesting Owner"). In the event such protest shall be made by a Protesting Owner prior to the time that the Condominium Property and Non-Condominium Property are separately assessed and taxed, the Protesting Owner shall be required to serve written notice to the other Owners at least ten (10) days prior to the filing of the objection. Any non-Protesting Owner may elect within ten (10) days after receipt of the notice described above to join the Protesting Owner in effecting such a reduction. In the event any other Owners fail to join the Protesting Owner in obtaining the reduction, the Protesting Owner shall be authorized to collect any tax refund payable as a result of any proceeding Protesting Owner may institute for that purpose and any such tax refund shall be the property of Protesting Owner. Notwithstanding the above, if any other Owner joins the Protesting Owner in seeking a lowering of the assessed valuation and shares in the legal fees incurred in proportion to its share of the real estate taxes, the Owners who have protested shall apportion the tax refund in accordance with their respective portions of the real estate taxes.

## ARTICLE 11

### INSURANCE

11.1    The Owner of the Residential Property, the Owner of the Condominium Property, the Owner of the Commercial Property and the Owner of the Garage Property shall procure and maintain the following insurance:

(a)    The Owner of the Residential Property, the Owner of the Commercial Property and the Owner of the Garage Property shall cooperate and assist the Owner of the Condominium Property to keep their respective portion of the Improvements insured for no less than "all risk" or "special form" coverage on real property and broad form named perils on personal property for an amount not less than ninety percent (90%) of the insurable replacement cost thereof. The Owner of the Condominium Property shall keep its portion of the Improvements insured for no less than "all risk" or "special form" coverage on real property and broad form named perils on personal property for an amount not less than one hundred percent (100%) (or such lesser percentage as may be permitted under the Act or the Condominium Declaration, but in no event less than ninety percent (90%) of

HAK0430 08/07/92 1547                    28

the insurable replacement cost thereof). Such policies shall be endorsed with a replacement coverage endorsement and an agreed amount clause and no co-insurance penalty shall be applicable.

(b)     The Owner of the Condominium Property, the Owner of the Commercial Property, the Owner of the Residential Property and the Owner of the Garage Property shall maintain Comprehensive General Liability Insurance with Broad Form Extensions covering claims for personal and bodily injury or property damage occurring in, on, under, within, upon or about their respective portions of the Total Property, or as a result of operations thereon, in such amounts as may be required by law and as from time to time shall be carried by prudent owners of first-class, residential buildings in the City of Chicago, but in all events for limits of not less than $1,000,000 combined single limit for personal and bodily injury or property damage with at least additional $1,000,000 umbrella coverage and containing "X," "C" and "U" coverage during any period of construction.

11.2    Unless all Owners otherwise agree in writing, the Owner of the Condominium Property shall purchase the insurance policies required under Section 11.1(a) for the Condominium Property, Commercial Property and Residential Property, if any, and required under Section 11.1(b) for the Condominium Property. The Owner of the Condominium Property shall purchase such policy or policies from insurance companies authorized and licensed to transact business in the State of Illinois who shall hold a current Policyholder's Alphabetical and Financial Size Category Rating of not less than "Excellent" according to Best's Insurance Reports or a substantially equivalent rating from a nationally-recognized insurance rating service.   The Owner of the Garage Property, Owner of the Commercial Property or Owner of the Residential Property, as applicable, may procure and maintain the insurance specified in Section 11.1(b) covering their separate interests, apart from the Owner of the Condominium Property; provided, that the insurance company is authorized and licensed to transact business in the State of Illinois and holds a current Policyholder's Alphabetical and Financial Size Category Rating of not less than "Excellent" according to Best's Insurance Reports.   Such policy or policies may be issued in combination covering one or all items and covering jointly the interests of each Owner, and shall name the other Owners as additional insureds.   Each of the Owners hereby agree to cooperate to procure and maintain insurance policies which jointly cover the interests of all of the Owners.

11.3    Each policy described in Section 11.1 and Section 11.2 hereof: (i) shall provide, if available, that the knowledge or acts or omissions of any insured party shall not invalidate the policy as against any other insured party or otherwise adversely affect the rights of any other insured party under any such policy; (ii) shall, with respect to all of the foregoing policies, insure as additional insureds the Owner of the Residential Property, the Owner of the Condominium Property, the Owner of the Commercial Property, the Owner of the Garage Property and their respective beneficiaries thereunder; provided, however, that so long as any portion of the Total Property shall be subject to the Act, the Association and not the individual Unit Owners or the Owner of that portion of the Total Property so submitted shall be insured as an additional insured; (iii) shall provide, except for liability insurance described in Section 11.1(B), by endorsement or otherwise, that

HAK0430 08/07/92 1547                    29

the insurance shall not be invalidated should any of the insureds under the policy
waive in writing prior to a loss any or all rights of recovery against any party for
loss occurring to the property insured under the policy, if such provisions or
endorsements are available and provided that such waiver by the insureds does not
invalidate the policy or diminish or impair the insured's ability to collect under the
policy, or unreasonably increase the premiums for such policy unless the party to
be benefited by such endorsement or provision pays such increase; (iv) shall provide
for a minimum of thirty (30) days' advance written notice of cancellation, non-
renewal or material modification thereof to all named insureds and additional
insureds thereunder, unless such cancellation is for non-payment of premium, in
which case only ten (10) days' advance written notice shall be sufficient and
(v) shall, if available, provide, except for the liability insurance required under
Section 11.1(B), that all amounts payable thereunder shall be paid to the Depositary
in accordance with Articles 17 and 23 hereof.    Nothing contained in this
Section 11.3 shall prevent the naming of any persons (in addition to those
mentioned in clause (ii) hereinabove), as an additional insured in any policy or as
prohibiting the inclusion in any policy of a usual and customary form of mortgage
clause; provided, however, that the mortgagee under any mortgage upon any part
of the Total Property receiving any proceeds of any insurance policy described in
Section 11.1(A) shall deposit the insurance proceeds with the Depositary in
accordance with Articles 17 and 18 to the extent that the owner of the mortgaged
property receiving such proceeds would be required to do so, except that such
obligation for such deposit by a mortgagee shall be subject to the following
conditions: (a) that at the time of deposit there shall be no then-uncured default
under the mortgage; (b) that at the time of such deposit, there shall be in the
hands of the Depositary a sufficient amount, which when added to the proceeds
to be deposited by the mortgagee, will be at least equal to the cost, as estimated
by the mortgagee, to complete the work; and (c) the insurers do not deny liability
as to the insureds.

11.4   Limits of liability or types of insurance specified in this Article 11 or
carried by the Owners shall be reasonable and prudent for an Owner of a first-
class residential and/or commercial facility, as applicable, and shall be jointly
reviewed by the Owners at least annually to determine if such limits, deductible
amounts and types of insurance are reasonable and prudent in view of the type,
place and amount of risk to be transferred, and to determine whether such limits,
deductible amounts and types of insurance comply with the requirements of all
applicable statutes, laws, ordinances, codes, rules, regulations or orders and whether
on a risk management basis, additional types of insurance or endorsements against
special risks should be carried or whether required coverages or endorsements should
be deleted.  Deductible amounts for insurance required under Sections 11.1(A) and
11.1(B) shall be in such amounts as are customary or prevalent for an Owner of a
first-class residential and/or commercial facility, as applicable.  Such limits shall be
increased or decreased, deductible amounts increased or decreased or types of
insurance shall be modified, if justified, based upon said annual review, and upon
any such increase, decrease or modification, the owners shall, if mutually agreeable,
execute an instrument in recordable form evidencing such increase, decrease or
modification, which any Owner may record with the Recorder as a supplement to
this Declaration.  The Owners shall employ an insurance consultant to perform such
review periodically on their behalf and the cost of employing any such consultant

FILED DATE: 2/11/2020 2:20 PM   2020CH01705

shall be shared by the Owners in the ratio their annual insurance premiums for Insurance required hereunder bear to each other. Such consultant may be the same insurance broker, or any employee thereof, through which the insurance policies are obtained hereunder.

11.5   Copies of all renewal insurance policies or certified binders delineating all forms of coverage and endorsements required hereunder shall be delivered by each Owner to the other Owner (or, if appropriate, to the Condominium Association) and to the Secured Residential Property Lenders, at least thirty (30) days prior to the expiration date of any such expiring insurance policy if market conditions so permit.   Should an Owner fail to provide and maintain any policy of insurance required under this Article 11 or pay its share of the premiums or other costs for any joint policies, then such Owner shall be a Defaulting Owner and any other Owner may purchase such policy and the costs thereof (or the Defaulting Owner's share of such costs) shall be due from the Defaulting Owner upon the Creditor Owner's written demand therefor plus interest at the Default Rate from the date of payment of the Creditor Owner to the date of reimbursement to the Creditor Owner.   Additionally, the Creditor Owner shall obtain a lien against the property of the Defaulting Owner, pursuant to Section 13.1 hereinbelow.

11.6   Provided that such a waiver does not invalidate the respective policy or policies or diminish or impair the insured's ability to collect under such policy or policies or unreasonably increase the premiums for such policy or policies unless the party to be benefited by such waiver pays such increase, and without limiting any release or waiver of liability or recovery contained elsewhere in this Declaration, each Owner hereby waives all claims for recovery from the other Owner for any loss or damage to any of its property insured (or required hereunder to be insured) under valid and collectible insurance policies to the extent of any recovery actually collected under such insurance policies, plus deductible amounts.

11.7   In the event of the occurrence of Condominium Consolidation, the obligations of the Owner of the Residential Property under this Article 11 shall, from and after such occurrence, be the obligation of the Owner of the Condominium Property to the extent of the portion of the Residential Property so submitted to the Act.

11.8   In the event the Owner of the Condominium Property is subject to any loads, including, without limitation, any restaurant load, general liability load or umbrella liability load, in connection with any insurance policy maintained pursuant to this Article 11, then the Owner of the Garage Property, the Owner of the Residential Property and the Owner of the Commercial Property shall be jointly and severally liable for the reimbursement to the Owner of the Condominium Property for such increased amounts.

HAK0430 08/07/92 1547                    31

## ARTICLE 12

### MAINTENANCE AND REPAIR; DAMAGE TO THE IMPROVEMENTS

12.1  Except as expressly provided hereinafter in this Article 12 in the event of fire or other casualty, the Owner of the Residential Property shall, through the Management Company, keep the Residential Property in good and safe order and condition and shall make all repairs or replacements of, in, on, under, within, upon or about such property, whether said repairs or replacements are to the interior or exterior thereof, or structural or non-structural components thereof, or involve ordinary or extraordinary repairs or replacements, necessary to keep the same in safe first-class working order and condition, howsoever the necessity or desirability thereof may arise, and whether or not necessitated by wear, tear, obsolescence, defects or otherwise. The Owner of the Residential Property further agrees that it shall not suffer or commit, and shall use all reasonable precaution to prevent, waste to such property. Any such costs incurred in accordance with this Section 12.1 shall be paid for by the Owner of the Residential Property, except as hereinafter provided in the event of fire or other casualty and except for such costs incurred in connection with the interior of any tenant's apartment or any system which serves exclusively a tenant's apartment or space.

12.2  Except as expressly provided hereinafter in this Article 12 in the event of fire or other casualty, the Owner of the Condominium Property shall, through the Management Company, keep the Condominium Property in good and safe order and condition, and shall make all repairs or replacements of, in, on, under, within, upon or about such property, whether said repairs or replacements are to the interior and exterior thereof, or structural and non-structural components thereof, or involve ordinary or extraordinary repairs or replacements, necessary to keep the same in safe first-class working order and condition, howsoever the necessity or desirability thereof may arise, and whether or not necessitated by wear, tear, obsolescence, defects or otherwise. The Owner of the Condominium Property further agrees that it shall not suffer or commit, and shall use all reasonable precautions to prevent, waste to such property. Any such costs incurred in accordance with this Section 12.2 shall be paid for by the Owner of the Condominium Property, except as hereinafter provided in the event of fire or other casualty and except for such costs incurred in connection with the interior of any Unit or any system which serves a Unit exclusively.

12.3  Except as expressly provided in this Article 12 the Owner of the Commercial Property shall (i) through the Management Company, keep and maintain the Commercial Property in a good, clean and safe order and condition, and (ii) at its sole cost and expense, make all repairs and replacements of, in, on, under, within, upon or about the Commercial Property whether said repairs or replacements are to the interior and exterior thereof, or structural and non-structural components thereof, or involve ordinary or extraordinary repairs or replacements, necessary to keep the same in safe first-class working order and condition, howsoever the necessity or desirability thereof may arise, and whether or not necessitated by wear, tear, obsolescence, defects or otherwise. The Owner of the Commercial Property may arrange for the Management Company to perform the foregoing obligations with respect to repairs and replacements, provided all costs are

HAK0430  08/07/92  1547                    32

borne by the Owner of the Commercial Property. The Owner of the Commercial Property further agrees that it shall not suffer or commit, and shall use all reasonable precautions to prevent waste to such property.

12.4   Except as expressly provided hereinafter in this Article 12 in the event of fire or other casualty, the Owner of the Garage Property shall, at its sole cost and expense, keep the Garage Property in good and safe order and condition, and shall make all repairs or replacements of, in, on, under, within, upon or about such property, whether said repairs or replacements are to the interior and exterior thereof, or structural and non-structural components thereof, or involve ordinary or extraordinary repairs or replacements, necessary to keep the same in safe first-class working order and condition, howsoever the necessity or desirability thereof may arise, and whether or not necessitated by wear, tear, obsolescence, defects or otherwise. The Owner of the Garage Property further agrees that it shall not suffer or commit, and shall use all reasonable precautions to prevent, waste to such property.

12.5   If the Improvements are damaged by fire or other casualty and (a) to the extent such damage occurs in, on, under, within, upon or about the Condominium Improvements only or (b) to the extent such damage occurs in, on, under, within, upon or about the Residential Improvements only, or (c) to the extent such damage occurs in, on, under, within, upon or about the Commercial Improvements only, or (d) to the extent such damage occurs in, on, under, within, upon or about the Garage Improvements only, then any such damage shall be repaired and restored by the Owner of the portion of the Improvements in which any such damage occurs in as timely a manner as practicable under the circumstances, and such Owner shall, in accordance with the provisions of Article 18 hereof, be entitled to withdraw any insurance proceeds held by the Depositary by reason of any such damage, for application to the cost and expense of the repair and restoration of any such damage. If at any time any Owner so obligated to repair and restore such damage shall not proceed diligently with any repair or restoration of damage adversely and materially affecting an Easement in favor of any other Owner or services to be furnished any other Owner under Article 7 hereof, then (i) the Creditor Owner may give written notice to the Defaulting Owner specifying the respect or respects in which such repair or restoration is not proceeding diligently and, if, upon expiration of thirty (30) days after the receipt of such notice, any such repair or restoration work is still not proceeding diligently, then the Creditor Owner may perform such repair and restoration and may take all appropriate steps to carry out the same; or (ii) in an Emergency Situation the Creditor Owner may immediately perform such repair or restoration and may take all appropriate steps to carry out the same. The Creditor Owner in so performing such repair and restoration shall, in accordance with Article 18 hereof, be entitled to withdraw any insurance proceeds and any other monies held by the Depositary as a result of any such damage for application to the cost and expense of any such repair or restoration and shall also be entitled to reimbursement upon demand from the Defaulting Owner for all costs and expenses incurred by the Creditor Owner in excess of said insurance proceeds, plus interest at the Default Rate from the date of payment by the Creditor Owner of the costs and expenses to the date of reimbursement to the Creditor Owner.

HAK0430  08/07/92  1547                    33

FILED DATE: 2/11/2020 2:20 PM   2020CH01705

92616148

12.6  If the Improvements are damaged by fire or other casualty and if the provisions of Section 12.3 are not applicable because the nature of the damage is such that it does not fall within any of the categories set forth in clauses (a), (b), (c) or (d) of Section 12.5, then the repair and restoration of such damage shall be the responsibility of the Owner or Owners whose portions of the Total Property are in need of such repair or restoration.   Said repair and restoration shall be commenced and pursued to completion in as timely a manner as practicable.   The plans and specifications for said repair and restoration shall be prepared on the behalf of those Owners who are responsible for such repair and restoration pursuant to the foregoing provisions.   Said repair and restoration shall be performed on behalf of such Owners by a contractor or contractors jointly selected by such Owners, subject to the approval of the Secured Property Lenders, if required.   In the event such Owners, and the Secured Property Lenders, if required, fail to agree upon the selection of a contractor, then the selection thereof shall be made by arbitration pursuant to Article 14 hereof.   The plans and specifications for such repair and reconstruction shall provide for the Improvements to be rebuilt as nearly as commercially practicable to the Improvements as constructed prior to the damage unless prohibited by law or unless the Owners otherwise agree, subject to the approval of the Secured Property Lenders, if required.

12.7  If the cost and expense of performing any repair and restoration to any Owner's Improvements provided for in Section 12.6 hereof shall exceed the amount of insurance proceeds, if any, paid by reason of the damage to such Owners' Improvements, then such excess cost and expense shall be borne by each respective Owner to the extent that the respective Owner's insurance proceeds on its Improvements are inadequate to pay the cost and expense of repairing and restoring to their former condition their respective portions of the Improvements.

12.8  In any instance of repair or restoration pursuant to Sections 12.5 or 12.6 hereof, any Owner may require that an estimate of the cost or expense of performing such repair or restoration be made by a reputable, independent, professional, construction, cost-estimating firm, except if a construction contract providing for the performance of such repair and restoration for a stipulated sum shall theretofore have been executed.  If said estimate or stipulated sum, or if the actual amount incurred in performing such repair or restoration, exceeds the amount of insurance proceeds, if any, paid or payable by reason of the damage, then any Owner may at any time give notice to the other Owners demanding that each Owner deposit with the Depositary the amount of such excess cost and expense attributable to each Owner pursuant to this Article 12.  In lieu of depositing its share of such excess amount based upon said estimate or stipulated sum, or actual cost and expense of performing such repair or restoration, any Owner may deliver to the Depositary security for payment of its share reasonably acceptable to the other Owners and the Depositary.  Such security may be in the form of, but shall not be limited to, an irrevocable and unconditional letter of credit in favor of the Depositary in the face amount of the share owed or a loan commitment, reasonably satisfactory to the other Owners and the Secured Property Lenders, if required, issued by a responsible lending institution, to disburse an amount equal to such Owner's share of such excess amount to the Depositary to pay the cost and expense of any such repair or restoration as the work progresses in proportion to such Owner's share of the cost and expense of any such repair or restoration.  If the

HAK0430  08/07/92  1547                    34

FILED DATE: 2/11/2020 2:20 PM   2020CH01705

92616148

FILED DATE: 2/11/2020 2:20 PM  2020CH01705

amount of the security required is based on an estimate of the cost and expense of repair and restoration, then the amount of security required to be deposited or available shall be readjusted upward or downward as the work progresses based on actual costs and expenses of the work. If any Owner shall fail to pay, or, as the case may be, deposit, such Owner's share of the cost and expense (or estimated cost and expense) of performing any repair or restoration in accordance with this Section 12.8, or fails to deliver the security provided for within thirty (30) days after receipt of another Owner's written demand therefor, then the Creditor Owner may (but shall not be obligated to) pay the Defaulting Owner's share and the Defaulting Owner shall, upon written demand, reimburse the Creditor Owner for such payment and the Creditor Owner's reasonable costs and expenses incurred in connection with such payment, plus interest at the Default Rate from the date of payment, by the Creditor Owner to the date of reimbursement to the Creditor Owner.

12.9  Upon completion of the repair and restoration of any damage to the Improvements, any remaining insurance proceeds paid by reason of such damage and attributable to a particular portion of the Total Property, shall be refunded to the respective Owner or, if applicable, to the holder of a mortgage encumbering the Owner's respective portion of the Total Property in accordance with the terms of such encumbrance, to the extent that such sum exceeds the actual repair or restoration costs incurred for all repair and restoration of such Owner's Improvements.  Such funds which are paid to each respective Owner or, if applicable, to the aforedescribed described mortgage holder, shall be payable only from each Owner's respective insurance proceeds.

12.10  If any or all of the Improvements are destroyed or substantially damaged and the Owner of the Condominium Property decides, in its sole judgment, not to rebuild, repair or restore the Improvements, subject to the written approval of the Secured Property Lenders, if required, then the Improvements shall be demolished to the extent necessary to comply with all applicable laws, statues, ordinances, codes, rules, regulations, orders or requirements of any governmental entity or agency thereof having jurisdiction of the Improvements.  In such event, the available insurance proceeds allocated to each respective Owner's Improvements, other than insurance proceeds used to cause said demolition to be performed, shall be refunded to such Owner, subject to the rights of the Secured Party Lenders. Such demolition shall be deemed to be a "repair or restoration" to which the provisions of Sections 12.5, 12.6, 12.7, 12.8 and 12.9 hereof are applicable except that demolition, and not construction, shall be performed.  Each Owner shall restore his portion of the Total Property after demolition to a sightly and safe condition (including weatherproofing any exposed portions thereof) and in such manner as to safeguard the other portions of the Total Property, to preserve the use of the Easements granted hereunder and to prevent any violations of the applicable ordinances of the City of Chicago caused by the other party's failure to rebuild.

12.11  For purposes of this Article 12, architects' and engineers' fees, attorneys' fees, consultants' fees, title insurance premiums and other similar constructed expenses relating to repair or restoration shall be included in the costs and expenses of any such repair or restoration.

HAK0430 08/07/92 1547                35

12.12  [Intentionally Deleted].

## ARTICLE 13

### LIENS, RIGHTS AND REMEDIES

13.1  If, at any time, any Owner falls within ten (10) days after notice or demand to pay any sum of money due another Owner, as Creditor Owner, under or pursuant to the provisions of this Declaration, then, in addition to any other rights or remedies the Creditor Owner may have, the Creditor Owner shall have (i) in the event of a default under Articles 12 or 16, a lien against any condemnation award or insurance proceeds payable to Defaulting Owner for loss or damage to such portion of the Total Property or other wise under insurance policies carried pursuant to Article 11 hereof, or (ii) in the event of a default under Articles 7, 8, 9, 10, 11, 22 or 23, a lien against the portion of the Total Property owned by the Defaulting Owner, to secure the repayment of such sum of money and all interest on such sum accruing pursuant to the provisions of this Article 13 or to secure performance of a covenant or obligation.  Such liens shall continue in full force and effect until such sum of money an any accrued interest thereon shall have been paid in full or the performance has been completed.  The liens provided for in this Section 13.1 shall be superior to and take precedence over any mortgage, trust deed or other encumbrance constituting a lien on a portion of the Total Property or other interest of the Defaulting Owner, other than a bona fide mortgage or trust deed which is a first mortgage or trust deed against such portion of the Total Property at the time of the recording of the notice of lien.

13.2  In the event of fire or other casualty or act of God or force majeure causing damage to any portions of the Condominium Property subject to the Act which would entitle any Owner, under the Act, to withdraw all or any part of the Condominium Property from the Act and not to repair and restore the Condominium Property as required by this Declaration, notwithstanding the foregoing sentence, then the other Owners shall have a lien on any insurance proceeds payable for loss or damage to such portion of the Total Property under insurance policies carried pursuant to Article 11 hereof and on any condemnation award pursuant to Article 16, in an amount necessary so that the other Owners shall have sufficient proceeds to demolish or repair and restore the improvements to a condition so as adequately to assure:

(a)     the structural integrity and safety of the improvements;

(b)     the continuous and efficient operation of all electrical, utility, mechanical, plumbing and other systems serving the improvements;

(c)     compliance with all zoning, building and other laws, rules, orders, ordinances, regulations and requirements of any governmental body or municipality or agency thereof having jurisdiction of the Total Property or any part thereof; and

(d)    the architectural unity and aesthetic appearance of the restored improvements as a first-class, mixed use property.

13.3   Any lien described in Sections 13.1 or 13.2 hereof shall arise immediately upon the recording of a notice by the Creditor Owner with the Recorder following the occurrence of a fire or other casualty or act of God or force majeure stating that it is a lien created by Sections 13.2 or 13.3, as applicable, of this Declaration. Such lien shall continue in full force and effect until either the sum of money required hereunder shall have been paid by the other Owners, or the Owner of the Condominium Property shall have discharged its obligation for such repair and restoration as required by this Declaration. Such lien may be enforced by a proceeding in equity to foreclose such lien in like manner as a mortgage of real property in the State of Illinois or by any other remedy available by statute or at law or in equity.

13.4   Without limiting any equitable remedies to which the other Owners may be entitled, so long as any portion of the Total Property remains subject to the provisions of the Act, each Unit Owner shall be liable only for such portions of any claim against the Owner of such portions of the Total Property equal to the amount of the claim multiplied by the percentage of ownership interest in Common Elements allocated to such Unit Owner's Unit as set forth in the applicable Condominium Declaration. Upon payment of such amount for which a Unit Owner is liable, (i) any lien arising against such Unit Owner's Unit Ownership on account of such claim shall be deemed released against such Unit Owner's Unit Ownership without further act or deed by any such Unit Owner, and (ii) upon the written request of such Unit Owner, the Creditor Owner who has recorded notice of such lien shall deliver to such Unit Owner an instrument evidencing the release of such lien, but only with respect to said Unit Owner's Unit Ownership. When a Unit Ownership is owned by more than one "person" (as defined in the Act) the liability of each such person for any claim against the Unit Ownership shall be joint and several.

13.5   No conveyance or other divestiture of title (other than foreclosure of a lien which shall then be and remain superior) shall in any way affect or diminish any lien arising pursuant to this Article 13, and any lien which would have arisen against any property pursuant to this Article 13 had there been no conveyance or divestiture of title (other than foreclosure of a lien which shall then be and remain superior) shall not be defeated or otherwise diminished or affected by reason of such conveyance or divestiture of title.

13.6   Interest shall accrue on any sums owed by a Defaulting Owner to a Creditor Owner pursuant to this Declaration, and shall be payable from the date any such sum first became due hereunder until paid in full, at a rate of interest equal to the lesser of: (a) the floating rate which is equal to three percent (3%) per annum in excess of the annual rate of interest from time to time announced by The First National Bank of Chicago in Chicago, Illinois, as its "corporate base rate" of interest or a reasonably equivalent substitute thereof in the event a corporate base rate is no longer announced, or (b) the then-maximum lawful rate of interest in Illinois applicable to the Defaulting Owner and the nature of the debt. In the event a "corporate base rate" or reasonable equivalent thereof is not announced by

HAK0430  08/07/92  1547                    37

FILED DATE: 2/11/2020 2:20 PM   2020CH01705

9 2 5 1 6 1 4 8

The First National Bank of Chicago, and no maximum lawful rate applies, then interest shall accrue at the annual rate of eighteen percent (18%).

13.7   Subject to the limitations set forth in Article 17 hereof, the rights and remedies of an Owner provided for in this Article 13 or elsewhere in this Declaration are cumulative and not intended to be exclusive of any other remedies to which such Owner may be entitled at law or in equity or by statute.   Any Owner may enforce, by a proceeding in equity for mandatory injunction, any other Owner's obligation to execute or record any document which such other Owner is required to execute under or pursuant to this Declaration.   The exercise by such Owner of any right or remedy to which it is entitled hereunder shall not preclude or restrict the exercise of any other right or remedy provided hereunder.

13.8   Each claim of any Owner arising under this Declaration shall be separate and distinct, and no defense, set-off, offset or counterclaim arising against the enforcement of any lien or other claim of any Owner shall thereby be or become a defense, set-off, offset or counterclaim against the enforcement of any other lien or claim.

13.9   Actions to enforce any right, claim or lien under this Declaration shall be commenced within three (3) years immediately following the date the cause of action occurred, or such other shorter period as may be provided by law or statute.

13.10   The Management Company described in Article 7 hereof shall coordinate all requests and contacts between the Owner of the Commercial Property, the Owner of the Condominium Property, the Owner of the Garage Property, the Owner of the Residential Property and the tenants of the Residential Property relating to the enjoyment of any Easements or the exercise of any rights or benefits granted under this Declaration or with respect to any other matters arising under or pursuant to this Declaration; provided, however, any such coordination shall not render the Management Company liable to either such tenants of the Residential Property or the Unit Owners or tenants of the Units or Owner of the Condominium Property or Owner of the Commercial Property or Owner of the Garage Property for acts of any other party.

13.11   A Defaulting Owner shall pay the reasonable attorneys' fees and court costs paid or incurred by a Creditor Owner in successfully enforcing its rights against the Defaulting Owner under this Declaration, and such fees and costs shall be added to the amount of any applicable lien created under this Article 13.

13.12   In the event a Creditor Owner consists of one or more Unit Owners, then the Condominium Association of which the Creditor Owner is a member shall have the sole and exclusive right to act for, bind, sue for, defend and represent, in accordance with Article 21 hereof, the Creditor Owner in any proceeding arising out of this Article 13, together with full power and authority to compromise any claims out of the terms of this Article 13 and to grant releases.

92516148

## ARTICLE 14

### ARBITRATION

14.1  All questions, differences, disputes, claims or controversies arising under this Declaration involving an amount not exceeding $50,000 (in 1988 equivalent dollars) or involving either of the following matters: (i) selection of an insurance company or apportionment of insurance premiums under Section 11.2 hereof and (ii) appointment of an architect or a contractor or contractors pursuant to Sections 12.6, 16.4 or 17.1 hereof, which shall be not resolved within sixty (60) days after same shall arise, except where otherwise expressly provided herein, shall be submitted for arbitration to a panel of three (3) arbitrators at the Chicago, Illinois office of the American Arbitration Association in accordance with its then-existing Commercial Arbitration Rules. Such arbitration may be initiated at the request of any Owner. The fees and costs of such arbitration (filing fees, arbitrators' fees and expenses, court reporter's fees and transcript fees, but exclusive of witness fees and attorneys' fees) shall be borne in equal shares by the Owners who are parties to such arbitration. The Owner requesting arbitration shall notify the Secured Property Lenders of its request to arbitrate within five (5) days thereafter. Any award of the arbitrators shall be final and binding upon the Owners and judgment thereon shall be entered by any court exercising jurisdiction over the Total Property or the Owners.

For purposes of this Article 14, "1988 equivalent dollars" means the equivalent purchasing power at any time of the value of One Dollar ($1.00) in calendar year 1988. The 1988 equivalent dollars of any amount shall be determined by multiplying said amount by one (1) plus a fraction, the numerator of which is the amount, if any, by which $(x)$ the monthly Consumer Price Index (as hereinafter defined) last published prior to the date of such determination exceeds $(y)$ the Consumer Price Index for July 1988, and the denominator of which is the Consumer Price Index for July 1988. As used herein, the term "Consumer Price Index" shall mean the Consumer Price Index for Urban Wage Earners and Clerical Workers, City of Chicago, All Items (Base Year 1967 = 100) for the applicable month published by the Bureau of Labor Statistics of the United States Department of Labor or equivalent index agreed to by the Owners if such index is no longer available.

## ARTICLE 15

### UNAVOIDABLE DELAYS

15.1  No Owner shall be deemed to be in default in the performance of any obligation created under or pursuant to this Declaration, other than an obligation requiring the payment of a sum of money, if and so long as non-performance of such obligation shall be caused by fire or other casualty, national emergency, governmental or municipal laws or restrictions, enemy action, civil commotion, strikes, lockouts, inability to obtain labor or materials, war or national defense preemptions, acts of God, energy shortages or similar causes beyond the reasonable control of such Owner (other than inability to make payment of money) ("Unavoidable Delay") and the time limit for such performance shall be extended for

u period equal to the period of any such Unavoidable Delay. The Owner unable to perform (hereafter in this Article the "Non-Performing Owner") shall notify the other Owners in writing of the existence and nature of any Unavoidable Delay within a reasonable time after the onset of any such Unavoidable Delay. The Non-Performing Owner shall, from time to time upon written request of any other Owner, keep the other Owners fully informed, in writing, of all further developments concerning any such Unavoidable Delay.

## ARTICLE 16

## CONDEMNATION

16.1   In the event of a taking by the exercise of the power of eminent domain or deed in lieu of condemnation of all or any part of the Total Property by any competent authority for any public or quasi-public use, the award, damages or just compensation (hereinafter in this Article 16, the "Award") resulting from any such taking shall be allocated and disbursed, and any repair and restoration of the Improvements shall be performed, in accordance with the requirements of this Article 16.

16.2   All awards resulting from the taking of all or any part of the Total Property, other than damages resulting from a taking of the temporary use of space as hereinafter described, shall be paid to the Depositary and disbursed by the Depositary as hereinafter provided. In the event of a taking of a temporary use of any space not affecting services described in Section 7.1 hereof, each Owner shall be entitled to receive directly from the taking authority any Award resulting from such temporary taking within its respective portion of the Total Property.

16.3   In the event of (a) a taking (other than a temporary taking) of a part of the Residential Property only (not affecting services described in Section 7.1 hereof, except those having minimal or incidental effect), or (b) a taking (other than a temporary taking) of a part of the Condominium Property only, or (c) a taking (other than a temporary taking) of a part of the Commercial Property only, or (d) a taking (other than a temporary taking) of a part of the Garage Property only, then, subject to the provisions of Section 16.6 hereof, the Owner of the portion of the Total Property in which the taking occurred shall repair and restore the remainder of its portion of the Improvements to form an architectural and functional whole. Such repair and restoration shall be commenced and pursued to completion in as timely a manner as practicable under the circumstances and shall be at the sole cost and expense of the Owner of the portion of the Total Property in which the taking occurred. Such Owner shall be entitled to withdraw any Award paid to the Depositary by reason of such taking for application to the cost of said repair and restoration in accordance with the provisions of Article 19 hereof and to retain any excess not required for such repair and restoration.

16.4   In the event of a taking other than (a) a temporary taking described in Section 16.2 hereof, (b) a taking described in Section 16.3 hereof, or (c) a taking of all or substantially all of the Total Property, then, subject to the provisions of Section 16.6 hereof, the Owners shall cooperate to repair and restore the remainder

HAK0430 08/07/92 1547          40

of the Improvements in accordance with plans and specifications (hereinafter described) jointly approved by the Owners affected by such taking and the Secured Property Lenders. The plans and specifications for such repair and restoration shall be prepared by the Architect. Such plans and specifications shall provide for repair and restoration of the remainder of the Improvements to form an architectural and functional whole with such changes in the Improvements as shall be required by reason of such taking. Such repair and restoration shall be commenced and pursued to completion in as timely a manner as practicable under the circumstances and the costs of such work shall be paid by those Owners whose portions of the Total Property were the subject of the taking in such shares as such Owners may agree among themselves and shall be performed on behalf of the Owners by a contractor jointly selected by the Owners. The selection of such contractors shall be subject to the approval of the Secured Property Lenders, if required. In the event such Owners, and the Secured Property Lenders, if required, fail to agree upon the selection of a contractor, then the selection shall be made by arbitration pursuant to Article 14 hereof. If such repair and restoration is to be performed solely in the portion of the Total Property owned by one of the Owners then, provided that the plans and specifications do not require an Alteration, as such term is hereinafter defined, the approval of the Owners of, and any Secured Property Lender with respect to, the other portion of the Total Property shall not be required with respect to the plans and specifications therefor, nor shall the consent of the Owners of, and any Secured Property Lender with respect to, the other portion of the Total Property be required with respect to selection of a contractor therefor. If as a result of such taking, any Easements or covenants under this Declaration are extinguished or materially impaired, then changes shall be made to provide for Easements of access, ingress and egress and use of Facilities and for furnishing of services comparable, to the extent commercially practicable, to Easements created under Articles 3, 4, 5 and 6 hereof and for the furnishing of services under Article 7 hereof.

16.5    The Award for any taking described in Section 16.4 shall first be used to pay for the repair and restoration (including any demolition, repair or restoration under Section 16.6 hereof). Each portion of the Award attributable to a particular portion of the Total Property shall only be utilized to repair and restore that portion of the Total Property to which it is attributed. Any excess of the Award attributed to a particular portion of the Total Property over the cost of repair and restoration to that portion of the Total Property shall then be allocated to the respective Owners of that portion of the Total Property, or, if applicable, to the holder of a mortgage encumbering such Owners' respective portions of the Total Property in accordance with the terms of such encumbrance.

16.6    Notwithstanding any other provision to the contrary, if, as a result of a taking (other than a temporary taking or a taking described in Section 16.7 hereof), any Owner reasonably determines that the portion of the Total Property owned by it no longer can be operated on an economically feasible basis, then such Owner shall not be obligated to repair or restore the Improvements owned by it as may be required by Sections 16.3 and 16.4 hereof. However, in such case, such Owner shall demolish, repair or restore the Improvements owned by it to the extent, if any, as may be necessary to provide essential services or structural support for the other portions of the Total Property, but only if all the Owners

HAK0430  08/07/92  1547                    41

of the other portions of the Total Property affected thereby request that it perform such demolition, repair or restoration. Furthermore, such Owner shall weatherproof any exposed portions of the Total Property owned by it and shall restore his portion of the Total Property to a slightly and safe condition and in such a manner as to safeguard the other portions of the Total Property, and to preserve the use of the Easements granted hereunder. Such demolition, repair or restoration shall be deemed to be a repair or restoration to which the provisions of Paragraph 16.4 hereof are applicable.

16.7   In the event of a taking of all or substantially all of the Total Property, the Award for such taking shall be allocated to the Owners in accordance with the apportionment made in any final judicial or administrative proceedings in connection with the taking and paid to the Owners in accordance with said apportionment.

## ARTICLE 17

## ARCHITECT

17.1   The appointment of an architect in accordance with this Article 17 shall be for the purpose of resolving disputes and other differences arising under this Declaration during the operation of the Total Property. The Owners shall jointly appoint a firm consisting of both architects and engineers (or a firm of architects and a firm of engineers agreeing to act jointly hereunder) experienced in the design and operation of high-rise structures similar to the Improvements to serve under and pursuant to the terms and provisions of this Declaration (the "Architect"). In the event the Owners cannot agree upon the appointment of the Architect, the matter shall be submitted to arbitration in accordance with the provisions of Article 14. The Architect shall, upon its appointment, execute an agreement with the Owners substantially in the form of or comparable to The American Institute of Architects ("AIA"), AIA Document B141, 1977 Edition, entitled "Standard Form Agreement between Owner and Architect." Any Owner may cause any Architect to be replaced if it demonstrates to the other Owners that such then-serving Architect has failed to perform its duties hereunder fairly, diligently or competently in accordance with the Owner-Architect Agreement. In such event, the Owner desiring replacement of the Architect shall serve notice upon the other Owners and the Secured Property Lenders, requesting the removal of the then-serving Architect, which notice shall set forth with specificity the respect or respects in which such Architect shall have failed to perform diligently or competently in accordance with the Owner-Architect Agreement. If, in the opinion of an Owner receiving such notice, the Owner desiring to replace the Architect is not entitled to require the appointment of a new Architect pursuant to this Section 17.1, an Owner receiving such notice and objecting to the appointment of a new Architect shall notify the other Owner of its objection in writing within fifteen (15) days after receipt of such notice from the other Owner. If, within ten (10) days after receipt by the Owner desiring to replace the Architect of such objection, the Owners do not resolve their differences, then the dispute shall be settled by arbitration pursuant to Article 14 hereof.

17.2   In any instance when the Architect serving pursuant to Section 17.1 hereof is authorized by this Declaration to advise the Owners concerning any dispute or matter, any Owner involved in such dispute or matter may submit the same to the Architect. The Owner submitting such dispute or matter shall simultaneously give written notice of the submission of such dispute or matter to the other Owners involved in such dispute and the Secured Property Lenders. The Architect shall, except in an Emergency Situation, afford each Owner involved in any dispute or matter, and any attorney or other representative designated by such Owner and the Secured Property Lenders, an opportunity to furnish information or data or to present such party's views.

17.3   The Architect shall be paid a reasonable fee for any services rendered hereunder and shall be reimbursed for reasonable and necessary expenses incurred in connection therewith, and the Owners shall each pay their equitable share of such fees. In any instance when the Architect shall, in accordance with any of the provisions of this Declaration, render services in connection with the preparation of plans and specifications or the supervision of repair, restoration or demolition of the Improvements or any part thereof, the fees and expenses of the Architect shall be considered as costs and expenses of said repair, restoration or demolition, as the case may be, and shall be paid in the same manner as other costs and expenses of repair, restoration and demolition under the provisions of this Declaration pursuant to which the Architect is performing such services. If any Owner shall fail to pay its allocable share of any fees or expenses of the Architect within ten (10) days after receipt of any invoice therefor from the Architect, then any other Owner may pay the same and the Owner failing to pay shall, within ten (10) days after written demand for reimbursement, reimburse the other Owner for any such payment, plus interest at the Default Rate from the date of payment by the Owner to the date of reimbursement to such Owner.

## ARTICLE 18

## DEPOSITARY

18.1   A depositary (the "Depositary") shall be appointed in the manner hereinafter provided to receive from the payor or payee thereof insurance proceeds and condemnation awards, to disburse such monies and to act otherwise in accordance with the terms and provisions of this Declaration. Except as otherwise provided hereunder, all insurance proceeds under the insurance policies required to be carried pursuant to Section 11.1(a) hereof and condemnation awards arising in connection with this Declaration shall be paid to the Depositary. Except as otherwise provided herein, the Depositary appointed hereunder shall be one of the then five (5) largest banks or trust companies (measured in terms of capital funds) with principal offices in Chicago, Illinois.

18.2   As used hereinafter in this Article, the phrase "Damaged Parcel" shall refer to any of the Residential Property, Condominium Property, Commercial Property or the Garage Property or any combination thereof, if applicable, as to which a casualty loss shall have occurred. In the event of any casualty loss which affects only the Residential Property, the Commercial Property, the Condominium

HAK0430  08/07/92  1547          43

Property or the Garage Property, then the Secured Property Lenders applicable to the Damaged Parcel shall have the right, within thirty (30) days after such casualty loss has been finally adjusted, to elect either to act as Depositary or to appoint the Depositary with regard to such funds.   If such right of election is not exercised within said thirty (30) day period, then the Owner of the Damaged Parcel shall have the right to appoint the Depositary with regard to such funds.

18.3   In the event of any casualty loss which affects more than one portion of the Total Property and if each Damaged Parcel is subject to a mortgage or trust deed held by Secured Property Lenders, then the Secured Property Lenders of the Damaged Parcels shall have the right, within thirty (30) days after such casualty loss has been finally adjusted, acting jointly, to appoint the Depositary with regard to such funds.

18.4   In the event of any casualty loss which affects more than one portion of the Total Property and if one or more but less than all of the Damaged Parcels is or are encumbered by a mortgage or trust deed held by Secured Property Lenders, then such Secured Property Lenders and the Owner or Owners of the unencumbered Damaged Parcel or Parcels shall have the right, within thirty (30) days after such casualty loss, acting jointly, to appoint the Depositary with regard to such funds.

18.5   If none of the provisions of Sections 18.3 or 18.4 are applicable, or if none of the rights of election or appointment conferred by said Sections are exercised within thirty (30) days after the casualty loss has been finally adjusted, then the Owners of the Damaged Parcels shall mutually appoint the Depositary.   Upon the failure of such Owners to appoint the Depositary within thirty (30) days after the casualty loss has been finally adjusted, then the matter shall be submitted to arbitration in accordance with Article 14 hereof and the arbitrator shall appoint the Depositary.

18.6   As to any Damaged Parcel with regard to such funds which shall have been submitted to a Condominium Declaration pursuant to the Act, notwithstanding that any individual Unit purchasers may have granted mortgages or trust deeds encumbering all or any portion or portions of the Damaged Parcel, the right and power of the Owner of such Damaged Parcel to appoint the Depositary under Sections 18.2 through 18.5 shall be exercised solely by the Condominium Association and the Unit purchasers and their mortgagees shall be bound thereby.

18.7   Each Owner whose portion of the Total Property is the subject of any such casualty loss or condemnation shall be obligated to pay the reasonable fees and expenses of the Depositary in proportion to the proceeds from their respective insurance policies or respective condemnation awards, as the case may be.   Any Depositary appointed to act hereunder shall execute an agreement with the Owners whose portion of the Total Property is the subject of any such casualty loss or condemnation accepting said appointment in form and content acceptable to such Owners and in accordance with the provisions of this Declaration.

18.8   The Depositary shall have no affirmative obligation to prosecute a determination of the amount of, or to effect the collection of, any insurance

HAK0430  08/07/92  1547                    44

FILED DATE: 2/11/2020 2:20 PM   2020CH01705

9251 6148

proceeds or condemnation award or awards unless the Depositary shall have been given an express written authorization from the Owners; provided that, if only one Owner claims said issuance proceeds or condemnation award or awards, then said Owner alone may authorize the Depositary to so proceed; provided further, however, that if the Residential Property, Commercial Property, Condominium Property and/or the Garage Property is in any material way affected by the disbursement of any such insurance proceeds or condemnation award or awards, then the consent of the holder of the appropriate Secured Property Lenders shall be required.

18.9    The monies on deposit shall be held in an interest-bearing account pursuant to an agreement among the Depositary and the Owners whose portion of the Total Property has been the subject of any casualty loss or condemnation.  The Depositary, within thirty (30) days after receipt of funds, shall purchase with such monies, to the extent feasible, United States Government securities payable to bearer and maturing within one (1) year from the date of purchase thereof, except insofar as it would, in the good faith judgment of the Depositary, be impracticable to invest in such securities by reason of any disbursement of such monies which the Depositary expects to make shortly thereafter, and the Depositary shall hold such securities in trust in accordance with the terms and provisions of this Declaration.    Any interest paid or received by the Depositary on monies or securities held in trust, and any gain and the redemption or sale of any securities, shall be added to the monies or securities so held in trust by the Depositary. Unless the Depositary shall have undertaken to pay interest thereon, monies received by the Depositary pursuant to any of the provisions of this Declaration shall not be mingled with the Depositary's own funds and shall be held by the Depositary in trust for the uses and purposes herein provided.

18.10  The Depositary may resign by serving written notice on the Owners. Within thirty (30) days after receipt of such notice or in case of failure or inability to act, the Owners shall jointly, with the consent of the Secured Property Lenders, appoint a substitute who qualifies under Section 18.1 hereof, and the Depositary shall transfer all funds, together with copies of all records held by it as Depositary, to such substitute, at which time its duties as Depositary shall cease.   If the Owners shall fail to appoint a substitute within said thirty (30) days, then the Secured Property Lenders shall appoint a substitute who qualifies under Section 18.1 hereof within thirty (30) days thereafter, and the Depositary shall transfer all funds, together with copies of all records held by it as Depositary, to such substitute, at which time its duties as Depositary shall cease.   If the Secured Property Lenders shall fail to appoint a substitute within said additional thirty (30) day period, then the Depositary may deposit such funds with either a court of competent jurisdiction or with a bank or trust company in Chicago, Illinois, who qualifies under Section 18.1 hereof.

18.11  Notwithstanding anything contained herein to the contrary, any insurance proceeds arising out of the policies required to be carried pursuant to Section 11.1(A) hereof or condemnation awards of less than $50,000 shall be paid directly to the party so entitled rather than to the Depositary.

HAK0430 08/07/92 1547                    45

## ARTICLE 19

### DISBURSEMENTS OF
### FUNDS BY DEPOSITARY

19.1  A,    Each request by an Owner acting pursuant to the provisions of this Declaration for disbursement of insurance proceeds, any condemnation award or other funds for application to the cost of repair, restoration or demolition (the "Work") shall be accompanied by a certificate of the applicable Owner, and with respect to the information described in Section 19.1A.(2) below, verified by the Architect, dated not more than ten (10) days prior to the date of the request for any such disbursement, setting forth the following:

(1)    That the sum requested has either (a) been paid by or on behalf of one of the Owners (in which event the certificate shall name such Owner) or by or on behalf of all Owners (in which event the certificate shall specify the amount paid by each respective Owner), or (b) is justly due to contractors, subcontractors, materialmen, engineers, architects or other persons (whose names and addresses shall be stated) who have rendered or furnished certain services or materials for the work; such certificate shall also give a brief description of such services and materials and the principal subdivisions or categories thereof, the respective amounts so paid or due to each of said persons in respect thereof and shall state the progress of the work up to the date of said certificate and any other information required by the Mechanics' Liens Act set forth in Chapter 82 of the Illinois Revised Statutes (the "Mechanics' Liens Act") and any title insurer affording coverage against mechanics' liens;

(2)    That the sum requested, plus all sums previously disbursed, does not exceed the cost of the work actually in place up to the date of such certificate, plus the cost of materials supplied and actually stored on site (which materials shall be adequately insured against fire, theft and other casualties);

(3)    That no part of the cost of the services and materials described in the certificate has been the basis of the withdrawal of any funds pursuant to any previous request or is the basis of any other pending request for funds; and

(4)    That the cost to complete the unfinished work will not exceed the funds or security therefor held by the Depositary after payment of the then-current request.

B,    Upon compliance with the provisions of Section 19.1A. (but not more frequently than once in each calendar month (thirty (30) day period)); and

(1)    upon receipt of contractors' and subcontractors' sworn statements required under the Mechanics' Liens Act accompanied by

HAK0430 08/07/92 1547                    46

partial or final waivers of lien, as appropriate, and any other information required by any title insurer affording coverage against mechanics' liens from the persons named in the sworn statement; and

(2)      approval by the title insurer, the Owners, the Secured Property Lenders holding mortgages on portions of the Total Property on which or for the benefit of which work will be performed, of the lien waivers and other documentation, and the willingness of the title insurer to issue an endorsement (satisfactory to such parties) insuring over possible mechanics' lien claims relating to work in place and the continued priority of the lien of the mortgage securing the Secured Property Lenders whose approval is required above.

The Depositary shall, out of the monies so held by the Depositary and subject to such reasonable retention as may be reasonably required in the circumstances and is customary in similar construction matters, pay or cause to be paid to the Owners, contractors, subcontractors, materialmen, engineers, architects and other persons named in the Owner's certificate and contractors' and subcontractors' sworn statements the respective amounts stated in said certificate and statements due them. Notwithstanding the foregoing, any or all of the Owners or the Secured Property Lenders or the Depositary may require that disbursements be made through the usual form of construction escrow then in use in Chicago, Illinois, with such changes as may be required to conform to the requirements or provisions of this Declaration. The Depositary may rely conclusively, with respect to the information contained therein, on any certificate furnished by the Owner to the Depositary in accordance with the provisions of Section 19.1A, hereof and shall not be liable or accountable for any disbursement of funds made by it in reliance upon such certificate or authorization.

## ARTICLE 20

### ESTOPPEL CERTIFICATES

20.1    Each Owner shall, from time to time, within ten (10) days after receipt of written request from another Owner (subject to payment therefor pursuant to Section 20.2 hereof), execute, acknowledge and deliver to the requesting Owner or to any existing or prospective purchaser or mortgagee designated by the requesting Owner, a certificate ("Estoppel Certificate") stating:

(1)      that the terms and provisions of this Declaration are unmodified and are in full force and effect or, if modified, identifying any such modifications;

(2)      whether there is any existing default hereunder (or grounds therefor after giving the requisite notice hereunder) by the requesting Owner and, if so, specifying the nature and extent thereof;

(3)      whether there are any sums (other than those arising out of the normal course of operation of the Improvements within the previous forty-

HAK0430  08/07/92  1547                    47

FILED DATE: 2/11/2020 2:20 PM   2020CH01705

five (45) days) which the Owner executing such Estoppel Certificate is entitled to receive or demand from the requesting Owner, and if there is any such sum specifying the nature and amount thereof;

(4)     whether the Owner executing the Estoppel Certificate has performed or is performing work other than services pursuant to Article 7 hereof, the cost of which such Owner is or will be entitled to charge in whole or in part to the requesting Owner under the provisions hereof, but has not yet charged to such other Owner, and if there is any such work, specifying the nature and extent thereof;

(5)     the nature and extent of any set-offs, claims, counterclaims or defenses then being asserted or capable of being asserted after giving the requisite notice, if any, required hereunder or otherwise known by the Owner against the enforcement of the requesting Owner's obligations hereunder;

(6)     the total amount of all liens being asserted or capable of being asserted after giving the requisite notice, if any, required hereunder by the Owner executing the Estoppel Certificate under the provisions of this Declaration describing the applicable provision or provisions and the details of any such lien claim;

(7)     whether the Owner executing the Estoppel Certificate has requested that a matter be submitted to arbitration, which matter has not been discharged, released or otherwise resolved, and if so, a copy of any such notice or notices shall be delivered with the Estoppel Certificate;

(8)     the nature of any arbitration proceeding or finding under Article 14, made within the ninety (90) days preceding the date of such Estoppel Certificate;

(9)     the current address or addresses to which notices given to the Owner executing such Estoppel Certificate are required to be mailed under Article 24 hereof; and

(10)    such other facts or conclusions as may be reasonably requested.

The Owner of any portion of the Total Property which is not subject to the Act, if requested to issue an Estoppel Certificate in connection with the purchase and sale or financing of a Unit Ownership, may charge the requesting Owner a fee for preparing, executing and delivering the Estoppel Certificate and may, in its sole discretion, limit to items (2) and (6) described above the statements made in the Estoppel Certificate.

20.2   So long as any portion of the Total Property remains subject to the provisions of the Act, an Estoppel Certificate requested from the Owner of such portion of the Total Property subject to the Act shall be issued by the Condominium Association on behalf of the Unit Owners and the Condominium Association and any Estoppel Certificate so issued shall be binding on the Unit Owners and such Condominium Association, and an Estoppel Certificate requested

HAK0430  08/07/92  1547                    48

by the Owner of any portion of the Total Property subject to the Act from an Owner of a portion of the Total Property not subject to the Act may only be requested by the Condominium Association on behalf of the Owner of such portion of the Total Property subject to the Act.

## ARTICLE 21

### CONDOMINIUM ASSOCIATION ACTING FOR UNIT OWNERS

So long as any portion of the Total Property is subject to the provisions of the Act, all rights, Easements and benefits under this Declaration appurtenant to or enjoyed by the Owner of such portions of the Total Property, and consents, waivers, approvals and appointments which may be granted by an Owner, shall be exercised by the Condominium Association on behalf of the Owner of such portions of the Total Property, except for such rights or benefits expressly granted to Unit Owners, and except for Easements which by their nature are exercisable only by Unit Owners and in the event of any such action taken by the Condominium Association, the Unit Owners shall be bound as if such Unit Owners had expressly consented and agreed to such actions by the Condominium Association. Any action to enforce or defend rights, obligations, Easements, burdens and benefits under this Declaration, or the right to settle and compromise any claims, on behalf of the Unit Owners who are members of the Condominium Association shall be taken on behalf of the Condominium Association and all such Unit Owners, solely by the Condominium Association by its duly authorized officers acting pursuant to authority granted by law, the Condominium Declaration or resolution of the board of managers of the Condominium Association. Except as otherwise noted herein, any requirement for any Unit Owner to furnish a notice or deliver a document may also be performed by the Condominium Association. No Unit Owner or group of Unit Owners shall have the right to take any action under this Declaration or to enforce any of the rights, Easements or privileges granted by this Declaration for the benefit of the Total Property or any part thereof. All obligations under this Declaration of the Owner of any portion of the Total Property subject to the Act shall be obligations jointly and severally of both the Condominium Association and all Unit Owners in such portions of the Total Property and any lien arising against the Owner of any such portion of the Total Property may be imposed against the Units of all such Unit Owners based upon their percentages of interest in the Common Elements appurtenant to such portion of the Total Property, which each Unit Owner may discharge in accordance with the provisions of Article 13 hereof.

## ARTICLE 22

### PARKING

The Owner of the Garage Property shall make available or cause to be made available to the Owner of the Condominium Property and upon recordation of the Condominium Declaration, then to the Unit Owners, a sufficient number of parking spaces to comply with the terms and provisions of the applicable City of Chicago Zoning Ordinances, as amended from time to time. The rental rates to be charged

HAK0430 08/07/92 1547                49

FILED DATE: 2/11/2020 2:20 PM   2020CH01705

by the Owner of the Garage Property or by its garage operators to the individual Unit Owners for parking in the Garage shall not exceed the rates charged to other third parties by the Owner of the Garage Property or its garage operators for parking in the Garage on a monthly basis. All persons granted the right to parking in the Garage shall comply with the reasonable rules and regulations from time to time promulgated by the Owner of the Garage Property or its garage operators. The Owner of the Garage Property shall also make available or cause to be made available to the Owner of the Residential Property, a sufficient number of parking spaces to comply with the terms and provisions of the applicable City of Chicago Zoning Ordinances, as amended from time to time. Such parking spaces for the Owner of the Condominium Property and the Owner of the Residential Property shall be made available on a pro rata basis based upon the number of units in the Residential Property and the Condominium Property.

## ARTICLE 23

## ALTERATIONS

23.1   A.   Any Owner (hereinafter in this Article 23, "Altering Owner") may, at any time, at such Altering Owner's sole cost and expense, make additional improvements or alterations (hereinafter in this Article 23, "Alterations") to the part of the Improvements within such Altering Owner's portion of the Total Property, provided that such Alterations comply with the balance of this Section 23.1 and all of the other provisions of this Article 23. Any plans and specifications for any restoration of the Improvements which contain substantially the same architectural features as the Improvements which existed prior to the necessity of restoration shall not be deemed to be Alterations within the meaning of this Article 23. Prohibitions and restrictions on Alterations by the Owner of the Condominium Property shall also apply to individual Unit Owners.

B.   Unless otherwise provided in Section 23.1A. and this Section 23.1B., the following Alterations shall not be made without the prior written consent of the other Owners if such Alterations will:

(1)   unreasonably diminish the benefits afforded to such other Owners by any Easement or unreasonably interrupt such other Owners' use or enjoyment of any Easement;

(2)   materially alter the facade of the Improvements;

(3)   impair the structural integrity of the Improvements (or any portion thereof) or necessitate the erection of additional columns, bearing walls, or other structures upon or within the Total Property;

(4)   affect Facilities benefiting the other Owner other than minimally or incidentally; or

(5)   materially change the expected pedestrian and vehicular traffic patterns or patterns of ingress and egress.

HAK0430 08/07/92 1547          50

Notwithstanding anything contained herein to the contrary, the Owner of the Commercial Property shall have the right and is hereby granted the necessary Easements to: (a) make additional openings in the first and second floors of the Building improvements for the purpose of expanding commercial facilities in the Building and creating additional commercial uses outside of the Building; (b) reconfigure any portion of the Commercial Property; and (c) undertake such changes in the Commercial Property, in its sole discretion, as it desires to make.

C.    If, at any time, the Altering Owner proposes to make any Alterations which require or could possibly require the consent of the other Owners or the Secured Property Lenders, if applicable, then before commencing or proceeding with such Alterations, the Altering Owner shall deliver to the other Owners and the applicable Secured Property Lenders, a copy of the plans and specifications showing the proposed Alterations and a reference to this Section 23.1. If such other Owners and the applicable Secured Property Lenders consent to such Alterations or state that their consents are not required, the Altering Owner may proceed to make its Alterations substantially in accordance with said plans and specifications. The Owners or Secured Property Lenders whose consents are requested shall make a good faith effort to respond to the Altering Owner within thirty (30) days after its receipt of said plans and specifications from the Altering Owner showing proposed Alterations. If the Altering Owner has not requested the other Owners' consents to the proposed alterations, and if, in the good faith opinion of the other Owners or the applicable Secured Property Lenders, the Altering Owner has violated or will violate the provisions of Section 23.1A. or B., such Owners or Secured Property Lenders shall notify the Altering Owner of its opinion that the Alterations or proposed Alterations violate or will violate the provisions of Section 23.1A. or B. hereof, and shall specify the respect or respects in which its provisions are or will be violated. If an Objecting Party in good faith asserts a violation of Section 23.1A. or B., then the Altering Owner shall not commence with the Alterations or proceed with the Alterations, if already commenced, until the matter has been resolved. In addition to any other legal or equitable rights or remedies to which the Objecting Party may be entitled by reason of an Altering Owner's violation or likely violation of the provisions of this Section 23.1, the Objecting Party shall be entitled to seek and obtain injunctive relief to enjoin any such violation.

D.    If any matter arises between the Owners with respect to whether any Alterations or proposed Alterations violate the provisions of Section 23.1A. or B., then any Owner may submit such matter to the Architect for its advice, and the Architect shall render its opinion whether the Alterations or proposed Alterations violate the provisions of Section 23.1A. or B. hereof.

E.    The Owners, in making Alterations, shall (i) perform all work in a good and workmanlike manner and in accordance with good construction practices, (ii) comply with all applicable federal, state and local laws, statutes, ordinances, codes, rules, regulations and orders, including, without limitation, the City of Chicago Building Code, and (iii) comply with all of the applicable provisions of this Declaration. Each Owner shall, to the extent reasonably practicable, make Alterations within its portion of the Total Property in such a manner as to

FILED DATE: 2/11/2020 2:20 PM   2020CH01705

FILED DATE: 2/11/2020 2:20 PM   2020CH01705

minimize any noise, vibration, particulate and dust infiltration or other interference or disturbance which would interfere with or disturb an occupant or occupants of the other portion of the Total Property, but such Owner shall not be liable in any event for damages as a result of any such disturbance.

23.2   Applications for building permits to make Alterations shall be filed and processed by the Altering Owner without the joinder of the other Owners in such application, unless the City of Chicago or other government agency having jurisdiction thereof requires joinder of the other Owners. If joinder by the other Owners not making Alterations is so required, said Owners shall cooperate in executing such application or other instruments as may be necessary to obtain the building permit; provided, however, the Altering Owner shall indemnify and hold harmless the other Owners from and against any and all loss, liability, claims, judgments, costs and expenses arising out of the other Owner's execution of the application, permit or other instrument.

23.3   An Altering Owner performing any work required or provided for under this Declaration shall include in any construction contract a provision pursuant to which the contractor (i) recognizes the separate ownership of the various Parcels which comprise the Total Property and agrees that any lien rights which the contractor or subcontractors have under the Mechanics' Liens Act shall only be enforceable against the portion of the Total Property owned by the Altering Owner, or (ii) agrees that no lien or claim may be filed or maintained by such contractor or any subcontractors and agrees to comply with the provisions of Section 21 of the Mechanics' Liens Act in connection with giving notice of such "no lien" provision.

## ARTICLE 24

## NOTICES

24.1   All notices, demands, elections or other communications required, permitted or desired to be served hereunder ("Notices") shall be in writing and shall be delivered in person or mailed as certified or registered matter, postage prepaid, return receipt requested, addressed as below stated:

For Notices to the Owner of
the Residential Property:

Lake Point Tower Limited
 Partnership
505 North Lake Shore Drive
2nd Floor
Chicago, Illinois  60611

For Notices to the Owner of
the Condominium Property:

Lake Point Tower Condominium
 Association
Attention:  President
505 North Lake Shore Drive,
2nd Floor
Chicago, Illinois  60611

For Notices to the Owner of          Lake Point Tower Limited
the Commercial Property:                Partnership
                                     505 North Lake Shore Drive
                                     2nd Floor
                                     Chicago, Illinois  60611

For Notices to the Owner of          Lake Point Tower Limited
the Garage Property:                    Partnership
                                     505 North Lake Shore Drive
                                     2nd Floor
                                     Chicago, Illinois  60611

The foregoing notwithstanding, at such time as any portion of the Total Property
is submitted to the Act, Notices to the Owners of such portion of the Total
Property shall be delivered or mailed, as aforesaid, to any officer, director or
managing agent of the applicable Condominium Association to such address as may
appear in any public record instead of the addresses set forth above.  Such change
of address shall be effective, however, only upon the giving of notice thereof to
the other Owners in accordance with the provision of Section 24.3, hereof.  Copies
of all such Notices shall also be sent to the applicable Secured Property Lenders.

     24.2   So long as any portion of the Total Property remains subject to the
Act, (a) the Owner of the other portions of the Total Property may, but shall not
be obligated to, give personal notice to any Unit Owner, Notice to the Condominium
Association hereby being deemed sufficient and effective notice to all Unit Owners
of such portions of the Total Property subject to the Act and (b) the Condominium
Association alone shall be empowered to give notice on behalf of any or all Unit
Owners with respect to the applicable portion of the Total Property under this
Declaration, which notice shall be binding on such Unit Owners.

     24.3   Any Notice delivered as aforesaid shall be deemed received when
delivered and receipted for or any Notice mailed as aforesaid shall be deemed
received five (5) business days after deposit in the United States Mail, or upon
actual receipt, whichever is earlier.   Addresses for service of Notice may be
changed by written notice served as hereinabove provided at least ten (10) days
prior to the effective date of any such change.  Nothing herein contained, however,
shall be construed to preclude service of any Notice in the same manner that
service of a summons or legal process may be made.

## ARTICLE 25

## CONDOMINIUM CONSOLIDATION

     It is anticipated that from time to time, portions of the Residential Property
will be submitted to the terms of the Act by adding on the Residential Property
to the same condominium regime as shall exist with respect to the Condominium
Property.   To that extent, any definitions relating to the Condominium Property
and Residential Property in Article 2 hereof shall be deemed amended to take into
consideration such submission.   In the event of Condominium Consolidation, any

FILED DATE: 2/11/2020 2:20 PM   2020CH01705

FILED DATE: 2/11/2020 2:20 PM   2020CH01705

Easements or right granted in this Declaration for the benefit of the Residential Property shall be deemed, to the extent of the Residential Property so submitted, to be granted for the benefit of the Condominium Property. In addition, any Easements granted in this Declaration which burden the Residential Property shall be deemed, to the extent of the Residential Property so submitted, to burden and bind the Condominium Property.

## ARTICLE 26

## LIMITATION OF LIABILITY

26.1   Each Owner of a portion of the Total Property shall cooperate in the securing and performing of the services as set forth in Article 7 of this Declaration but shall not be liable for interruption or inadequacy of service, loss or damage to property or injury (including death) to any person for any reason. Each Owner obligated hereunder is reserved the right to curtail or halt the performance of any service hereunder at any time in reasonable respects for a reasonable period of time to make necessary repairs or in case of an Emergency Situation.

26.2   In the event of any conveyance or divestiture of title to any portion of or interest in any portion of the Total Property: (1) the Owner who is divested of title shall be entirely freed and relieved of all covenants and obligations thereafter accruing hereunder but only with respect to any such portion or interest conveyed or divested; and (2) the grantee or the person or persons or other entity or entities who succeed to title shall be deemed to have assumed all of the covenants and obligations of the Owner of such portion or interest thereafter accruing hereunder, until such grantee or successor is itself freed and relieved therefrom as hereinabove provided in this Section, and then any such grantee's or successor's grantee or successor shall thereafter be so bound.

26.3   The enforcement of any rights or obligations contained in this Declaration against an Owner of any portion of the Total Property shall be limited to the interest of such Owner in the Total Property. No judgment against any Owner of any portion of the Total Property shall be subject to execution, or be a lien on any assets of, such Owner other than Owner's interest in the Total Property.

## ARTICLE 27

## GENERAL

27.1   In fulfilling obligations and exercising rights under this Declaration, each Owner shall cooperate with the other Owner to promote the efficient operation of each respective portion of the Total Property and the harmonious relationship between the Owners and to protect the value of each Owner's respective portion, estate or interest in the Total Property. To that end, each Owner shall share information which it possesses relating to matters which are the subject of this Declaration, except such information as such Owner may reasonably

HAK0430  08/07/92  1547 ·                    54

FILED DATE: 2/11/2020 2:20 PM   2020CH01705

deem confidential or which may be the subject of litigation and which such Owner is prohibited from revealing pursuant to court order. From time to time after the date hereof, each Owner shall furnish, execute and acknowledge, without charge (except where elsewhere provided herein) (i) such other instruments, documents, materials and information as any other Owner hereto may reasonably request in order to confirm to such requesting Owner the benefits contemplated hereby, but only so long as any such request does not restrict or abridge the benefits granted the other Owner hereunder; and (ii) such grants of Easements to and agreements with utility companies as any other Owner hereto may reasonably request in order to enable such utility company to furnish utility services as required by such Owner, provided that the Secured Property Lenders which hold any mortgage on the portions of the Total Property on which such Easement is granted have first consented in writing to such Easements.

27.2   The illegality, invalidity or unenforceability under law of any covenant, restriction or condition or any other provision of this Declaration shall not impair or affect in any manner the validity, enforceability or effect of the remaining provisions of this Declaration.

27.3   The headings of Articles in this Declaration are for convenience of reference only and shall not in any way limit or define the content, substance or effect of the Articles.

27.4   A.   Except as otherwise provided herein, this Declaration may be amended or terminated only by an instrument signed by the Owners and the Secured Property Lenders. So long as any portion of the Total Property is submitted to the Act, the Condominium Association may, by its authorized officers, execute all amendments to or any termination of this Declaration on behalf of all Unit Owners in such portion of the Total Property and the Owner of such portions of the Total Property, which amendments or termination shall be binding on all Unit Owners and the Owner of such portions of the Total Property.   Any amendment to or termination of this Declaration shall be recorded with the Recorder.

B.   Declarant reserves the right and power to record a special amendment ("Special Amendment") to this Declaration at any time and from time to time which amends this Declaration to correct clerical or typographical errors in this Declaration.   A Special Amendment may also contain such complementary and supplemental grants and reservations of Easements as may be necessary in order to effectuate the maintenance, operation and administration of the Total Property. Declarant also reserves the right to include, within a Special Amendment, a revision to the legal descriptions of the Residential Property and Commercial Property located on the first and second floors of the Building.   In furtherance of the foregoing, a power coupled with an interest is hereby reserved and granted to the Declarant to vote in favor of, make, or consent to a Special Amendment on behalf of each Owner as proxy or attorney-in-fact, as the case may be.   Each deed, mortgage, trust deed, other evidence of obligation, or other instrument affecting any portion of the Total Property, and the acceptance thereof shall be deemed to be a grant and acknowledgment of, and a consent to the reservation of, the power to the Declarant to vote in favor of, make, execute and record Special Amendments. The right of the Declarant to act pursuant to rights reserved or granted under this

HAK0430 08/07/92 1547                    55

FILED DATE: 2/11/2020 2:20 PM   2020CH01705

section shall terminate at such time as the Declarant no longer holds or controls title to any portion of the Total Property.

27.5   Except for the perpetual Easements provided for under this Declaration, the covenants, conditions and restrictions contained in this Declaration shall be enforceable by the Owners and their respective successors and assigns for a term of forty (40) years from the date this Declaration is recorded, after which time said covenants, conditions and restrictions shall be automatically extended without further act or deed of the Owners, except as may be required by law and as provided below, for successive periods of ten (10) years, subject to amendment or termination as hereinabove set forth in Section 27.4; provided, however, that this Declaration, and all Easements, covenants, conditions and restrictions contained herein, shall terminate and be deemed abrogated upon the demolition or destruction of all of the Improvements and the failure to restore or rebuild the same within five (5) years after such demolition or destruction.   If and to the extent that any of the covenants would otherwise be unlawful or void for violation of (a) the rule against perpetuities, (b) the rule restricting restraints on alienation, or (c) any other applicable statute or common law rule analogous thereto or otherwise imposing limitations upon the time for which such covenants may be valid, then the provision concerned shall continue and endure only until the expiration of a period of twenty-one (21) years after the date of the last to survive of the class of persons consisting of all of the lawful descendants of Joseph P. Kennedy, former ambassador of the United States, living at the date of this Declaration.

27.6   The provisions of this Declaration shall be construed to the end that the Total Property shall remain a first-class, mixed-use property.

27.7   All the Easements, covenants, restrictions and conditions herein contained shall run with the land and shall inure to the benefit of and be binding upon Declarant and each subsequent holder of any interest in any portion of the Total Property and their grantees, mortgagees, heirs, successors, personal representatives and assigns with the same full force and effect for all purposes as though set forth at length in each and every conveyance of the Total Property or any part thereof.

27.8   Easements created hereunder shall not be presumed abandoned by non-use or the occurrence of damage or destruction of a portion of the Improvements subject to an Easement unless the Owner benefited by such Easement states in writing its intention to abandon the Easement or unless the Easement has been abandoned for a period in excess of two (2) years.

27.9   The parties hereto acknowledge that this Declaration and all other instruments in connection herewith, have been negotiated, executed and delivered in the City of Chicago, County of Cook and State of Illinois.   This Declaration and said other instruments shall, in all respects, be governed, construed, applied and enforced in accordance with the laws of Illinois including, without limitation, matters affecting title to all real property described herein.

27.10   This Declaration is not intended to give or confer any benefits, rights, privileges, claims, actions or remedies to any person or entity as a third-party

92516148

beneficiary (except the Secured Property Lenders) under any statutes, laws, codes, ordinances, rules, regulations, orders, decrees or otherwise.

27.11 Each provision of the Recitals to this Declaration and each Exhibit attached hereto is hereby incorporated in this Declaration and is an integral part hereof.

27.12 Concurrently with the giving of any notification required hereunder to be given, or which any other party hereto may desire to give to the Owner of the Residential Property, the Owner of the Commercial Property, the Owner of the Condominium Property or the Owner of the Garage Property, a duplicate original of such notification shall be given to the Secured Property Lenders affected thereby at the address for the giving of notice set forth in the mortgage or trust deed securing indebtedness to such Secured Property Lenders, or to any other address of which notice by United States Mail, return receipt requested, shall have been given to the other parties hereto.

27.13 No charges shall be made for any Easements or rights granted hereunder unless otherwise provided or permitted under the terms of this Declaration.

27.14 The seventieth (70th) floor of the Residential Property is currently occupied by a restaurant as of the date hereof. The owner of that portion of the Residential Property consisting of the seventieth (70th) floor shall have the right to extend the elevators currently in use between the sixty-eighth (68th) to seventieth (70th) floors to the roof and to utilize that portion of the roof over such floor as a patio. In such event, any costs related to such construction, together with all costs related to the maintenance and repair of such roof and elevator, shall be borne by such Owner as his sole responsibility.

27.15 American Invesco Realty, Inc. shall have the exclusive right to operate a residential real estate office in the Building during the period of the conversion of the Building to the condominium form of ownership and as long as the space is not owned by a third party other than American Invesco Realty, Inc.; provided, however, that if, as of the date of recording of this Declaration, there are tenants in the Building utilizing their space as residential real estate offices, such use may continue until the expiration of such lease or, in the event the Unit is purchased by the tenant, until such time as the lease would have otherwise expired.

27.16 Each Owner shall have the right to maintain, in its respective portion of Total Property, such signage on the facade of the Building in order to identify such Owner's use of the Building.

27.17 The Owner of the Commercial Property shall make available to the Owner of the Condominium Property and the Owner of the Residential Property the use of the swimming pool located on the roof of the Garage at rates which shall not exceed the rates charged to other third parties by the Owner of the Commercial Property and in accordance with rules and regulations promulgated by the Owner of the Commercial Property.

HAK0430 08/07/92 1547          57

27.18 In connection with the recording of this Lake Point Tower Amended and Restated Declaration of Covenants, Conditions, Restrictions and Easements, title to a portion of the Commercial Property commonly known as the Health Club and legally described on Exhibit I attached hereto ("Health Club Property") will be conveyed to the Lake Point Tower Condominium Association. It is hereby declared that any and all easements Granted under the terms of this document for the benefit of the Commercial Property in, to, under, over, upon, through and about portions of the Residential Property, Condominium Property and Garage Property are hereby Granted for the benefit of the Health Club Property and furthermore, any easements for ingress, egress and structural support reasonably necessary for the use and enjoyment of the Health Club Property are hereby Granted in, to, under, over, upon, through and about portions of the Commercial Property. Furthermore, it is hereby declared that any and all easements Granted under the terms of this document for the benefit of any portion of the Total Property are also Granted for the benefit of any portion of each component of the Total Property in the event such component (Residential Property, Commercial Property, Garage Property and Condominium Property) is divided into two (2) or more parcels.

THIS DECLARATION is executed by Declarant, not personally but solely in its capacity as Trustee as aforesaid, in the exercise of the power and authority conferred upon and vested in it in its capacity as such Trustee. All the obligations, duties, agreements, covenants and conditions to be performed by Declarant under this Declaration are undertaken by it solely in its capacity, as Trustee as aforesaid, and not individually, and no personal liability shall be asserted or be enforceable against Declarant by reason of any of the terms, provisions, statements, obligations, duties, agreements, covenants and conditions contained in this Declaration.

IN WITNESS WHEREOF, Declarant, not personally but solely in its capacity as Trustee as aforesaid, and the Association have caused this Declaration to be executed and sealed this __7th__ day of __July__, 1992.

American National Bank and Trust Company of Chicago, a national banking association, as Trustee under Trust Agreement dated January 7, 1988 and known as Trust No. 1043-99-09

By: _____ Peter Johanson

ATTEST:

By: _____ Gregory S. Kasprzyk
   (Assistant) Secretary

Lake Point Tower Condominium Association, an Illinois not-for-profit corporation

By: _____
   Its: _____

ATTEST:

By: _____
   Its: _____

FILED DATE: 2/11/2020 2:20 PM   2020CH01705

27.18  In connection with the recording of this Lake Point Tower Amended and Restated Declaration of Covenants, Conditions, Restrictions and Easements, title to a portion of the Commercial Property commonly known as the Health Club and legally described on Exhibit I attached hereto ("Health Club Property") will be conveyed to the Lake Point Tower Condominium Association. It is hereby declared that any and all easements Granted under the terms of this document for the benefit of the Commercial Property in, to, under, over, upon, through and about portions of the Residential Property, Condominium Property and Garage Property are hereby Granted for the benefit of the Health Club Property and furthermore, any easements for ingress, egress and structural support reasonably necessary for the use and enjoyment of the Health Club Property are hereby Granted in, to, under, over, upon, through and about portions of the Commercial Property.  Furthermore, it is hereby declared that any and all easements Granted under the terms of this document for the benefit of any portion of the Total Property are also Granted for the benefit of any portion of each component of the Total Property in the event such component (Residential Property, Commercial Property, Garage Property and Condominium Property) is divided into two (2) or more parcels.

THIS DECLARATION is executed by Declarant, not personally but solely in its capacity as Trustee as aforesaid, in the exercise of the power and authority conferred upon and vested in it in its capacity as such Trustee. All the obligations, duties, agreements, covenants and conditions to be performed by Declarant under this Declaration are undertaken by it solely in its capacity, as Trustee as aforesaid, and not individually, and no personal liability shall be asserted or be enforceable against Declarant by reason of any of the terms, provisions, statements, obligations, duties, agreements, covenants and conditions contained in this Declaration.

IN WITNESS WHEREOF, Declarant, not personally but solely in its capacity as Trustee as aforesaid, and the Association have caused this Declaration to be executed and sealed this ___ day of _____, 1992.

American National Bank and Trust Company of Chicago, a national banking association, as Trustee under Trust Agreement dated January 7, 1988 and known as Trust No. 1043-99-09

By:_____

ATTEST:

By:_____
    (Assistant) Secretary

Lake Point Tower Condominium Association, an Illinois not-for-profit corporation

By:_____
    Its:_____

ATTEST:

By:_____
    Its: Treasurer

HAK0430 08/07/92 1547          58

FILED DATE: 2/11/2020 2:20 PM   2020CH01705

## EXHIBIT G

### BILLING; PAYMENT

1.    **Charges.**   Each month, the Management Company shall submit a statement to each Owner for the aggregate charges incurred in the previous month.

2.    **Submission and Payment of Statements.**   Except as otherwise provided herein, each statement hereunder:   (a) shall be submitted on the first day of the month involved and (b) shall be paid within ten (10) days after receipt.

3.    **Inspection of Books.**   Any Owner shall have the right at all reasonable times to examine the books and records of the Management Company pertaining to services and charges for services under Article 7 of this Declaration.   The Owners shall treat such books and records as confidential and shall not divulge the contents thereof to third parties except where required in the event of litigation or arbitration or otherwise pursuant to a final order of a court of competent jurisdiction.

HAK0430  06/29/92  1458                    G-1

FILED DATE: 2/11/2020 2:20 PM 2020CH01705

**EXHIBIT H**

## Philip Rootberg & Company

CERTIFIED PUBLIC ACCOUNTANTS

350 SOUTH WACKER DRIVE, SUITE 600

CHICAGO, ILLINOIS 60606

(312) 930-9600

To the Unit Owners and Board of Directors
Lake Point Tower Condominium Association

We have examined the accompanying forecasted statement of net assessments of Lake Point Tower Condominium Association for the years ending June 30, 1989 and June 30, 1991. Our examination was made in accordance with standards for an examination of a forecast established by the American Institute of Certified Public Accountants and, accordingly, included such procedures as we considered necessary to evaluate both the assumptions used by management and the preparation and presentation of the forecast.

In our opinion, the accompanying forecast is presented in conformity with guidelines for presentation of a forecast established by the American Institute of Certified Public Accountants, and the underlying assumptions provide a reasonable basis for management's forecast. However, there will usually be differences between the forecasted and actual results, because events and circumstances frequently do not occur as expected, and those differences may be material. We have no responsibility to update this report for events and circumstances occurring after the date of this report.

*Philip Rootberg & Company*

March 9, 1988

## LAKE POINT TOWER CONDOMINIUM ASSOCIATION

### FORECASTED STATEMENT OF NET ASSESSMENTS
### FOR THE YEARS ENDING JUNE 30, 1989 AND 1991

|  | 1989 | 1991 |
|---|---|---|
| **OPERATING EXPENSES** | | |
| General operating (Schedule 1) | $1,870,000 | $2,061,700 |
| Building services (Schedule 2) | 153,100 | 168,700 |
| Repairs and maintenance (Schedule 3) | 283,500 | 312,500 |
| General and administrative (Schedule 4) | 336,700 | 371,100 |
| Total Operating Expenses | 2,643,300 | 2,914,000 |
| **LESS MISCELLANEOUS REVENUE** | | |
| Maintenance income | 15,600 | 17,200 |
| Electrical income | 10,800 | 11,900 |
| T.V. hook-up | 10,100 | 11,200 |
| Interest | 4,400 | 14,000 |
| Sundry | 6,900 | 7,600 |
| Total Miscellaneous Revenue | 47,800 | 61,900 |
| **NET OPERATING EXPENSES** | 2,595,500 | 2,852,100 |
| Contingency reserve | 100,000 | 100,000 |
| **NET OPERATING EXPENSES BEFORE ALLOCATION TO COMMERCIAL SPACE** | 2,695,500 | 2,952,100 |
| Less: Portion of operating expenses allocated to commercial space | 44,862 | 49,460 |
| User utility charges allocated to commercial space | 49,557 | 54,637 |
| **NET OPERATING EXPENSES FOR RESIDENTIAL APARTMENT UNITS** | 2,601,081 | 2,848,003 |
| OPERATING EXPENSES TO RENTAL APARTMENT UNITS | 2,187,716 | — |
| NET ASSESSMENTS TO CONDOMINIUM UNIT OWNERS | $ 413,365 | $2,848,003 |

(See accompanying notes and assumptions and accountant's report)

Philip Rootberg & Company
CERTIFIED PUBLIC ACCOUNTANTS

H-2

FILED DATE: 2/11/2020 2:20 PM 2020CH01705

FILED DATE: 2/11/2020 2:20 PM   2020CH01705

Schedule 1

### LAKE POINT TOWER CONDOMINIUM ASSOCIATION

#### SCHEDULE OF FORECASTED GENERAL OPERATING EXPENSES
#### FOR THE YEARS ENDING JUNE 30, 1989 AND 1991

|                                          | 1989 | 1991 |
|------------------------------------------|-----:|-----:|
| Building staff expense                   | $ 598,800 | $ 660,200 |
| Additional employee expense              | 150,200 | 165,600 |
| Uniform expense                          | 10,800 | 11,900 |
| Electricity expense                      | 666,500 | 734,800 |
| Water expense                            | 144,000 | 158,800 |
| Insurance                                | 289,700 | 319,400 |
| Fees and permits                         | 10,000 | 11,000 |
| Total Forecasted General Operating Expenses | $1,870,000 | $2,061,700 |

(See accompanying notes and assumptions and accountant's report)

925165148

Philip Rootberg & Company
CERTIFIED PUBLIC ACCOUNTANTS

H-3

## LAKE POINT TOWER CONDOMINIUM ASSOCIATION

### SCHEDULE OF FORECASTED BUILDING SERVICES
### FOR THE YEARS ENDING JUNE 30, 1989 AND 1991

|  | 1989 | 1991 |
|---|---|---|
| Scavenger expense | $ 44,000 | $ 48,500 |
| Exterminating | 12,000 | 13,200 |
| Security expense | 35,100 | 38,700 |
| Master antenna and intercom expense | 31,500 | 34,700 |
| Landscaping expense | 22,500 | 24,800 |
| Plant and flower expense | 8,000 | 8,800 |
| Total Forecasted Building Services | $153,100 | $168,700 |

(See accompanying notes and assumptions and accountant's report)

Philip Rootberg & Company
CERTIFIED PUBLIC ACCOUNTANTS

H-4

FILED DATE: 2/11/2020 2:20 PM   2020CH01705

Schedule 3

## LAKE POINT TOWER CONDOMINIUM ASSOCIATION

### SCHEDULE OF FORECASTED REPAIRS AND MAINTENANCE
### FOR THE YEARS ENDING JUNE 30, 1989 AND 1991

|  | 1989 | 1991 |
|---|---|---|
| Elevator expense | $ 99,100 | $109,300 |
| Window washing expense | 26,500 | 29,200 |
| Plumbing | 18,000 | 19,800 |
| Light bulb expense | 8,400 | 9,300 |
| Carpet and flooring expense | 8,100 | 8,900 |
| Carpeting expense | 1,200 | 1,300 |
| Electrical expense | 2,000 | 2,200 |
| Garbage rooms and chute expense | 5,000 | 5,500 |
| Equipment repair expense | 15,500 | 17,100 |
| Building exterior expense | 2,000 | 2,200 |
| Security system expense | 10,300 | 11,400 |
| Glass replacement expense | 12,800 | 14,100 |
| Locks and key expense | 1,200 | 1,300 |
| Ventilating and air conditioning | 36,500 | 40,200 |
| Snow removal expense | 900 | 1,000 |
| Cleaning supply expense | 36,000 | 39,700 |
| Total Forecasted Repairs and Maintenance | $283,500 | $312,500 |

(See accompanying notes and assumptions and accountant's report)

Philip Rootberg & Company
CERTIFIED PUBLIC ACCOUNTANTS

H-5

FILED DATE: 2/11/2020 2:20 PM   2020CH01705

Schedule 4

## LAKE POINT TOWER CONDOMINIUM ASSOCIATION

### SCHEDULE OF FORECASTED GENERAL AND ADMINISTRATIVE EXPENSES
### FOR THE YEARS ENDING JUNE 30, 1989 AND 1991

|  | 1989 | 1991 |
|---|---|---|
| Rent | $ 12,000 | $ 13,200 |
| Management fee | 63,300 | 69,800 |
| Office salaries | 107,500 | 118,500 |
| Accounting salaries | 55,000 | 60,600 |
| Payroll taxes and insurance | 22,100 | 24,400 |
| Office supplies | 12,000 | 13,200 |
| Telephone | 7,200 | 7,900 |
| Computer expense | 5,000 | 5,500 |
| Legal expense | 10,000 | 11,000 |
| Audit expense | 10,000 | 11,000 |
| Equipment rental expense | 10,300 | 11,400 |
| Postage expense | 3,600 | 4,000 |
| Printing expense | 10,000 | 11,000 |
| Newsletter expense | 8,200 | 9,000 |
| Dues expense | 500 | 600 |
| Total Forecasted General and Administrative Expenses | $336,700 | $371,100 |

(See accompanying notes and assumptions and accountant's report)

Philip Romberg & Company
CERTIFIED PUBLIC ACCOUNTANTS

H-6

FILED DATE: 2/11/2020 2:20 PM   2020CH01705

## LAKE POINT TOWER CONDOMINIUM ASSOCIATION

### NOTES AND ASSUMPTIONS TO FORECAST — Continued
### FOR THE YEARS ENDING JUNE 30, 1989 AND 1991

The accompanying financial forecast was prepared by Lake Point Tower Consultants, Inc., the general partner of Lake Point Tower Limited Partnership, which is the developer converting the apartment units into condominium units.

This forecast presents, to the best of the developer's knowledge and belief, the Association's expected net assessments for the year ending June 30, 1989 which is the year Phase I units are offered for sale and for the year ending June 30, 1991 which is the first full year after conversion of all apartment units to condominium units. Accordingly, the forecast reflects its judgment as of March 9, 1988, the date of this forecast, of the expected conditions and its expected course of action. The assumptions disclosed herein are those that the developer believes are significant to the forecast. There will usually be differences between forecasted and actual results, because events and circumstances frequently do not occur as expected, and those differences may be material. This forecast is based on the total cost of operating the entire building and the appropriate allocation thereof to the units converted to condominiums. The developer is anticipating the conversion of the residential units into condominium units in phases as described in the Property Report. This forecast and the accompanying notes and assumptions should be read in conjunction with the Property Report for Lake Point Tower Condominium.

### Note 1 — Organization

The Lake Point Tower Condominium Association will be incorporated on the date the Declaration of Condominium Ownership is recorded which is presently anticipated by the developer to be July 15, 1988. It will be incorporated as an Illinois general not-for-profit corporation for the purpose of administrating and operating the condominium building located at 505 North Lake Shore Drive, Chicago, Illinois.

### Note 2 — Miscellaneous Revenue

Forecasted maintenance, T.V. hook-up and electrical income are based on the previous three year experience and anticipated income from individual occupants.

### Note 3 — General Operating Expenses

Building staff and additional employee expenses are based on the actual current number of employees on staff adjusted for staff needs to operate a condominium. Annual costs incurred from the electricity and water expenses are estimated based on the previous three year experience plus a 5% increase.

Insurance expense is based on current policy costs from Liberty Mutual Insurance Company.

Real estate taxes have not been provided because it is anticipated that no assessment will be made to the common elements of the building as described in the Property Report. Therefore, all real estate taxes will be included in each unit owners' individual real estate tax bill. In the interim period, real estate taxes will be paid in accordance with the formulas set forth in the Operating Declaration.

### Note 4 — Building Services

Forecasted building services are based essentially on contracts and charges currently in effect.

### Note 5 — Repairs and Maintenance

Elevator expense is based on a contract in effect with Metropolitan Elevator Company plus $5,000 for anticipated repairs not covered by the contract.

92C16148

## LAKE POINT TOWER CONDOMINIUM ASSOCIATION

### NOTES AND ASSUMPTIONS TO FORECAST — Continued
### FOR THE YEARS ENDING JUNE 30, 1989 AND 1991

#### Note 6 — Working Capital Reserve

The Association will set up a reserve for working capital expenditures from collections from each individual purchaser at the time of closing in an amount equal to 2 months of assessments. The board of directors of the Condominium Association may designate a portion of this reserve to be used as a replacement reserve.

#### Note 7 — Allocation to Commercial Space

All operating expenses are being allocated to the commercial space at 1.57% except for elevator expense which is being allocated at 5.28% since there will be more commercial usage of certain elevators. Additionally, no allocation is being made to the commercial space for legal and audit expenses as these costs are specifically related to the condominium units. The 1.57% is based on the appraised value of the commercial space as compared to the total value of the entire building. User utility charges directly related to the commercial space is presented as a reduction to the net operating expenses based on the developer's estimation of these expenses.

The value of the entire building is the total of the appraised value of the commercial space plus the Introductory Prices of the residential apartment units as reflected in Exhibit G of the Property Report.

#### Note 8 — Net Assessment to Condominium Unit Owners

It is anticipated that 90 units will be converted into condominium units in Phase I as discussed in the Property Report. As reflected in the Property Report, these 90 units will comprise 15.89205% of the anticipated final percentage ownership interest in the common elements of the building.

The net assessment to condominium unit owners for the year ending June 30, 1989 has been determined by multiplying the net operating expenses for residential apartment units by 15.89205%.

During the condominium conversion period, expenses not allocated to the condominium unit owners will remain as part of the operations related to the apartments rented.

#### Note 9 — Forecasted Operating Expenses and Miscellaneous Revenue
#### for the Year Ending June 30, 1991

It is anticipated that the year ending June 30, 1991 will be the first full year all the residential apartment units will be part of the condominium association. The forecasted operating expense and miscellaneous revenues are forecasted to increase at 5 percent annually for 1990 and 1991.

The year ended June 30, 1990, which is a transition year in the conversion process, is not being presented in this forecast. The forecasted net operating expense for the residential apartment units for June 30, 1990 is approximately $2,720,000.

FILED DATE: 2/11/2020 2:20 PM   2020CH01705

9256148

## EXHIBIT I

PARCEL K (PART OF POOL ABOVE 2ND FLOOR OF 2-STORY
COMMERCIAL BUILDING):
ALL THAT PART OF LOT 7 IN CHICAGO DOCK AND CANAL COMPANY'S
PESHTIGO DOCK ADDITION IN SECTION 10, TOWNSHIP 39 NORTH,
RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, WHICH LIES
SOUTH OF THE SOUTH LINE OF GRAND AVENUE EXTENDED EAST;
NORTH OF THE NORTH LINE OF A STRIP OF LAND 74.00 FEET IN
WIDTH NOW USED AS EAST ILLINOIS STREET; WEST OF THE WEST
LINE OF STREETER DRIVE AND EAST OF THE EAST LINE OF NORTH
LAKE SHORE DRIVE, ESTABLISHED BY DEED DATED JULY 25, 1929
IN CONDEMNATION PROCEEDINGS GENERAL NUMBER B-177476 IN
CIRCUIT COURT OF COOK COUNTY, ILLINOIS, BOUNDED AND
DESCRIBED AS FOLLOWS:
COMMENCING AT A POINT ON THE SOUTH LINE OF THE NORTH 74.00
FEET OF SAID LOT 7 WHICH IS THE SOUTH LINE OF EAST GRAND
AVENUE PER DOCUMENT NO. 5249665 SAID POINT BEING 357.76
FEET EAST OF THE WEST LINE OF SAID LOT 7; THENCE NORTH 89
DEGREES 43 MINUTES 30 SECONDS EAST ALONG SAID SOUTH LINE
252.87 FEET; THENCE SOUTH 0 DEGREES 17 MINUTES 10 SECONDS
EAST 87.29 FEET TO A POINT "X", SAID POINT BEING THE POINT
OF BEGINNING OF THE PARCEL OF AIR SPACE HEREIN DESCRIBED;
THENCE SOUTHEASTERLY AND SOUTHERLY 70.71 FEET ALONG THE ARC
OF A CIRCLE CONVEX TO THE EAST HAVING A RADIUS OF 63.75
FEET AND WHOSE CHORD BEARS SOUTH 5 DEGREES 02 MINUTES 09
SECONDS EAST 67.14 FEET TO A POINT OF INTERSECTION WITH AN
ARC OF ANOTHER CIRCLE; THENCE SOUTHWESTERLY 9.41 FEET ALONG
THE ARC OF SAID CIRCLE CONVEX TO THE SOUTHEAST HAVING A
RADIUS OF 34.81 FEET AND WHOSE CHORD BEARS SOUTH 36 DEGREES
04 MINUTES 09 SECONDS WEST 9.38 FEET TO A POINT; THENCE
NORTH 0 DEGREES 17 MINUTES 10 SECONDS WEST 74.46 FEET TO
THE HEREINABOVE DESCRIBED POINT "X", BEING ALSO THE POINT
OF BEGINNING OF THE PARCEL OF AIR SPACE HEREIN DESCRIBED;
SAID PARCEL OF AIR SPACE HAVING AS A LOWER LIMIT A
HORIZONTAL PLANE OF ELEVATION +43.05 FEET (CHICAGO CITY
DATUM), ALL IN COOK COUNTY, ILLINOIS.

PARCEL L (POOL AND SPA PARCEL BELOW 1ST FLOOR):
ALL THAT PART OF LOT 7 IN CHICAGO DOCK AND CANAL COMPANY'S
PESHTIGO DOCK ADDITION IN SECTION 10, TOWNSHIP 39 NORTH,
RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, WHICH LIES
SOUTH OF THE SOUTH LINE OF GRAND AVENUE EXTENDED EAST;
NORTH OF THE NORTH LINE OF A STRIP OF LAND 74.00 FEET IN
WIDTH NOW USED AS EAST ILLINOIS STREET; WEST OF THE WEST
LINE OF STREETER DRIVE AND EAST OF THE EAST LINE OF NORTH
LAKE SHORE DRIVE, ESTABLISHED BY DEED DATED JULY 25, 1929
IN CONDEMNATION PROCEEDINGS GENERAL NUMBER B-177476 IN
CIRCUIT COURT OF COOK COUNTY, ILLINOIS, BOUNDED AND
DESCRIBED AS FOLLOWS:

FILED DATE: 2/11/2020 2:20 PM   2020CH01705

FILED DATE: 2/11/2020 2:20 PM   2020CH01705

COMMENCING AT A POINT ON THE SOUTH LINE OF THE NORTH 74.00
FEET OF SAID LOT 7 WHICH IS THE SOUTH LINE OF EAST GRAND
AVENUE PER DOCUMENT NO. 5249665 SAID POINT BEING 357.76
FEET EAST OF THE WEST LINE OF SAID LOT 7; THENCE NORTH 89
DEGREES 43 MINUTES 30 SECONDS EAST ALONG SAID SOUTH LINE
255.72 FEET; THENCE CONTINUING NORTH 89 DEGREES 43 MINUTES
30 SECONDS EAST ALONG SAID SOUTH LINE 286.52 FEET TO A
POINT ON THE WEST LINE OF NORTH STREETER DRIVE PER DOCUMENT
NO. 5249665, SAID POINT BEING THE POINT OF BEGINNING OF THE
FOLLOWING DESCRIBED PARCEL OF LAND; THENCE SOUTH 0 DEGREES
09 MINUTES 53 SECONDS EAST, ALONG SAID WEST LINE 91.20
FEET; THENCE SOUTH 89 DEGREES 42 MINUTES 42 SECONDS WEST,
43.80 FEET; THENCE NORTH 0 DEGREES 17 MINUTES 18 SECONDS
WEST, 20.15 FEET; THENCE SOUTH 89 DEGREES 42 MINUTES 42
SECONDS WEST, 7.20 FEET; THENCE NORTH 0 DEGREES 17 MINUTES
18 SECONDS WEST, 62.60 FEET; THENCE SOUTH 89 DEGREES 42
MINUTES 42 SECONDS WEST, 14.68 FEET; THENCE NORTH 0 DEGREES
17 MINUTES 18 SECONDS WEST, 8.47 FEET TO THE POINT OF
INTERSECTION WITH THE SOUTH LINE OF SAID EAST GRAND AVENUE;
THENCE NORTH 89 DEGREES 43 MINUTES 30 SECONDS EAST, ALONG
SAID SOUTH LINE, 65.88 FEET TO THE HEREINABOVE DESIGNATED
POINT OF BEGINNING; SAID PARCEL OF LAND HAVING AS A LOWER
LIMIT A HORIZONTAL PLANE OF ELEVATION +6.92 FEET (CHICAGO
CITY DATUM) AND HAVING AS AN UPPER LIMIT A HORIZONTAL PLANE
OF ELEVATION +12.92 FEET (CHICAGO CITY DATUM), ALL IN COOK
COUNTY, ILLINOIS.

PARCEL M (POOL AND SPA PARCEL AT 1ST FLOOR):
ALL THAT PART OF LOT 7 IN CHICAGO DOCK AND CANAL COMPANY'S
PESHTIGO DOCK ADDITION IN SECTION 10, TOWNSHIP 39 NORTH,
RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, WHICH LIES
SOUTH OF THE SOUTH LINE OF GRAND AVENUE EXTENDED EAST;
NORTH OF THE NORTH LINE OF A STRIP OF LAND 74.00 FEET IN
WIDTH NOW USED AS EAST ILLINOIS STREET; WEST OF THE WEST
LINE OF STREETER DRIVE AND EAST OF THE EAST LINE OF NORTH
LAKE SHORE DRIVE, ESTABLISHED BY DEED DATED JULY 25, 1929
IN CONDEMNATION PROCEEDINGS GENERAL NUMBER B-177476 IN
CIRCUIT COURT OF COOK COUNTY, ILLINOIS, BOUNDED AND
DESCRIBED AS FOLLOWS:
COMMENCING AT A POINT ON THE SOUTH LINE OF THE NORTH 74.00
FEET OF SAID LOT 7 WHICH IS THE SOUTH LINE OF EAST GRAND
AVENUE PER DOCUMENT NO. 5249665 SAID POINT BEING 357.76
FEET EAST OF THE WEST LINE OF SAID LOT 7; THENCE NORTH 89
DEGREES 43 MINUTES 30 SECONDS EAST ALONG SAID SOUTH LINE
255.72 FEET; THENCE CONTINUING NORTH 89 DEGREES 43 MINUTES
30 SECONDS EAST ALONG SAID SOUTH LINE 286.52 FEET TO A
POINT ON THE WEST LINE OF NORTH STREETER DRIVE PER DOCUMENT
NO. 5249665, SAID POINT BEING THE POINT OF BEGINNING OF THE
FOLLOWING DESCRIBED PARCEL OF LAND; THENCE SOUTH 0 DEGREES
09 MINUTES 53 SECONDS EAST, ALONG SAID WEST LINE 91.64
FEET; THENCE SOUTH 89 DEGREES 42 MINUTES 42 SECONDS WEST,
44.09 FEET; THENCE NORTH 0 DEGREES 17 MINUTES 18 SECONDS
WEST, 20.22 FEET; THENCE SOUTH 89 DEGREES 42 MINUTES 42
SECONDS WEST, 7.31 FEET; THENCE NORTH 0 DEGREES 17 MINUTES
18 SECONDS WEST, 62.45 FEET; THENCE SOUTH 89 DEGREES 42
MINUTES 42 SECONDS WEST, 14.82 FEET; THENCE NORTH 0 DEGREES
17 MINUTES 18 SECONDS WEST, 8.98 FEET TO THE POINT OF
INTERSECTION WITH THE SOUTH LINE OF SAID EAST GRAND AVENUE;

I-2

FILED DATE: 2/11/2020 2:20 PM 2020CH01705

THENCE NORTH 89 DEGREES 43 MINUTES 30 SECONDS EAST, ALONG
SAID SOUTH LINE, 66.43 FEET TO THE HEREINABOVE DESIGNATED
POINT OF BEGINNING; SAID PARCEL OF LAND HAVING AS A LOWER
LIMIT A HORIZONTAL PLANE OF ELEVATION +12.92 FEET (CHICAGO
CITY DATUM) AND HAVING AS AN UPPER LIMIT A HORIZONTAL PLANE
OF ELEVATION +28.91 FEET (CHICAGO CITY DATUM), ALL IN COOK
COUNTY, ILLINOIS.

PARCEL N (SPA PARCEL AT 2ND FLOOR):
ALL THAT PART OF LOT 7 IN CHICAGO DOCK AND CANAL COMPANY'S
PESHTIGO DOCK ADDITION IN SECTION 10, TOWNSHIP 39 NORTH,
RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, WHICH LIES
SOUTH OF THE SOUTH LINE OF GRAND AVENUE EXTENDED EAST;
NORTH OF THE NORTH LINE OF A STRIP OF LAND 74.00 FEET IN
WIDTH NOW USED AS EAST ILLINOIS STREET; WEST OF THE WEST
LINE OF STREETER DRIVE AND EAST OF THE EAST LINE OF NORTH
LAKE SHORE DRIVE, ESTABLISHED BY DEED DATED JULY 25, 1929
IN CONDEMNATION PROCEEDINGS GENERAL NUMBER B-177476 IN
CIRCUIT COURT OF COOK COUNTY, ILLINOIS, BOUNDED AND
DESCRIBED AS FOLLOWS:
COMMENCING AT A POINT ON THE SOUTH LINE OF THE NORTH 74.00
FEET OF SAID LOT 7 WHICH IS THE SOUTH LINE OF EAST GRAND
AVENUE PER DOCUMENT NO. 5249665 SAID POINT BEING 357.76
FEET EAST OF THE WEST LINE OF SAID LOT 7; THENCE NORTH 89
DEGREES 43 MINUTES 30 SECONDS EAST ALONG SAID SOUTH LINE
252.87 FEET; THENCE CONTINUING NORTH 89 DEGREES 43 MINUTES
30 SECONDS EAST ALONG SAID SOUTH LINE 289.37 FEET TO A
POINT ON THE WEST LINE OF NORTH STREETER DRIVE PER DOCUMENT
NO. 5249665, SAID POINT BEING THE POINT OF BEGINNING OF THE
FOLLOWING DESCRIBED PARCEL OF LAND; THENCE SOUTH 0 DEGREES
09 MINUTES 53 SECONDS EAST, ALONG SAID WEST LINE 92.41
FEET; THENCE SOUTH 89 DEGREES 42 MINUTES 42 SECONDS WEST,
31.58 FEET; THENCE SOUTH 0 DEGREES 17 MINUTES 18 SECONDS
EAST, 0.67 FEET; THENCE SOUTH 89 DEGREES 42 MINUTES 42
SECONDS WEST, 5.84 FEET; THENCE NORTH 0 DEGREES 17 MINUTES
18 SECONDS WEST, 8.51 FEET; THENCE SOUTH 89 DEGREES 42
MINUTES 42 SECONDS WEST, 28.43 FEET; THENCE NORTH 0 DEGREES
17 MINUTES 18 SECONDS WEST, 3.31 FEET; THENCE SOUTH 89
DEGREES 42 MINUTES 42 SECONDS WEST, 29.79 FEET; THENCE
NORTH 0 DEGREES 17 MINUTES 18 SECONDS WEST, 51.25 FEET;
THENCE NORTH 89 DEGREES 42 MINUTES 42 SECONDS EAST, 0.52
FEET; THENCE NORTH 0 DEGREES 17 MINUTES 18 SECONDS WEST,
12.21 FEET; THENCE SOUTH 89 DEGREES 42 MINUTES 42 SECONDS
WEST, 0.46 FEET; THENCE NORTH 0 DEGREES 17 MINUTES 18
SECONDS WEST, 17.81 FEET TO THE POINT OF INTERSECTION WITH
THE SOUTH LINE OF SAID EAST GRAND AVENUE; THENCE NORTH 89
DEGREES 43 MINUTES 30 SECONDS EAST, ALONG SAID SOUTH LINE,
95.79 FEET TO THE HEREINABOVE DESIGNATED POINT OF
BEGINNING; SAID PARCEL OF LAND HAVING AS A LOWER LIMIT A
HORIZONTAL PLANE OF ELEVATION +28.91 FEET (CHICAGO CITY
DATUM) AND HAVING AS AN UPPER LIMIT A HORIZONTAL PLANE OF
ELEVATION +42.89 FEET (CHICAGO CITY DATUM), ALL IN COOK
COUNTY, ILLINOIS.

I-3

92616148

PARCEL P (POOL PARCEL AT 3RD FLOOR - COMMERCIAL PROPERTY)
PART I
ALL THAT PART OF LOT 7 IN CHICAGO DOCK AND CANAL COMPANY'S
PESHTIGO DOCK ADDITION IN SECTION 10, TOWNSHIP 39 NORTH,
RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, WHICH LIES
SOUTH OF THE SOUTH LINE OF GRAND AVENUE EXTENDED EAST;
NORTH OF THE NORTH LINE OF A STRIP OF LAND 74.00 FEET IN
WIDTH NOW USED AS EAST ILLINOIS STREET; WEST OF THE WEST
LINE OF STREETER DRIVE AND EAST OF THE EAST LINE OF NORTH
LAKE SHORE DRIVE, ESTABLISHED BY DEED DATED JULY 25, 1929
IN CONDEMNATION PROCEEDINGS GENERAL NUMBER B-177476 IN
CIRCUIT COURT OF COOK COUNTY, ILLINOIS, BOUNDED AND
DESCRIBED AS FOLLOWS:
COMMENCING AT A POINT ON THE SOUTH LINE OF THE NORTH 74.00
FEET OF SAID LOT 7, WHICH IS THE SOUTH LINE OF EAST GRAND
AVENUE PER DOCUMENT NO. 5249665, SAID POINT BEING 357.76
FEET EAST OF THE WEST LINE OF LOT 7; THENCE NORTH 89
DEGREES 43 MINUTES 30 SECONDS EAST, ALONG SAID SOUTH LINE,
252.87 FEET TO A POINT, SAID POINT BEING 610.63 FEET EAST
OF THE WEST LINE OF LOT 7; THENCE SOUTH 0 DEGREES 17
MINUTES 10 SECONDS EAST, 87.29 FEET TO A POINT "X"; THENCE
CONTINUING SOUTH 0 DEGREES 17 MINUTES 10 SECONDS EAST 74.46
FEET TO A POINT OF COMPOUND CURVATURE, SAID POINT BEING
POINT OF BEGINNING NUMBER 1 OF THE PARCEL OF AIR SPACE
HEREIN DESCRIBED; THENCE SOUTHWESTERLY AND WESTERLY 49.52
FEET ALONG THE ARC OF A CIRCLE CONVEX TO THE SOUTHEAST,
HAVING A RADIUS OF 34.81 FEET AND WHOSE CHORD BEARS SOUTH
84 DEGREES 34 MINUTES 08 SECONDS WEST, 45.45 FEET TO A
POINT OF INTERSECTION WITH AN ARC OF ANOTHER CIRCLE; THENCE
NORTHWESTERLY AND NORTHERLY 90.30 FEET ALONG THE ARC OF
SAID CIRCLE CONVEX TO THE SOUTHWEST HAVING A RADIUS OF
61.59 FEET AND WHOSE CHORD BEARS NORTH 13 DEGREES 56
MINUTES 29 SECONDS WEST, 82.43 FEET TO A POINT OF
INTERSECTION WITH AN ARC OF ANOTHER CIRCLE; THENCE
NORTHEASTERLY AND EASTERLY 57.91 FEET ALONG THE ARC OF SAID
CIRCLE CONVEX TO THE NORTHWEST HAVING A RADIUS OF 33.09
FEET AND WHOSE CHORD BEARS NORTH 74 DEGREES 20 MINUTES 43
SECONDS EAST, 50.80 FEET TO A POINT OF INTERSECTION WITH AN
ARC OF ANOTHER CIRCLE; THENCE SOUTHEASTERLY 21.87 FEET
ALONG THE ARC OF SAID CIRCLE CONVEX TO THE NORTHEAST,
HAVING A RADIUS OF 65.76 FEET AND WHOSE CHORD BEARS SOUTH
46 DEGREES 37 MINUTES 38 SECONDS EAST, 21.76 FEET TO THE
HEREINABOVE DESCRIBED POINT "X", SAID POINT BEING ALSO A
POINT OF COMPOUND CURVATURE; THENCE SOUTH 0 DEGREES 17
MINUTES 10 SECONDS EAST, 74.46 FEET TO THE HEREINABOVE
DESCRIBED POINT OF BEGINNING NUMBER 1; SAID PARCEL OF AIR
SPACE HAVING AS A LOWER LIMIT A HORIZONTAL PLANE OF
ELEVATION +38.20 FEET (CHICAGO CITY DATUM),

ALSO

I-4

FILED DATE: 2/11/2020 2:20 PM   2020CH01705

PART II
THAT PART OF LOT 7 AFORESAID, DESCRIBED AS FOLLOWS:
COMMENCING AT THE HEREINABOVE DESIGNATED POINT "X"; THENCE
SOUTH 0 DEGREES 17 MINUTES 10 SECONDS EAST, 20.57 FEET TO
POINT OF BEGINNING NUMBER 2 OF THE PARCEL OF AIR SPACE
HEREIN DESCRIBED; THENCE SOUTH 0 DEGREES 17 MINUTES 10
SECONDS EAST, 2.31 FEET; THENCE SOUTH 89 DEGREES 42 MINUTES
50 SECONDS WEST, 7.91 FEET; THENCE SOUTH 0 DEGREES 17
MINUTES 10 SECONDS EAST, 35.15 FEET; THENCE SOUTH 89
DEGREES 42 MINUTES 50 SECONDS WEST, 36.76 FEET; THENCE
NORTH 0 DEGREES 17 MINUTES 10 SECONDS WEST, 18.71 FEET;
THENCE SOUTH 89 DEGREES 42 MINUTES 50 SECONDS WEST, 14.81
FEET; THENCE NORTH 0 DEGREES 17 MINUTES 10 SECONDS WEST,
16.39 FEET; THENCE SOUTH 89 DEGREES 42 MINUTES 50 SECONDS
WEST, 14.32 FEET; THENCE NORTH 0 DEGREES 17 MINUTES 10
SECONDS WEST, 2.36 FEET; THENCE NORTH 89 DEGREES 42 MINUTES
50 SECONDS EAST, 73.80 FEET TO THE HEREINABOVE DESCRIBED
POINT OF BEGINNING NUMBER 2; SAID PARCEL OF AIR SPACE
HAVING AS A LOWER LIMIT A HORIZONTAL PLANE OF ELEVATION
+30.33 FEET (CHICAGO CITY DATUM) AND HAVING AS AN UPPER
LIMIT A HORIZONTAL PLANE OF ELEVATION +38.20 FEET (CHICAGO
CITY DATUM),

ALSO

PART III
THAT PART OF LOT 7 AFORESAID, DESCRIBED AS FOLLOWS:
COMMENCING AT THE HEREINABOVE DESIGNATED POINT "X"; THENCE
SOUTH 0 DEGREES 17 MINUTES 10 SECONDS EAST, 22.88 FEET;
THENCE SOUTH 89 DEGREES 42 MINUTES 50 SECONDS WEST, 7.91
FEET; THENCE SOUTH 0 DEGREES 17 MINUTES 10 SECONDS EAST,
35.15 FEET; THENCE SOUTH 89 DEGREES 42 MINUTES 50 SECONDS
WEST, 36.76 FEET TO POINT OF BEGINNING NUMBER 3 OF THE
PARCEL OF AIR SPACE HEREIN DESCRIBED; THENCE SOUTH 89
DEGREES 42 MINUTES 50 SECONDS WEST, 31.20 FEET; THENCE
NORTH 0 DEGREES 17 MINUTES 10 SECONDS WEST, 35.10 FEET;
THENCE NORTH 89 DEGREES 42 MINUTES 50 SECONDS EAST, 16.39
FEET; THENCE SOUTH 0 DEGREES 17 MINUTES 10 SECONDS EAST,
16.39 FEET; THENCE NORTH 89 DEGREES 42 MINUTES 50 SECONDS
EAST, 14.81 FEET; THENCE SOUTH 0 DEGREES 17 MINUTES 10
SECONDS EAST, 18.71 FEET TO THE HEREINABOVE DESCRIBED POINT
OF BEGINNING NUMBER 3; SAID PARCEL OF AIR SPACE HAVING AS A
LOWER LIMIT A HORIZONTAL PLANE OF ELEVATION +30.55 FEET
(CHICAGO CITY DATUM) AND HAVING AS AN UPPER LIMIT A
HORIZONTAL PLANE OF ELEVATION +38.20 FEET (CHICAGO CITY
DATUM),

ALSO

I-5

FILED DATE: 2/11/2020 2:20 PM   2020CH01705

92616148

PART IV
THAT PART OF LOT 7 AFORESAID, DESCRIBED AS FOLLOWS:
COMMENCING AT THE HEREINABOVE DESIGNATED POINT "X"; THENCE
SOUTH 0 DEGREES 17 MINUTES 10 SECONDS EAST, 20.57 FEET;
THENCE NORTH 89 DEGREES 42 MINUTES 50 SECONDS EAST, 8.24
FEET TO POINT OF BEGINNING NUMBER 4 OF THE PARCEL OF AIR
SPACE HEREIN DESCRIBED; THENCE SOUTH 89 DEGREES 42 MINUTES
50 SECONDS WEST, 48.30 FEET; THENCE NORTHEASTERLY 17.01
FEET ALONG THE ARC OF A CIRCLE CONVEX TO THE NORTHWEST
HAVING A RADIUS OF 18.93 FEET AND WHOSE CHORD BEARS NORTH
11 DEGREES 20 MINUTES 04 SECONDS EAST, 16.45 FEET TO A
POINT OF COMPOUND CURVATURE; THENCE NORTHEASTERLY 15.23
FEET ALONG THE ARC OF A CIRCLE CONVEX TO THE NORTHWEST
HAVING A RADIUS OF 22.38 FEET AND WHOSE CHORD BEARS NORTH
56 DEGREES 34 MINUTES 42 SECONDS EAST, 14.93 FEET; THENCE
NORTH 13 DEGREES 55 MINUTES 45 SECONDS WEST, ALONG A LINE
BEING RADIAL TO THE LAST DESCRIBED CIRCLE, 1.00 FEET;
THENCE NORTH 78 DEGREES 31 MINUTES 01 SECONDS EAST, 2.00
FEET TO THE POINT OF INTERSECTION WITH A LINE, SAID LINE
BEING ALSO RADIAL TO THE LAST DESCRIBED CIRCLE; THENCE
SOUTH 09 DEGREES 02 MINUTES 12 SECONDS EAST ALONG SAID
RADIAL LINE, 1.00 FEET; THENCE SOUTHEASTERLY 23.97 FEET
ALONG THE ARC OF A CIRCLE, CONVEX TO THE NORTHEAST, HAVING
A RADIUS OF 22.38 FEET AND WHOSE CHORD BEARS SOUTH 68
DEGREES 20 MINUTES 51 SECONDS EAST, 22.84 FEET TO THE POINT
OF INTERSECTION WITH ANOTHER ARC OF A CIRCLE; THENCE
SOUTHEASTERLY 18.74 FEET ALONG THE ARC OF SAID CIRCLE,
CONVEX TO THE NORTHEAST, HAVING A RADIUS OF 58.45 FEET AND
WHOSE CHORD BEARS SOUTH 30 DEGREES 36 MINUTES 08 SECONDS
EAST, 18.66 FEET TO THE HEREINABOVE DESCRIBED POINT OF
BEGINNING NUMBER 4; SAID PARCEL OF AIR SPACE HAVING AS A
LOWER LIMIT A HORIZONTAL PLANE OF ELEVATION +30.44 FEET
(CHICAGO CITY DATUM) AND HAVING AS AN UPPER LIMIT A
HORIZONTAL PLANE OF ELEVATION +38.20 FEET (CHICAGO CITY
DATUM),

ALSO

PART V
THAT PART OF LOT 7 AFORESAID, DESCRIBED AS FOLLOWS:
COMMENCING AT THE HEREINABOVE DESIGNATED POINT "X"; THENCE
SOUTH 0 DEGREES 17 MINUTES 10 SECONDS EAST, 22.88 FEET TO
POINT "A", SAID POINT BEING ALSO POINT OF BEGINNING NUMBER
5 OF THE PARCEL OF AIR SPACE HEREIN DESCRIBED; THENCE SOUTH
89 DEGREES 42 MINUTES 50 SECONDS WEST, 7.91 FEET TO POINT
"B"; THENCE SOUTH 0 DEGREES 17 MINUTES 10 SECONDS EAST,
24.90 FEET TO POINT "C"; THENCE NORTH 89 DEGREES 42 MINUTES
50 SECONDS EAST, 7.91 FEET TO POINT "D"; THENCE NORTH 0
DEGREES 17 MINUTES 10 SECONDS WEST, 24.90 FEET TO AFORESAID
POINT "A", BEING THE HEREINABOVE DESCRIBED POINT OF
BEGINNING NUMBER 5; SAID PARCEL OF AIR SPACE HAVING AS A
LOWER LIMIT AN INCLINED PLANE WHICH INTERSECTS AT AN
ELEVATION OF +36.82 FEET A VERTICAL PLANE PASSING THROUGH
THE VERTICAL PROJECTIONS OF AFORESAID POINTS "A & B", AND
WHICH INTERSECTS AT AN ELEVATION OF +38.20 FEET A VERTICAL
PLANE PASSING THROUGH AFORESAID POINTS "C & D", AND HAVING
AS AN UPPER LIMIT A HORIZONTAL PLANE OF ELEVATION +38.20
FEET (CHICAGO CITY DATUM),

ALSO

I-6

FILED DATE: 2/11/2020 2:20 PM   2020CH01705

PART VI
THAT PART OF LOT 7 AFORESAID, DESCRIBED AS FOLLOWS:
COMMENCING AT THE HEREINABOVE DESIGNATED POINT "X"; THENCE
SOUTH 0 DEGREES 17 MINUTES 10 SECONDS EAST, 47.78 FEET TO
POINT OF BEGINNING NUMBER 6 OF THE PARCEL OF AIR SPACE
HEREIN DESCRIBED; THENCE SOUTH 0 DEGREES 17 MINUTES 10
SECONDS EAST, 8.59 FEET; THENCE SOUTH 89 DEGREES 42 MINUTES
50 SECONDS WEST, 1.29 FEET; THENCE SOUTH 0 DEGREES 17
MINUTES 10 SECONDS EAST, 2.69 FEET; THENCE NORTH 89 DEGREES
42 MINUTES 50 SECONDS EAST, 1.29 FEET; THENCE SOUTH 0
DEGREES 17 MINUTES 10 SECONDS EAST, 8.75 FEET; THENCE SOUTH
89 DEGREES 42 MINUTES 50 SECONDS WEST, 44.89 FEET; THENCE
NORTH 0 DEGREES 17 MINUTES 10 SECONDS WEST, 9.78 FEET;
THENCE NORTH 89 DEGREES 42 MINUTES 50 SECONDS EAST, 36.98
FEET; THENCE NORTH 0 DEGREES 17 MINUTES 10 SECONDS WEST,
10.25 FEET; THENCE NORTH 89 DEGREES 42 MINUTES 50 SECONDS
EAST, 7.91 FEET TO THE HEREINABOVE DESCRIBED POINT OF
BEGINNING NUMBER 6; SAID PARCEL OF AIR SPACE HAVING AS A
LOWER LIMIT A HORIZONTAL PLANE OF ELEVATION +36.50 FEET
(CHICAGO CITY DATUM) AND HAVING AS AN UPPER LIMIT A
HORIZONTAL PLANE OF ELEVATION +38.20 FEET (CHICAGO CITY
DATUM), ALL IN COOK COUNTY, ILLINOIS.

FILED DATE: 2/11/2020 2:20 PM   2020CH01705

92616148

FILED DATE: 2/11/2020 2:20 PM   2020CH01705

95898506

DEPT-01 RECORDING          $55.00
T$0012   TRAN 8390 12/27/95 14:55:00
$7626 $ JM *-95-898506
COOK COUNTY RECORDER

**FIRST SPECIAL AMENDMENT TO AMENDED AND
RESTATED DECLARATION OF COVENANTS,
CONDITIONS, RESTRICTIONS AND EASEMENTS**

This instrument was prepared by and
mail to:
Herbert A. Kessel, Esq.
BEERMANN, SWERDLOVE, WOLOSHIN,
BAREZKY, BECKER, GENIN & LONDON
161 North Clark Street, #2600
Chicago, Illinois 60601-3221
(312) 621-9700

95898506

BOX 333-CTI

FILED DATE: 2/11/2020 2:20 PM 2020CH01705

### FIRST SPECIAL AMENDMENT TO AMENDED AND RESTATED DECLARATION OF COVENANTS, CONDITIONS, RESTRICTIONS AND EASEMENTS

This First Special Amendment to Amended and Restated Declaration is entered into this 21st day of December , 1995 by American National Bank and Trust Company of Chicago, as Trustee under Trust Agreement dated January 7, 1988 and known as Trust No. 1043-99-09 ("Declarant").

### W I T N E S S E T H:

WHEREAS, Declarant executed that certain Amended and Restated Declaration of Covenants, Conditions, Restrictions and Easements dated July 7, 1992 and recorded in the Office of the Recorder of Deeds of Cook County, Illinois as Document No. 92616148 ("Declaration"); and

WHEREAS, the Declaration subjected the real estate legally described on Exhibit A attached hereto to the terms of the Declaration ("Property"); and

WHEREAS, the Declarant, pursuant to Article 27.4.B of the Declaration, desires to amend the terms of the Declaration and to create such complementary and supplemental grants and reservations of easements and related provisions as may be necessary in order to effectuate the maintenance, operation and administration of the Property.

NOW, THEREFORE, the Declarant hereby declares that the Declaration is hereby amended as follows:

1. Section 27.18 to added as follows:

"27.18. Notwithstanding any provisions contained herein to the contrary, the following shall apply:

(a) That the 1.57% share of Operating Expenses allocated to the owner(s) of the Commercial Property pursuant to Section 7.3(d) hereof shall be payable by each of the current owners of the Commercial Property (and their respective successors and assigns) as follows:

| Owner | Total Footage | Percentage | Reallocation |
|---|---|---|---|
| Condominium Association | 5,589.70 | 11.28% | .18% |
| Laundry | 1,855.00 | 3.74% | .06% |
| Dry Cleaner | 1,010.00 | 2.04% | .03% |
| Lake Point Tower Limited Partnership ("Partnership") | 41,102.70 | 82.94% | 1.30% |
| | 49,557.40 | 100.00% | 1.57% |

said 1.57 allocation having been made (and to continue to be made) to each owner of the said 49,557.40 square feet of Commercial Property in proportion to each such owner's share of such 49,557.40 square feet of Commercial Property;

95898506

CNM294A 12/22/95.10

FILED DATE: 2/11/2020 2:20 PM    2020CH01705

(b)    That the share of utility expenses to be borne by the owner(s) of the Commercial Property pursuant to Section 7.3(d) hereof shall be payable by each of the current owners of the Commercial Property (and their respective successors and assigns) as follows:

| Owner | Total Footage | Percentage |
|---|---|---|
| Condominium Association | 5,589.70 | 11.28% |
| Laundry | 1,855.00 | 3.74% |
| Dry Cleaner | 1,010.00 | 2.04% |
| Partnership | 41,102.70 | 82.94% |
| | 49,557.40 | 100.00% |

said re-allocation of utility expense having been made (and to continue to be made) to each owner of Commercial Property encompassed by the said 49,557.40 square feet of Commercial Property in proportion to each such owner's share of such 49,557.40 square feet of Commercial Property;

(c)    That the 5.345% share of insurance expenses to be borne by the owner(s) of the Commercial Property pursuant to Section 7.3(d) hereof shall be payable by each of the current owners of the Commercial Property (and their respective successors and assigns) as follows:

| Owner | Total Footage | Percentage | Reallocation |
|---|---|---|---|
| Condominium Association | 8,741.00 | 10.28% | .549% |
| Laundry | 1,855.00 | 2.18% | .117% |
| Dry Cleaner | 1,010.00 | 1.19% | .064% |
| Partnership | 73,434.90 | 86.35% | 4.615% |
| | 85,041.00 | 100.00% | 5.345% |

said-reallocation of insurance expense having been made (and to continue to be made) to each owner of Commercial Property encompassed by the said 85,041 square feet of Commercial Property in proportion to each such owner's share of such 85,041 square feet of Commercial Property; and

(d)    That the 5.28% share of elevator expenses to be borne by the owner(s) of the Commercial Property pursuant to Section 7.3(d) hereof shall be payable by each of the current owners of the Commercial Property (and their respective successors and assigns) as follows:

| Owner | Total Footage | Percentage | Reallocation |
|---|---|---|---|
| Condominium Association | 8,741.00 | 10.28% | .54% |
| Laundry | 1,855.00 | 2.18% | .12% |
| Dry Cleaner | 1,010.00 | 1.19% | .06% |
| Partnership | 73,434.90 | 86.35% | 4.56% |
| | 85,041.00 | 100.00% | 5.28% |

said re-allocation of elevator expense having been made (and to continue to be made) to each owner of Commercial Property encompassed by the

CNM294A  12/22/95.10

said 85,041 square feet of Commercial Property in proportion to each such owner's share of such 85,041 square feet of Commercial Property.

The Partnership shall not be responsible for payment of Operating Expenses, elevator expenses, insurance expenses, or utility expense allocable to space to be submitted to the Declaration of Condominium Ownership For Lake Point Tower Condominium Association as Common Elements pursuant to that certain Master Agreement dated December 8, 1995, by and between Declarant, the Condominium Association and the Partnership ("Agreement") (including but not limited to the GE Room space) for periods subsequent to the Closing, as such term is defined in the Agreement; the Partnership shall, however, remain responsible for payment of Operating Expenses, elevator expenses, insurance expenses, and utility expenses allocable to such space for periods prior to the Closing."

2.      Section 27.19 is hereby added to the Declaration:

"27.19.      All space owned by Declarant as record title holder shall be restricted to prohibit the operation of a food market or grocery store therein, except that nothing herein shall prevent or preclude the Declarant from honoring the terms of a current lease with a food market or grocery store, or arranging for the lawful and orderly repossession of space from a current food market or grocery store lessee upon lease termination."

3.      Intentionally Omitted

4.      Section 27.20 is hereby added to the Declaration:

"27.20.      Subject to the continued tenancies of existing lessees of as the date of the recording of the First Special Amendment to this Declaration, the Commercial Property shall be restricted to occupancy only by retail merchants of the type which currently occupy or could be expected to occupy, such upscale retail venues as One Magnificent Mile, Water Place, 900 North Michigan Avenue and Chicago Place ("Upscale Retail Venues"), to the express exclusion, without limitation, of off-track betting facilities, pool or billiard establishments, video game or amusement arcades, establishments whose primary purpose is selling merchandise of a sexual nature (ie., adult book store, etc.); and shops whose primary business is the sale of tee-shirts or souvenirs to the extent they offer for sale primarily "low end" merchandise (it being expressly understood and agreed that shops whose primary business is the selling of tee-shirts or souvenirs shall be permitted in the Commercial Property so long as the shops themselves, and the merchandise they offer, are comparable in quality to similar shops, if any, in Upscale Retail Venues). In addition to the foregoing, for a period of five (5) years subsequent to the recording of the First Special Amendment to this Declaration, the current grocery store or food store shall have the exclusive right (but not the obligation) to conduct a fast food operation in Lake Point Tower, and the Declarant and/or its beneficiary shall expressly consent to any lease provisions by and between the Condominium Association and such grocery store or food market granting such exclusive five (5) year right. Upon expiration of the aforesaid five (5) year period, other fast food restaurants shall be permitted to operate in the Commercial Property, provided that they are comparable with respect to standards of decor and otherwise, to fast food restaurants operated in Upscale Retail Venues."

CNM294A  12/22/95.10

-3-

5.     Section 27.21 is hereby added to the Declaration:

"27.21.     The Partnership and the Condominium Association shall, within ten days after the Closing, as such term is defined in the Agreement, jointly and expeditiously retain the security consulting firm of Liability Consultants, Ltd. of Framingham, Massachusetts, or such other security consulting firm as the parties mutually agree upon, to evaluate Lake Point Tower security, and formulate suggested methods to achieve the following objective: To insulate residential portions of Lake Point Tower from non-residential and unauthorized traffic and protect the safety of inhabitants, without impeding access of business visitors and customers to the second and seventieth floor space owned by the Partnership. The scope of the security consulting firm's engagement shall include recommendations which anticipate and address the Partnership's installation of an escalator or other entryway providing direct access to the second floor Commercial Spaces, as such term is defined in the Agreement, without the need to go through the front lobby reception area. Representatives of both the Condominium Association and the Partnership shall be entitled to attend and participate in all meetings with the security consultant, and the actual implementation of any security measures shall be accomplished through the joint action of the parties. All costs and expenses with respect to or incurred in connection with the aforesaid security consulting firm's engagement, and all costs and expenses incurred in connection with implementing the security consulting firm's recommendations, shall be split evenly between the Partnership and the Condominium Association. The parties expressly agree to implement the recommendations of the security consultant, subject to the following restrictions and conditions: (a) security recommendations which would require visitors to the Cite Restaurant or a successor restaurant tenant to "sign in" or display any form of identification, or which would require doormen to secure telephonic approval prior to admitting Cite' Restaurant visitors to the interior of the Residential Tower, as such term is defined in the Agreement, are hereby expressly prohibited; and (b) the Partnership shall not be obligated to accept or implement any security recommendations as it believes would have a material detrimental impact on the Cite' Restaurant or any successor restaurant tenant. In the event of a dispute or disagreement as to whether a security recommendation satisfies the aforesaid "material detrimental impact" criteria, the issue shall be submitted to a security committee, comprised of equal numbers of Condominium Association and Partnership representatives, each with one vote. A security measure so submitted to the security committee with respect to measures impacting on the Cite' Restaurant or any successor restaurant tenant shall not be implemented unless approved by a simple majority vote of the entire security committee."

6.     Section 27.22 is hereby added to the Declaration:

"27.22.     Any escalator leading from the ground floor of Lake Point Tower to the second floor Commercial Spaces shall be (a) restricted to the interior perimeter of the Residential Tower (i.e., it shall not extend, at its base, to the "outside" of the Residential Tower), and (b) "securitized" at its ground floor landing, so as to permit "closing off" access to the escalator during non-business hours. Further, the exterior Residential Tower door which provides access to the escalator shall be kept locked during the second floor tenants' non-business hours, unless such door gives access to areas of the Residential Tower other than those accessed via the escalator."

CNM294A  12/22/91.10

-4-

FILED DATE: 2/11/2020 2:20 PM   2020CH01705

7.    Section 27.23 is hereby added to the Declaration:

"27.23.    The Condominium Association acknowledges that from the plane of the deck of the park situated on the third level of the Residential Tower ("Skyline Park"), down to the ground, the Partnership owns and controls, and shall hereafter own and control, the Residential Tower's exterior walls, and the Partnership affirms its continuing obligation to maintain said walls to the extent that such obligation is set forth in, and imposed upon it by, this Declaration. Further, the Residential Association acknowledges that the Partnership owns and controls, and shall hereafter own and control, the Residential Tower's existing Grand Avenue door, and will own and control any future doors or entrances constructed in or through the Residential Tower's exterior walls."

8.    Section 27.25 is hereby added to the Declaration:

"27.25.    With respect to any new entrances, windows, signage or awnings which are added to the exterior of Lake Point Tower, or with respect to any changes to the facade of the Building, the following conditions shall apply:

(a)    The Partnership shall be entitled to add up to two additional entrances on the Grand Avenue side of the Residential Tower for the purpose of providing direct entry to the premises of Partnership tenants. Nothing herein shall diminish the right of the Partnership to add, in any number and for any purpose, entrances on the remaining sides of the Residential Tower, subject to the requirement that all new entrances, regardless of who constructs them, shall be constructed only from glass, brass, granite or marble, or such other materials as are expressly approved, in the course of an overall aesthetic approval, by a simple majority vote of the Paragraph 24(e) Committee, as such term is defined in the Agreement, which approval shall not be unreasonably withheld;

(b)    With respect to the addition of any new windows on the Grand Avenue side of the Residential Tower, such windows must be appropriate for the particular tenant in question. All new windows added to the Residential Tower, whether on the Grand Avenue side of the Residential Tower or otherwise, must (i) be of the fixed-pane non-opening type, and (ii) must be aesthetically approved by simple majority vote of the Paragraph 24(e) Committee, which approval shall not unreasonably be withheld;

(c)    Neither the Condominium Association nor the Partnership shall affix to the exterior of Lake Point Tower any neon or flashing lights, except the existing rotunda taxi light. Moreover, (i) any signs hereafter affixed to the Grand Avenue exterior walls shall be substantially flush with the Building as such term is defined in the Agreement; and (ii) no banners shall be hung or displayed on the Building's Grand Avenue exterior walls. Without in any way limiting the foregoing, all other signage affixed to the Building's exterior walls shall be subject to approval by the Paragraph 24(e) Committee;

CNM294A  12/22/95.10

-5-

95894506

FILED DATE: 2/11/2020 2:20 PM   2020CH01705

(d)     In the event the Partnership or any tenant of the Partnership seeks to conduct an alfresco dining operation on the sidewalk or grassy area adjacent to the east (Streeter) side of Lake Point Tower, the Condominium Association agrees that it will voice neither support for nor opposition to such venture. Further, in the event the Partnership or any tenant of the Partnership seeks to install an awning at the east (Streeter) side of Lake Point Tower, the Condominium Association agrees to consent to said awning, subject to aesthetic approval by simple majority vote of the Paragraph 24(e) Committee, which approval shall not be unreasonably withheld;

(e)     A committee comprised of two representatives from the Residential Association, two representatives from the Partnership, and George Schipporeit or another person chosen by simple majority vote of the remaining members of the committee (the "Architect") must aesthetically approve all plans and specifications for additional exterior entrances, windows, signage, awnings or other modifications to the facade of the Building, which approval shall not be unreasonably withheld. Each member of the committee shall have one vote, and approval of plans and specifications shall require no more than a simple majority vote. Responsibility for payment of any fees charged by the Architect shall be shared equally by the Condominium Association and the Partnership."

9.     Section 27.24 is hereby added to the Declaration:

"27.24.     The Partnership and the Condominium Association agree that in the event there is any future litigation between them relating to the Agreement, or this Declaration, as amended, the party which loses such litigation, as a result of a final ruling of court not subject to further appeal, shall pay the prevailing party's legal fees and costs."

10.     Section 27.25 is hereby added to the Declaration:

"27.25.     The Partnership acknowledges and reaffirms its obligation under this Declaration to maintain, on a timely basis, those spaces which it owns in Lake Point Tower which contain mechanical equipment providing service to the Condominium Association. The foregoing commitment to maintain mechanical room spaces is not a commitment to keep said spaces clean or maintain any equipment located therein, and as to such space cleaning and equipment maintenance the Condominium Association retains, and acknowledges that it retains, all easements necessary to itself provide such space cleaning and equipment maintenance, but makes no other or further representation or warranty to the Partnership herein with respect to such space or equipment or the maintenance thereof."

11.     Section 27.26 is hereby added to the Declaration:

"27.26.     Except for Unit A-1 in the Garage, which will be utilized for a valet parking operation, and except for the leasing of Units in the Garage owned by persons other than the Partnership, no industry, business, trade,

CNM294A   12/22/95.10                    -6-

occupation or profession of any kind, commercial, religious, educational, or otherwise, designed for profit, altruism, exploration, or otherwise, shall be conducted, maintained, or permitted in any Unit in the Garage."

12.   Section 27.27 is hereby added to the Declaration:

"27.27   (a)   From and after the Closing, the Partnership shall provide the Condominium Association with the following limited number of reduced rate parking spaces for Condominium Association employees, which reduced rate parking shall only be in effect Monday through Friday, from 7:00 a.m. through 3:00 p.m.: twenty-two parking spaces at one-third of the standard monthly parking rate charged to Lake Point Tower residents, and eleven parking spaces at one-half of the standard monthly parking rate charged to Lake Point Tower residents.

(b)   Effective as of the date Lake Point Tower Market, Inc. vacates it's current space in connection with and pursuant to any executed or yet-to-be-executed agreement with the Partnership, the Partnership shall provide the Condominium Association with the following limited number of reduced rate parking spaces to be used exclusively for employees of any grocery store or market as may hereafter be located in the Lake Point Tower space commonly known as the GE Room, which reduced rate parking shall be in effect seven days a week, twenty-four hours a day: (a) for the first five years following the Closing, seven parking spaces at thirty-five dollars ($35.00) per month; and (b) thereafter, if a market remains as the Condominium Association's tenant in Lake Point Tower, seven parking spaces at one-half the standard monthly parking rate charged to Lake Point Tower residents.

(c)   The Partnership shall (until such time as non-Lake Point Tower destination parking in the garage is permitted in accordance with Section 27.29(f) hereof) conspicuously post three signs (one at the entrance to the Building, one at the Streeter side of the Building, and one at the Illinois side of the Building), stating "NO NAVY PIER PARKING - LAKE POINT TOWER DESTINATION PARKING ONLY", or such other wording as to which the Partnership and Condominium Association agree.

(d)   Within five months after the Closing, the Partnership shall either (i) commence construction of a third, reversible lane in the rotunda entrance to the Building, or (ii) submit to the committee established at Paragraph 24(e) of the Agreement (the "Paragraph 24(e) Committee") the Partnership's plans and specifications for construction of a vehicular entrance to the Building from Illinois Street. If the Partnership elects to construct an Illinois Street entrance, such construction shall be completed within four (4) months after approval is granted by the Paragraph 24(e) Committee, subject, however, to delays caused by inclement weather, strikes, lockouts, acts of God or other circumstances not within the Partnership's control. If the Partnership does not so elect to construct an Illinois Street entrance, then it shall construct a third reversible lane, which construction shall be completed within four (4) months after commencement thereof, subject, however, to delays caused by inclement weather, strikes, lockouts, acts of God or other circumstances not within the Partnership's control.

(e)   Once plans with respect to an Illinois Street entrance to the Building have been submitted to the Paragraph 24(e) Committee, it shall have ninety (90) days to approve said plans, which approval shall not be unreasonably withheld. To the extent, if any, that the

Condominium Association's approval is required for construction of an Illinois Street entrance to the Building or construction of a third reversible lane in the rotunda entrance to the Building, such permission is hereby granted, subject to the approval of Illinois Street plans by the Paragraph 24(e) Committee, as set forth above. To the extent reasonably practicable, construction of a third reversible lane in the rotunda entrance to the Building shall be accomplished in a manner which requires either no, or the least possible, utilization or physical alteration of or infringement upon Condominium Association-owned space, structures or property. However, in the event construction of a third reversible lane in the rotunda entrance to the Building reasonably necessitates utilization or physical alteration of, or infringement upon, certain Condominium Association-owned space, structures or property, and the Condominium Association refuses to consent to such utilization, physical alteration or infringement, then the Partnership shall be relieved from its obligation to construct a third reversible rotunda lane. Further, any Illinois Street entrance to the Building or third reversible lane are expressly agreed to be exempt from the glass, brass, marble or granite requirement set forth in Paragraph 24(a) of the Agreement.

(f)    Until such time, if any, as an Illinois Street entrance to the Building is constructed and operational, and thereafter with respect to such hours as the Illinois Street entrance to the Building is not open for use, parking in the Building shall be limited to (i) owners of deeded garage parking spaces and their lessees; (ii) owners and tenants of the commercial space (the "Commercial Space" or the Commercial Property") in the Residential Tower, as such term is defined in the Agreement and employees of those owners and tenants; (iii) Lake Point Tower Condominium owners and occupants; (iv) employees of the Condominium Association and employees of the market in accordance with the rights granted under Paragraphs a and b hereof; and (v) any other persons whose pedestrian destination is located inside the Residential Tower. Nothing hereinabove shall require that a car belonging to a person who permissibly entered the Building during a period the Illinois Street entrance was operational be removed from the Building merely because the Illinois Street entrance is thereafter closed for the day.

(g)    Once any Illinois Street garage entrance is operational, the manager of the Building shall be instructed by the Partnership and the Condominium Association that entry to the Building through the rotunda entrance, during hours that the Illinois Street entrance is operational, shall be available only to (i) owners of deeded Building parking spaces and their lessees; (ii) owners and tenants of the Commercial Space or Commercial Property in the Residential Tower and employees of those owners and tenants; (iii) Lake Point Tower Condominium Unit Owners and occupants; (iv) employees of the Association and employees of the market in accordance with the rights granted under Paragraphs (a) and (b) hereof; and (v) any other persons whose pedestrian destination is located inside the Residential Tower. Additionally, if an Illinois Street entrance is constructed, then on days of heavy parking utilization or on event evenings, the Partnership may reverse the Illinois Street entrance so as to make it an exit lane, to alleviate heavy exit traffic through the rotunda entrance. If a third reversible lane is constructed, said third lane shall be an express lane for self-parkers, unless the Condominium Association, after the Partnership surrenders control thereof, votes otherwise.

13.     Section 27.28 is hereby added to the Declaration:

"27.28 The Condominium Association shall have an option to purchase Unit A-1 in the Garage from the Partnership for a purchase price of Three Million Eight Hundred One Thousand Three Hundred Dollars ($3,801,300.000). The aforesaid option shall expire twelve (12) months after the Units in the Garage are first officially offered for sale. Exercise of such option shall be evidenced by a notice in writing delivered to the Partnership prior to the expiration of the option period.

(a)     In connection with the submission of the Garage to the condominium form of ownership, four hundred eighty-four (484) parking spaces will be set aside for use of Lake Point Tower residential Unit Owners. As certain parking places have room to park more than one (1) car, for purposes of the four hundred eighty-four (484) space calculation, a parking place which has room to park two (2) cars shall be deemed to be two (2) parking spaces, and a parking place which has room to park three (3) cars shall be deemed to be three (3) parking spaces. The term "use" will mean use either by ownership of a parking space, or use through monthly, daily or hourly leasing from the owner of the garage basement and/or the garage operator. A leased space shall be deemed to have been "made available" to residential Unit Owners if it is leased either to a residential Unit Owner, or to a "non-owner" resident of Lake Point Tower. A space which is offered for use by the garage operator on a daily or hourly rate, or a "first come, first serve" basis, shall be deemed to have been "made available" to a residential Unit Owner, even if occupied by outsiders.

(b)     In determining the set-aside of the aforesaid four hundred eighty-four (484) spaces, the "subtraction process" will be utilized. For example, if two hundred (200) residential Unit Owners purchase parking spaces submitted to the Act, the Declarant must continue to make available "lease" parking for two hundred eighty-four (284) residential Unit Owner vehicles. A sale of a parking space by the Declarant will only satisfy the "make available" requirement if the sale is to (i) a residential Unit Owner, (ii) the Condominium Association or (iii) a non-owner Lake Point Tower resident. Sale to a non-owner Lake Point Tower resident shall only be credited toward satisfaction of the "make available" obligation for so long as the non-owner resides at Lake Point Tower. Upon the sale by the Declarant of a parking space to a residential Unit Owner, or the Condominium Association, that space shall permanently be considered as having been "made available" for unit owner use for purposes of satisfying the four hundred eight-four (484) space requirement, regardless of how that space is subsequently used, or whether or to whom it is resold. All Unit Owners, including the Owner of Unit A-1 in the Garage, are jointly and severally responsible for compliance of the "make available" obligation contained herein."

14.     Section 27.29 is hereby added to the Declaration:

"27.29 Residents of Lake Point Tower will be given priority rights to obtain monthly parking in the Garage. Lake Point Tower residents will have an exclusive "advance" right to purchase monthly parking each month, and only when that "advance" period expires will monthly parking be offered to the general public. This priority right will continue to apply, and benefit Lake Point Tower residents, even if the four hundred eighty-four (484) space "make available" obligation has been satisfied."

15.     Section 27.30 is hereby added to the Declaration:

"27.30 Parking rates charged by the garage operator to Lake Point Tower residents who use monthly leased valet parking will not exceed the highest amount charged for monthly parking by any one of a group of three selected high-end or prestige residential or mixed-use building parking garages (namely one Magnificient

CNM294A  12/22/95.10

-9-

FILED DATE: 2/11/2020 2:20 PM   2020CH01705

Mile, Water Tower Place and 900 North Michigan). In any event, parking rates for monthly leased parking charged to Lake Point Tower residents will not exceed the rates which the Garage charges to the general public."

16.     27.31 is hereby added to the Declaration:

"27.31 Parking rates for residential Unit Owners will remain unchanged for a period expiring seven (7) months after the Units in the Garage are first officially offered for sale."

17.     Except as otherwise provided herein, the remaining terms and provisions of the Declaration are hereby ratified and confirmed.

This document is executed by Declarant, not personally but solely in its capacity as Trustee as aforesaid, in the exercise of the power and authority conferred upon and vested in it in its capacity as such Trustee. All the obligations, duties, agreements, covenants and conditions to be performed by Declarant under this document are undertaken by it solely in its capacity, as Trustee as aforesaid, and not individually, and no personal liability shall be asserted or be enforceable against Declarant by reason of any of the terms, provisions, statements, obligations, duties, agreements, covenants and conditions contained in this document.

IN WITNESS WHEREOF, Declarant, not personally but solely in its capacity as Trustee as aforesaid, have caused this document to be executed and sealed this 21st day of December ,199 5 .

AMERICAN NATIONAL BANK AND TRUST COMPANY OF CHICAGO, a National Banking Association, as Trustee under Trust Agreement dated January 7, 1988 and known as Trust No. 1043-99-09

By: _____
                Second Vice President

ATTEST:

By: _____
        (Assistant) Secretary

CNM294A  12/22/95.10

-10-

STATE OF ILLINOIS   )
                    ) SS.
COUNTY OF C O O K   )

American National Bank and Trust Company of Chicago

I, _____C. M. SOVIENSKI_____, a Notary Public in and for said
County and State aforesaid, DO HEREBY CERTIFY that __P. JOHANSEN__, as
~~Second Vice President~~ of _____, and __J. MICHAEL WHELAN__
as __ASSISTANT SECRETARY__ of American National Bank and Trust Company of
Chicago, known to me to be the same persons who names are subscribed to the fore-
going     instrument     as     such     ~~Second Vice President~~     and
____ASSISTANT SECRETARY____, respectively, appeared before me this day in per-
son and acknowledged that they signed and delivered said instrument as their own free
and voluntary act, and as the free and voluntary act of said Bank, for the uses and pur-
poses therein set forth; and said __ASSISTANT SECRETARY__ did thereby acknowledge
that he, as custodian of the Corporate Seal of said Bank, did affix the Corporate Seal of
said Bank to said instrument as his own free and voluntary act, and as the free and vol-
untary act of said Bank, for the uses and purposes therein set forth.

GIVEN  under  my  hand  and  Notarial  Seal  this  _____  day  of
_____, 1995.

DEC 26 1995

_L. M. Sovienski_
Notary Public

My Commission Expires:

_____

CNM294A  12/12/95.10                    -11-

## CONSENT AND ACKNOWLEDGEMENT

Lake Point Tower Condominium Association, an Illinois not-for-profit corporation, hereby joins in the execution of the attached First Special Amendment to Amended and Restated Declaration of Covenants, Conditions, Restrictions and Easements and agrees that it, including its successors and assigns, shall be bound by its terms and provisions.

Lake Point Tower Condominium Association,
an Illinois not-for-profit corporation

By: _____

Its PRESIDENT

ATTEST:

Its _____

CNM294A  12/22/95.10

95898506

FILED DATE: 2/11/2020 2:20 PM   2020CH01705

STATE OF ILLINOIS    )
                     ) SS.
COUNTY OF C O O K    )

I, __DAVID SUGAR__ , a Notary Public in and for said County and State aforesaid, DO HEREBY CERTIFY that __Patricia S. Stearns__, as __President__ of __Lake Point Tower Condominium Association__ and __Vivian M. Raviaro__ as __Secretary__, of Lake Point Tower Condominium Association, an Illinois not-for-profit corporation, known to me to be the same persons who names are subscribed to the foregoing instrument as such __President__ and __Secretary__ respectively, appeared before me this day in person and acknowledged that they signed and delivered said instrument as their own free and voluntary act, and as the free and voluntary act of said Corporation, for the uses and purposes therein set forth; and said __Vivian M. Raviaro__ did thereby acknowledge that she, as custodian of the Corporate Seal of said Corporation, did affix the Corporate Seal of said Corporation to said instrument as his own free and voluntary act, and as the free and voluntary act of said Corporation, for the uses and purposes therein set forth.

GIVEN under my hand and Notarial Seal this __27TH__ day of __December__, 199 __5__.

_____
Notary Public

My Commission Expires:

__November 25, 1999__

```
"OFFICIAL SEAL"
DAVID SUGAR
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 11/25/99
```

CNM294A  12/22/95.10

95898506

FILED DATE: 2/11/2020 2:20 PM  2020CH01705

## CONSENT AND ACKNOWLEDGEMENT

Lake Point Tower Limited Partnership, an Illinois limited partnership, hereby joins in the execution of the attached First Special Amendment to Amended and Restated Declaration of Covenants, Conditions, Restrictions and Easements and agrees that it, including its successors and assigns, shall be bound by its terms and provisions.

Lake Point Tower Limited Partnership,
an Illinois limited partnership

By:     Lake Point Tower Consultants, Inc.
an Illinois corporation, its
general partner

By:

ATTEST:

_____

Its

CNM294A  12/22/95.10

-12-

STATE OF ILLINOIS     )
                                  ) SS.
COUNTY OF C O O K    )

       I, _JOYCE Id o P S o N_ , a Notary Public in and for said County and State aforesaid, DO HEREBY CERTIFY that _Nicholas Gouletas_ as _PRESIDENT_ of Lake Point Tower Consultants, Inc., an Illinois corporation, and _____ as _____ , of said corporations, known to me to be the same persons who names are subscribed to the foregoing instrument as such _PRESIDENT_ and _____ , respectively, appeared before me this day in person and acknowledged that they signed and delivered said instrument as their own free and voluntary act, and as the free and voluntary act of said Corporation, as general partner of Lake Point Tower Limited Partnership, an Illinois Limited Partnership, for the uses and purposes therein set forth; and said _____ did thereby acknowledge that he, as custodian of the Corporate Seal of said Corporation, did affix the Corporate Seal of said Corporation to said instrument as his own free and voluntary act, and as the free and voluntary act of said Corporation, for the uses and purposes therein set forth.

       GIVEN under my hand and Notarial Seal this _27 th_ day of _December_ , 199_5_ .

                                _Joyce E. Hopson_
                                Notary Public

My Commission Expires:

OFFICIAL SEAL
JOYCE E. HOPSON
Notary Public, State of Illinois
My Commission Expires June 25, 1997

CNM294A 12/22/95.10

-13-

## EXHIBIT A

FILED DATE: 2/11/2020 2:20 PM   2020CH01705

ALL THAT PART OF LOT 7 IN CHICAGO DOCK AND CANAL COMPANY'S
PESHTIGO DOCK ADDITION IN SECTION 10, TOWNSHIP 39 NORTH,
RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, WHICH LIES
SOUTH OF THE SOUTH LINE OF GRAND AVENUE EXTENDED EAST;
NORTH OF THE NORTH LINE OF A STRIP OF LAND 74 FEET IN
WIDTH NOW USED AS EAST ILLINOIS STREET; WEST OF THE WEST
LINE OF STREETER DRIVE AND EAST OF THE EAST LINE OF NORTH
LAKE SHORE DRIVE, ESTABLISHED BY DEED DATED JULY 25, 1929
IN CONDEMNATION PROCEEDINGS GENERAL NUMBER B-177476 IN
CIRCUIT COURT OF COOK COUNTY, ILLINOIS, EXCEPTING
THEREFROM THAT PART OF LOT 7 IN CHICAGO DOCK AND CANAL
COMPANY'S PESHTIGO DOCK ADDITION IN SECTION 10, TOWNSHIP
39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN,
BOUNDED AND DESCRIBED AS FOLLOWS:
BEGINNING AT A POINT ON THE SOUTH LINE OF THE NORTH 74.00
FEET OF SAID LOT 7 WHICH IS THE SOUTH LINE OF EAST GRAND
AVENUE 312.18 FEET EAST OF THE WEST LINE OF SAID LOT 7,
SAID LINE HAVING A BEARING OF NORTH 89 DEGREES 43 MINUTES
30 SECONDS EAST (ASSUMED); THENCE SOUTH ALONG A LINE
HAVING A BEARING OF SOUTH 0 DEGREES 14 MINUTES 15 SECONDS
EAST A DISTANCE OF 218 FEET TO THE NORTH LINE OF A STRIP
OF LAND 74 FEET IN WIDTH NOW USED AS EAST ILLINOIS STREET;
THENCE EAST ALONG THE NORTH LINE OF SAID STRIP HAVING A
BEARING OF NORTH 89 DEGREES 43 MINUTES 30 SECONDS EAST A
DISTANCE OF 40.146 FEET; THENCE NORTH ALONG A LINE HAVING
A BEARING OF NORTH 0 DEGREES 14 MINUTES 15 SECONDS WEST A
DISTANCE OF 195.898 FEET; THENCE EAST ALONG A LINE HAVING
A BEARING OF NORTH 89 DEGREES 43 MINUTES 31 SECONDS EAST A
DISTANCE OF 5.444 FEET; THENCE NORTH ALONG A LINE HAVING A
BEARING OF NORTH 0 DEGREES 15 MINUTES 41 SECONDS WEST A
DISTANCE OF 22.102 FEET TO THE SOUTH LINE OF EAST GRAND
AVENUE AS AFOREMENTIONED; THENCE WEST ALONG SAID SOUTH
LINE A DISTANCE OF 45.580 FEET TO THE POINT OF BEGINNING,
IN COOK COUNTY, ILLINOIS.

*pin*
17-10-214 008

*ppty address*
505 N. Lake Shore Drive
Chicago, IL

A-1

N117040.A  7/10/92

# EXHIBIT B

n     95898506

. DEPT-01 RECORDING                    $55.00
. T$0012  TRAN 8390 12/27/95 14:55:00
. $7626 $ JM *-95-898506
. COOK COUNTY RECORDER

### FIRST SPECIAL AMENDMENT TO AMENDED AND RESTATED DECLARATION OF COVENANTS, CONDITIONS, RESTRICTIONS AND EASEMENTS

This instrument was prepared by and
mail to:
Herbert A. Kessel, Esq.
BEERMANN, SWERDLOVE, WOLOSHIN,
BAREZKY, BECKER, GENIN & LONDON
161 North Clark Street, #2600
Chicago, Illinois 60601-3221
(312) 621-9700

95898506

BOX 333-CTI

5300.
6 Copus
Jill

## FIRST SPECIAL AMENDMENT TO AMENDED AND RESTATED DECLARATION OF COVENANTS, CONDITIONS, RESTRICTIONS AND EASEMENTS

This First Special Amendment to Amended and Restated Declaration is entered into this 21st day of December ___, 1995 by American National Bank and Trust Company of Chicago, as Trustee under Trust Agreement dated January 7, 1988 and known as Trust No. 1043-99-09 ("Declarant").

## WITNESSETH:

WHEREAS, Declarant executed that certain Amended and Restated Declaration of Covenants, Conditions, Restrictions and Easements dated July 7, 1992 and recorded in the Office of the Recorder of Deeds of Cook County, Illinois as Document No. 92616148 ("Declaration"); and

WHEREAS, the Declaration subjected the real estate legally described on Exhibit A attached hereto to the terms of the Declaration ("Property"); and

WHEREAS, the Declarant, pursuant to Article 27.4.B of the Declaration, desires to amend the terms of the Declaration and to create such complementary and supplemental grants and reservations of easements and related provisions as may be necessary in order to effectuate the maintenance, operation and administration of the Property.

NOW, THEREFORE, the Declarant hereby declares that the Declaration is hereby amended as follows:

1. Section 27.18 to added as follows:

"27.18.    Notwithstanding any provisions contained herein to the contrary, the following shall apply:

(a)    That the 1.57% share of Operating Expenses allocated to the owner(s) of the Commercial Property pursuant to Section 7.3(d) hereof shall be payable by each of the current owners of the Commercial Property (and their respective successors and assigns) as follows:

| Owner | Total Footage | Percentage | Reallocation |
|---|---|---|---|
| Condominium Association | 5,589.70 | 11.28% | .18% |
| Laundry | 1,855.00 | 3.74% | .06% |
| Dry Cleaner | 1,010.00 | 2.04% | .03% |
| Lake Point Tower Limited Partnership ("Partnership") | 41,102.70 | 82.94% | 1.30% |
| | 49,557.40 | 100.00% | 1.57% |

said 1.57 allocation having been made (and to continue to be made) to each owner of the said 49,557.40 square feet of Commercial Property in proportion to each such owner's share of such 49,557.40 square feet of Commercial Property;

CNM094A  12/22/95.10

(b)    That the share of utility expenses to be borne by the owner(s) of the Commercial Property pursuant to Section 7.3(d) hereof shall be payable by each of the current owners of the Commercial Property (and their respective successors and assigns) as follows:

| Owner | Total Footage | Percentage |
|---|---|---|
| Condominium Association | 5,589.70 | 11.28% |
| Laundry | 1,855.00 | 3.74% |
| Dry Cleaner | 1,010.00 | 2.04% |
| Partnership | 41,102.70 | 82.94% |
| | 49,557.40 | 100.00% |

said re-allocation of utility expense having been made (and to continue to be made) to each owner of Commercial Property encompassed by the said 49,557.40 square feet of Commercial Property in proportion to each such owner's share of such 49,557.40 square feet of Commercial Property;

(c)    That the 5.345% share of insurance expenses to be borne by the owner(s) of the Commercial Property pursuant to Section 7.3(d) hereof shall be payable by each of the current owners of the Commercial Property (and their respective successors and assigns) as follows:

| Owner | Total Footage | Percentage | Reallocation |
|---|---|---|---|
| Condominium Association | 8,741.00 | 10.28% | .549% |
| Laundry | 1,855.00 | 2.18% | .117% |
| Dry Cleaner | 1,010.00 | 1.19% | .064% |
| Partnership | 73,434.90 | 86.35% | 4.615% |
| | 85,041.00 | 100.00% | 5.345% |

said-reallocation of insurance expense having been made (and to continue to be made) to each owner of Commercial Property encompassed by the said 85,041 square feet of Commercial Property in proportion to each such owner's share of such 85,041 square feet of Commercial Property; and

(d)    That the 5.28% share of elevator expenses to be borne by the owner(s) of the Commercial Property pursuant to Section 7.3(d) hereof shall be payable by each of the current owners of the Commercial Property (and their respective successors and assigns) as follows:

| Owner | Total Footage | Percentage | Reallocation |
|---|---|---|---|
| Condominium Association | 8,741.00 | 10.28% | .54% |
| Laundry | 1,855.00 | 2.18% | .12% |
| Dry Cleaner | 1,010.00 | 1.19% | .06% |
| Partnership | 73,434.90 | 86.35% | 4.56% |
| | 85,041.00 | 100.00% | 5.28% |

said re-allocation of elevator expense having been made (and to continue to be made) to each owner of Commercial Property encompassed by the

said 85,041 square feet of Commercial Property in proportion to each such owner's share of such 85,041 square feet of Commercial Property.

The Partnership shall not be responsible for payment of Operating Expenses, elevator expenses, insurance expenses, or utility expense allocable to space to be submitted to the Declaration of Condominium Ownership For Lake Point Tower Condominium Association as Common Elements pursuant to that certain Master Agreement dated December 8, 1995, by and between Declarant, the Condominium Association and the Partnership ("Agreement") (including but not limited to the GE Room space) for periods subsequent to the Closing, as such term is defined in the Agreement; the Partnership shall, however, remain responsible for payment of Operating Expenses, elevator expenses, insurance expenses, and utility expenses allocable to such space for periods prior to the Closing."

2.    Section 27.19 is hereby added to the Declaration:

"27.19.    All space owned by Declarant as record title holder shall be restricted to prohibit the operation of a food market  or grocery store therein, except that nothing herein shall prevent or preclude the Declarant from honoring the terms of a current lease with a food market or grocery store, or arranging for the lawful and orderly repossession of space from a current food market or grocery store lessee upon lease termination."

3.    Intentionally Omitted

4.    Section 27.20 is hereby added to the Declaration:

"27.20.    Subject to the continued tenancies of existing lessees of as the date of the recording of the First Special Amendment to this Declaration, the Commercial Property shall be restricted to occupancy only by retail merchants of the type which currently occupy or could be expected to occupy, such upscale retail venues as One Magnificent Mile, Water Place, 900 North Michigan Avenue and Chicago Place ("Upscale Retail Venues"), to the express exclusion, without limitation, of off-track betting facilities, pool or billiard establishments, video game or amusement arcades, establishments whose primary purpose is selling merchandise of a sexual nature (ie., adult book store, etc.); and shops whose primary business is the sale of tee-shirts or souvenirs to the extent they offer for sale primarily "low end" merchandise (it being expressly understood and agreed that shops whose primary business is the selling of tee-shirts or souvenirs shall be permitted in the Commercial Property so long as the shops themselves, and the merchandise they offer, are comparable in quality to similar shops, if any, in Upscale Retail Venues). In addition to the foregoing, for a period of five (5) years subsequent to the recording of the First Special Amendment to this Declaration, the current grocery store or food store shall have the exclusive right (but not the obligation) to conduct a fast food operation in Lake Point Tower, and the Declarant and/or its beneficiary shall expressly consent to any lease provisions by and between the Condominium Association and such grocery store or food market granting such exclusive five (5) year right. Upon expiration of the aforesaid five (5) year period, other fast food restaurants shall be permitted to operate in the Commercial Property, provided that they are comparable with respect to standards of decor and otherwise, to fast food restaurants operated in Upscale Retail Venues."

CNM294A  12/22/95 10

-3-

5.    Section 27.21 is hereby added to the Declaration:

"27.21.      The Partnership and the Condominium Association shall, within ten days after the Closing, as such term is defined in the Agreement, jointly and expeditiously retain the security consulting firm of Liability Consultants, Ltd. of Framingham, Massachusetts, or such other security consulting firm as the parties mutually agree upon, to evaluate Lake Point Tower security, and formulate suggested methods to achieve the following objective: To insulate residential portions of Lake Point Tower from non-residential and unauthorized traffic and protect the safety of inhabitants, without impeding access of business visitors and customers to the second and seventieth floor space owned by the Partnership. The scope of the security consulting firm's engagement shall include recommendations which anticipate and address the Partnership's installation of an escalator or other entryway providing direct access to the second floor Commercial Spaces, as such term is defined in the Agreement, without the need to go through the front lobby reception area. Representatives of both the Condominium Association and the Partnership shall be entitled to attend and participate in all meetings with the security consultant, and the actual implementation of any security measures shall be accomplished through the joint action of the parties. All costs and expenses with respect to or incurred in connection with the aforesaid security consulting firm's engagement, and all costs and expenses incurred in connection with implementing the security consulting firm's recommendations, shall be split evenly between the Partnership and the Condominium Association. The parties expressly agree to implement the recommendations of the security consultant, subject to the following restrictions and conditions: (a) security recommendations which would require visitors to the Cite Restaurant or a successor restaurant tenant to "sign in" or display any form of identification, or which would require doormen to secure telephonic approval prior to admitting Cite' Restaurant visitors to the interior of the Residential Tower, as such term is defined in the Agreement, are hereby expressly prohibited; and (b) the Partnership shall not be obligated to accept or implement any security recommendations as it believes would have a material detrimental impact on the Cite' Restaurant or any successor restaurant tenant. In the event of a dispute or disagreement as to whether a security recommendation satisfies the aforesaid "material detrimental impact" criteria, the issue shall be submitted to a security committee, comprised of equal numbers of Condominium Association and Partnership representatives, each with one vote. A security measure so submitted to the security committee with respect to measures impacting on the Cite' Restaurant or any successor restaurant tenant shall not be implemented unless approved by a simple majority vote of the entire security committee."

6.    Section 27.22 is hereby added to the Declaration:

"27.22.      Any escalator leading from the ground floor of Lake Point Tower to the second floor Commercial Spaces shall be (a) restricted to the interior perimeter of the Residential Tower (i.e., it shall not extend, at its base, to the "outside" of the Residential Tower), and (b) "securitized" at its ground floor landing, so as to permit "closing off" access to the escalator during non-business hours. Further, the exterior Residential Tower door which provides access to the escalator shall be kept locked during the second floor tenants' non-business hours, unless such door gives access to areas of the Residential Tower other than those accessed via the escalator."

CRM294A  12/22/93.10

-4-

7.    Section 27.23 is hereby added to the Declaration:

"27.23.    The Condominium Association acknowl-
edges that from the plane of the deck of the park situated on the third level of the Resi-
dential Tower ("Skyline Park"), down to the ground, the Partnership owns and
controls, and shall hereafter own and control, the Residential Tower's exterior walls,
and the Partnership affirms its continuing obligation to maintain said walls to the extent
that such obligation is set forth in, and imposed upon it by, this Declaration. Further,
the Residential Association acknowledges that the Partnership owns and controls, and
shall hereafter own and control, the Residential Tower's existing Grand Avenue door,
and will own and control any future doors or entrances constructed in or through the
Residential Tower's exterior walls."

8.    Section 27.25 is hereby added to the Declaration:

"27.25.    With respect to any new entrances,
windows, signage or awnings which are added to the exterior of Lake Point Tower, or
with respect to any changes to the facade of the Building, the following conditions shall
apply:

(a)    The Partnership shall be entitled to add up to two
additional entrances on the Grand Avenue side of the Residential Tower
for the purpose of providing direct entry to the premises of Partnership
tenants.  Nothing herein shall diminish the right of the Partnership to
add, in any number and for any purpose, entrances on the remaining
sides of the Residential Tower, subject to the requirement that all new
entrances, regardless of who constructs them, shall be constructed only
from glass, brass, granite or marble, or such other materials as are
expressly approved, in the course of an overall aesthetic approval, by a
simple majority vote of the Paragraph 24(e) Committee, as such term is
defined in the Agreement, which approval shall not be unreasonably
withheld;

(b)    With respect to the addition of any new windows
on the Grand Avenue side of the Residential Tower, such windows must
be appropriate for the particular tenant in question.  All new windows
added to the Residential Tower, whether on the Grand Avenue side of
the Residential Tower or otherwise, must (i) be of the fixed-pane non-
opening type, and (ii) must be aesthetically approved by simple majority
vote of the Paragraph 24(e) Committee, which approval shall not unrea-
sonably be withheld;

(c)    Neither the Condominium Association nor the
Partnership shall affix to the exterior of Lake Point Tower any neon or
flashing lights, except the existing rotunda taxi light.  Moreover, (i) any
signs hereafter affixed to the Grand Avenue exterior walls shall be
substantially flush with the Building as such term is defined in the
Agreement; and (ii) no banners shall be hung or displayed on the Build-
ing's Grand Avenue exterior walls.  Without in any way limiting the
foregoing, all other signage affixed to the Building's exterior walls shall
be subject to approval by the Paragraph 24(e) Committee;

(d)    In the event the Partnership or any tenant of the Partnership seeks to conduct an alfresco dining operation on the sidewalk or grassy area adjacent to the east (Streeter) side of Lake Point Tower, the Condominium Association agrees that it will voice neither support for nor opposition to such venture. Further, in the event the Partnership or any tenant of the Partnership seeks to install an awning at the east (Streeter) side of Lake Point Tower, the Condominium Association agrees to consent to said awning, subject to aesthetic approval by simple majority vote of the Paragraph 24(e) Committee, which approval shall not be unreasonably withheld;

(e)    A committee comprised of two representatives from the Residential Association, two representatives from the Partnership, and George Schipporeit or another person chosen by simple majority vote of the remaining members of the committee (the "Architect") must aesthetically approve all plans and specifications for additional exterior entrances, windows, signage, awnings or other modifications to the facade of the Building, which approval shall not be unreasonably withheld. Each member of the committee shall have one vote, and approval of plans and specifications shall require no more than a simple majority vote. Responsibility for payment of any fees charged by the Architect shall be shared equally by the Condominium Association and the Partnership."

9.    Section 27.24 is hereby added to the Declaration:

"27.24.    The Partnership and the Condominium Association agree that in the event there is any future litigation between them relating to the Agreement, or this Declaration, as amended, the party which loses such litigation, as a result of a final ruling of court not subject to further appeal, shall pay the prevailing party's legal fees and costs."

10.    Section 27.25 is hereby added to the Declaration:

"27.25.    The Partnership acknowledges and reaffirms its obligation under this Declaration to maintain, on a timely basis, those spaces which it owns in Lake Point Tower which contain mechanical equipment providing service to the Condominium Association. The foregoing commitment to maintain mechanical room spaces is not a commitment to keep said spaces clean or maintain any equipment located therein, and as to such space cleaning and equipment maintenance the Condominium Association retains, and acknowledges that it retains, all easements necessary to itself provide such space cleaning and equipment maintenance, but makes no other or further representation or warranty to the Partnership herein with respect to such space or equipment or the maintenance thereof."

11.    Section 27.26 is hereby added to the Declaration:

"27.26.    Except for Unit A-1 in the Garage, which will be utilized for a valet parking operation, and except for the leasing of Units in the Garage owned by persons other than the Partnership, no industry, business, trade,

CNM294A 12/22/95.10

occupation or profession of any kind, commercial, religious, educational, or otherwise, designed for profit, altruism, exploration, or otherwise, shall be conducted, maintained, or permitted in any Unit in the Garage."

12.     Section 27.27 is hereby added to the Declaration:

"27.27     (a)     From and after the Closing, the Partnership shall provide the Condominium Association with the following limited number of reduced rate parking spaces for Condominium Association employees, which reduced rate parking shall only be in effect Monday through Friday, from 7:00 a.m. through 3:00 p.m.: twenty-two parking spaces at one-third of the standard monthly parking rate charged to Lake Point Tower residents, and eleven parking spaces at one-half of the standard monthly parking rate charged to Lake Point Tower residents.

(b)     Effective as of the date Lake Point Tower Market, Inc. vacates it's current space in connection with and pursuant to any executed or yet-to-be-executed agreement with the Partnership, the Partnership shall provide the Condominium Association with the following limited number of reduced rate parking spaces to be used exclusively for employees of any grocery store or market as may hereafter be located in the Lake Point Tower space commonly known as the GE Room, which reduced rate parking shall be in effect seven days a week, twenty-four hours a day: (a) for the first five years following the Closing, seven parking spaces at thirty-five dollars ($35.00) per month; and (b) thereafter, if a market remains as the Condominium Association's tenant in Lake Point Tower, seven parking spaces at one-half the standard monthly parking rate charged to Lake Point Tower residents.

(c)     The Partnership shall (until such time as non-Lake Point Tower destination parking in the garage is permitted in accordance with Section 27.29(f) hereof) conspicuously post three signs (one at the entrance to the Building, one at the Streeter side of the Building, and one at the Illinois side of the Building), stating "NO NAVY PIER PARKING - LAKE POINT TOWER DESTINATION PARKING ONLY", or such other wording as to which the Partnership and Condominium Association agree.

(d)     Within five months after the Closing, the Partnership shall either (i) commence construction of a third, reversible lane in the rotunda entrance to the Building, or (ii) submit to the committee established at Paragraph 24(e) of the Agreement (the "Paragraph 24(e) Committee") the Partnership's plans and specifications for construction of a vehicular entrance to the Building from Illinois Street. If the Partnership elects to construct an Illinois Street entrance, such construction shall be completed within four (4) months after approval is granted by the Paragraph 24(e) Committee, subject, however, to delays caused by inclement weather, strikes, lockouts, acts of God or other circumstances not within the Partnership's control. If the Partnership does not so elect to construct an Illinois Street entrance, then it shall construct a third reversible lane, which construction shall be completed within four (4) months after commencement thereof, subject, however, to delays caused by inclement weather, strikes, lockouts, acts of God or other circumstances not within the Partnership's control.

(e)     Once plans with respect to an Illinois Street entrance to the Building have been submitted to the Paragraph 24(e) Committee, it shall have ninety (90) days to approve said plans, which approval shall not be unreasonably withheld. To the extent, if any, that the

CNM294A  12/22/95.10

-7-

FILED DATE: 2/11/2020 2:20 PM   2020CH01705

Condominium Association's approval is required for construction of an Illinois Street entrance to the Building or construction of a third reversible lane in the rotunda entrance to the Building, such permission is hereby granted, subject to the approval of Illinois Street plans by the Paragraph 24(e) Committee, as set forth above.   To the extent reasonably practicable, construction of a third reversible lane in the rotunda entrance to the Building shall be accomplished in a manner which requires either no, or the least possible, utilization or physical alteration of or infringement upon Condominium Association-owned space, structures or property.   However, in the event construction of a third reversible lane in the rotunda entrance to the Building reasonably necessitates utilization or physical alteration of, or infringement upon, certain Condominium Association-owned space, structures or property, and the Condominium Association refuses to consent to such utilization, physical alteration or infringement, then the Partnership shall be relieved from its obligation to construct a third reversible rotunda lane.   Further, any Illinois Street entrance to the Building or third reversible lane are expressly agreed to be exempt from the glass, brass, marble or granite requirement set forth in Paragraph 24(a) of the Agreement.

(f)     Until such time, if any, as an Illinois Street entrance to the Building is constructed and operational, and thereafter with respect to such hours as the Illinois Street entrance to the Building is not open for use, parking in the Building shall be limited to (i) owners of deeded garage parking spaces and their lessees; (ii) owners and tenants of the commercial space (the "Commercial Space" or the Commercial Property") in the Residential Tower, as such term is defined in the Agreement and employees of those owners and tenants; (iii) Lake Point Tower Condominium owners and occupants; (iv) employees of the Condominium Association and employees of the market in accordance with the rights granted under Paragraphs  a and b hereof; and (v) any other persons whose pedestrian destination is located inside the Residential Tower.   Nothing hereinabove shall require that a car belonging to a person who permissibly entered the Building during a period the Illinois Street entrance was operational be removed from the Building merely because the Illinois Street entrance is thereafter closed for the day.

(g)     Once any Illinois Street garage entrance is operational, the manager of the Building shall be instructed by the Partnership and the Condominium Association that entry to the Building through the rotunda entrance, during hours that the Illinois Street entrance is operational, shall be available only to (i) owners of deeded Building parking spaces and their lessees; (ii) owners and tenants of the Commercial Space or Commercial Property in the Residential Tower and employees of those owners and tenants; (iii) Lake Point Tower Condominium Unit Owners and occupants; (iv) employees of the Association and employees of the market in accordance with the rights granted under Paragraphs (a) and (b) hereof; and (v) any other persons whose pedestrian destination is located inside the Residential Tower. Additionally, if an Illinois Street entrance is constructed, then on days of heavy parking utilization or on event evenings, the Partnership may reverse the Illinois Street entrance so as to make it an exit lane, to alleviate heavy exit traffic through the rotunda entrance.   If a third reversible lane is constructed, said third lane shall be an express lane for self-parkers, unless the Condominium Association, after the Partnership surrenders control thereof, votes otherwise.

13.    Section 27.28 is hereby added to the Declaration:

"27.28 The Condominium Association shall have an option to purchase Unit A-1 in the Garage from the Partnership for a purchase price of Three Million Eight Hundred One Thousand Three Hundred Dollars ($3,801,300.000). The aforesaid option shall expire twelve (12) months after the Units in the Garage are first officially offered for sale. Exercise of such option shall be evidenced by a notice in writing delivered to the Partnership prior to the expiration of the option period.

(a)    In connection with the submission of the Garage to the condominium form of ownership, four hundred eighty-four (484) parking spaces will be set aside for use of Lake Point Tower residential Unit Owners. As certain parking places have room to park more than one (1) car, for purposes of the four hundred eighty-four (484) space calculation, a parking place which has room to park two (2) cars shall be deemed to be two (2) parking spaces, and a parking place which has room to park three (3) cars shall be deemed to be three (3) parking spaces. The term "use" will mean use either by ownership of a parking space, or use through monthly, daily or hourly leasing from the owner of the garage basement and/or the garage operator. A leased space shall be deemed to have been "made available" to residential Unit Owners if it is leased either to a residential Unit Owner, or to a "non-owner" resident of Lake Point Tower. A space which is offered for use by the garage operator on a daily or hourly rate, or a "first come, first serve" basis, shall be deemed to have been "made available" to a residential Unit Owner, even if occupied by outsiders.

(b)    In determining the set-aside of the aforesaid four hundred eighty-four (484) spaces, the "subtraction process" will be utilized. For example, if two hundred (200) residential Unit Owners purchase parking spaces submitted to the Act, the Declarant must continue to make available "lease" parking for two hundred eight-four (284) residential Unit Owner vehicles. A sale of a parking space by the Declarant will only satisfy the "make available" requirement if the sale is to (i) a residential Unit Owner, (ii) the Condominium Association or (iii) a non-owner Lake Point Tower resident. Sale to a non-owner Lake Point Tower resident shall only be credited toward satisfaction of the "make available" obligation for so long as the non-owner resides at Lake Point Tower. Upon the sale by the Declarant of a parking space to a residential Unit Owner, or the Condominium Association, that space shall permanently be considered as having been "made available" for unit owner use for purposes of satisfying the four hundred eight-four (484) space requirement, regardless of how that space is subsequently used, or whether or to whom it is resold. All Unit Owners, including the Owner of Unit A-1 in the Garage, are jointly and severally responsible for compliance of the "make available" obligation contained herein."

14.    Section 27.29 is hereby added to the Declaration:

"27.29 Residents of Lake Point Tower will be given priority rights to obtain monthly parking in the Garage. Lake Point Tower residents will have an exclusive "advance" right to purchase monthly parking each month, and only when that "advance" period expires will monthly parking be offered to the general public. This priority right will continue to apply, and benefit Lake Point Tower residents, even if the four hundred eighty-four (484) space "make available" obligation has been satisfied."

15.    Section 27.30 is hereby added to the Declaration:

"27.30 Parking rates charged by the garage operator to Lake Point Tower residents who use monthly leased valet parking will not exceed the highest amount charged for monthly parking by any one of a group of three selected high-end or prestige residential or mixed-use building parking garages (namely one Magnificient

Mile, Water Tower Place and 900 North Michigan). In any event, parking rates for monthly leased parking charged to Lake Point Tower residents will not exceed the rates which the Garage charges to the general public."

16.   27.31 is hereby added to the Declaration:

"27.31 Parking rates for residential Unit Owners will remain unchanged for a period expiring seven (7) months after the Units in the Garage are first officially offered for sale."

17.   Except as otherwise provided herein, the remaining terms and provisions of the Declaration are hereby ratified and confirmed.

This document is executed by Declarant, not personally but solely in its capacity as Trustee as aforesaid, in the exercise of the power and authority conferred upon and vested in it in its capacity as such Trustee. All the obligations, duties, agreements, covenants and conditions to be performed by Declarant under this document are undertaken by it solely in its capacity, as Trustee as aforesaid, and not individually, and no personal liability shall be asserted or be enforceable against Declarant by reason of any of the terms, provisions, statements, obligations, duties, agreements, covenants and conditions contained in this document.

IN WITNESS WHEREOF, Declarant, not personally but solely in its capacity as Trustee as aforesaid, have caused this document to be executed and sealed this 21st day of December ,199 5 .

AMERICAN NATIONAL BANK AND TRUST COMPANY OF CHICAGO, a National Banking Association, as Trustee under Trust Agreement dated January 7, 1988 and known as Trust No. 1043-99-09

By: _____

Second Vice President

ATTEST:

By: _____

(Assistant) Secretary

STATE OF ILLINOIS    )
                     ) SS.
COUNTY OF C O O K    )                    American National Bank and Trust Company of Chicago

        I, _____ L. M. SOVIENSKI _____, a Notary Public in and for said County and State aforesaid, DO HEREBY CERTIFY that ___P. JOHANSEN___, as _____Second Vice President___ of _____, and ___T. MICHAEL WHELAN___ as ___ASSISTANT SECRETARY___ of American National Bank and Trust Company of Chicago, known to me to be the same persons who names are subscribed to the foregoing instrument as such _____Second Vice President_____ and ___ASSISTANT SECRETARY___, respectively, appeared before me this day in person and acknowledged that they signed and delivered said instrument as their own free and voluntary act, and as the free and voluntary act of said Bank, for the uses and purposes therein set forth; and said ASSISTANT SECRETARY did thereby acknowledge that he, as custodian of the Corporate Seal of said Bank, did affix the Corporate Seal of said Bank to said instrument as his own free and voluntary act, and as the free and voluntary act of said Bank, for the uses and purposes therein set forth.

        GIVEN under my hand and Notarial Seal this _____ day of _____, 1995.

DEC 28 1995

_L. M. Sovienski_____
Notary Public

My Commission Expires:

_____

## CONSENT AND ACKNOWLEDGEMENT

Lake Point Tower Condominium Association, an Illinois not-for-profit corporation, hereby joins in the execution of the attached First Special Amendment to Amended and Restated Declaration of Covenants, Conditions, Restrictions and Easements and agrees that it, including its successors and assigns, shall be bound by its terms and provisions.

Lake Point Tower Condominium Association,
an Illinois not-for-profit corporation

By: _____

Its PRESIDENT

ATTEST:

_____

Its _____

CNM294A  12/22/93 10

95089506

STATE OF ILLINOIS          )
                           ) SS.
COUNTY OF C O O K          )

I, __DAVID  SUGAR__, a Notary Public in and for said County and State aforesaid, DO HEREBY CERTIFY that __Patricia S. Stearns__, as __President__ of __Lake Point Tower Condominium Association__ and __Vivian M. Raviaro__ as __Secretary__, of Lake Point Tower Condominium Association, an Illinois not-for-profit corporation, known to me to be the same persons who names are subscribed to the foregoing instrument as such __President__ and __Secretary__ respectively, appeared before me this day in person and acknowledged that they signed and delivered said instrument as their own free and voluntary act, and as the free and voluntary act of said Corporation, for the uses and purposes therein set forth; and said __Vivian M. Raviaro__ did thereby acknowledge that he, as custodian of the Corporate Seal of said Corporation, did affix the Corporate Seal of said Corporation to said instrument as his own free and voluntary act, and as the free and voluntary act of said Corporation, for the uses and purposes therein set forth.

GIVEN under my hand and Notarial Seal this __27TH__ day of __December__, 199 __5__.

_____
Notary Public

My Commission Expires:

__November 25, 1999__

"OFFICIAL SEAL"
DAVID SUGAR
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 11/25/99

FILED DATE: 2/11/2020 2:20 PM    2020CH01705

95894506

CNM294A  12/22/95.10

## CONSENT AND ACKNOWLEDGEMENT

Lake Point Tower Limited Partnership, an Illinois limited partnership, hereby joins in the execution of the attached First Special Amendment to Amended and Restated Declaration of Covenants, Conditions, Restrictions and Easements and agrees that it, including its successors and assigns, shall be bound by its terms and provisions.

Lake Point Tower Limited Partnership,
an Illinois limited partnership

By:    Lake Point Tower Consultants, Inc.
an Illinois corporation, its
general partner

By: _____

ATTEST:

_____

Its

CNM294A  12/22/95.10

STATE OF ILLINOIS        )
                         ) SS.
COUNTY OF C O O K        )

I, JOYCE HOPSON , a Notary Public in and for said County and State aforesaid, DO HEREBY CERTIFY that NICHOLAS GOULRPAS as PRESIDENT of Lake Point Tower Consultants, Inc., an Illinois corporation, and as _____, of said corporations, known to me to be the same persons who names are subscribed to the foregoing instrument as such PRESIDENT and _____, respectively, appeared before me this day in person and acknowledged that they signed and delivered said instrument as their own free and voluntary act, and as the free and voluntary act of said Corporation, as general partner of Lake Point Tower Limited Partnership, an Illinois Limited Partnership, for the uses and purposes therein set forth; and said _____ did thereby acknowledge that he, as custodian of the Corporate Seal of said Corporation, did affix the Corporate Seal of said Corporation to said instrument as his own free and voluntary act, and as the free and voluntary act of said Corporation, for the uses and purposes therein set forth.

GIVEN under my hand and Notarial Seal this 27 th day of December, 1995.

Joyce E. Hopson
Notary Public

My Commission Expires
OFFICIAL SEAL
JOYCE E. HOPSON
Notary Public, State of Illinois
My Commission Expires June 25, 1997

CNM294A  11/22/95.10
-13-

FILED DATE: 2/11/2020 2:20 PM   2020CH01705

## EXHIBIT A

ALL THAT PART OF LOT 7 IN CHICAGO DOCK AND CANAL COMPANY'S
PESHTIGO DOCK ADDITION IN SECTION 10, TOWNSHIP 39 NORTH,
RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, WHICH LIES
SOUTH OF THE SOUTH LINE OF GRAND AVENUE EXTENDED EAST;
NORTH OF THE NORTH LINE OF A STRIP OF LAND 74 FEET IN
WIDTH NOW USED AS EAST ILLINOIS STREET; WEST OF THE WEST
LINE OF STREETER DRIVE AND EAST OF THE EAST LINE OF NORTH
LAKE SHORE DRIVE, ESTABLISHED BY DEED DATED JULY 25, 1929
IN CONDEMNATION PROCEEDINGS GENERAL NUMBER B-177476 IN
CIRCUIT COURT OF COOK COUNTY, ILLINOIS, EXCEPTING
THEREFROM THAT PART OF LOT 7 IN CHICAGO DOCK AND CANAL
COMPANY'S PESHTIGO DOCK ADDITION IN SECTION 10, TOWNSHIP
39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN,
BOUNDED AND DESCRIBED AS FOLLOWS:
BEGINNING AT A POINT ON THE SOUTH LINE OF THE NORTH 74.00
FEET OF SAID LOT 7 WHICH IS THE SOUTH LINE OF EAST GRAND
AVENUE 312.18 FEET EAST OF THE WEST LINE OF SAID LOT 7,
SAID LINE HAVING A BEARING OF NORTH 89 DEGREES 43 MINUTES
30 SECONDS EAST (ASSUMED); THENCE SOUTH ALONG A LINE
HAVING A BEARING OF SOUTH 0 DEGREES 14 MINUTES 15 SECONDS
EAST A DISTANCE OF 218 FEET TO THE NORTH LINE OF A STRIP
OF LAND 74 FEET IN WIDTH NOW USED AS EAST ILLINOIS STREET;
THENCE EAST ALONG THE NORTH LINE OF SAID STRIP HAVING A
BEARING OF NORTH 89 DEGREES 43 MINUTES 30 SECONDS EAST A
DISTANCE OF 40.146 FEET; THENCE NORTH ALONG A LINE HAVING
A BEARING OF NORTH 0 DEGREES 14 MINUTES 15 SECONDS WEST A
DISTANCE OF 195.898 FEET; THENCE EAST ALONG A LINE HAVING
A BEARING OF NORTH 89 DEGREES 43 MINUTES 31 SECONDS EAST A
DISTANCE OF 5.444 FEET; THENCE NORTH ALONG A LINE HAVING A
BEARING OF NORTH 0 DEGREES 15 MINUTES 41 SECONDS WEST A
DISTANCE OF 22.102 FEET TO THE SOUTH LINE OF EAST GRAND
AVENUE AS AFOREMENTIONED; THENCE WEST ALONG SAID SOUTH
LINE A DISTANCE OF 45.580 FEET TO THE POINT OF BEGINNING,
IN COOK COUNTY, ILLINOIS.

pin
17-10-214 008

prty address
505 N. Lake Shore Drive
Chicago, IL

9589506

A-1

N117040.A   7/10/92

# EXHIBIT C

FILED DATE: 2/11/2020 2:20 PM   2020CH01705

STATE OF ILLINOIS      )
                    ) SS.
COUNTY OF COOK      )

```
*1935110055*
Doc# 1935110055 Fee $88.00
RHSP FEE:$9.00 RPRF FEE: $1.00
EDWARD M. MOODY
COOK COUNTY RECORDER OF DEEDS
DATE: 12/17/2019 11:25 AM  PG:  1 OF 8
```

P.I.N. 17-10-214-009-0000 &
17-10-214-035-0000


## NOTICE OF LIEN

KNOW ALL MEN BY THESE PRESENTS, that Lake Point Tower Condominium

Association, an Illinois not-for-profit corporation, has and claims a lien pursuant to Sections

7 and 13 of that certain Amended and Restated Declaration of Covenants, Conditions,

Restrictions and Easements dated July 7, 1992, and recorded with the Cook County Recorder

of Deeds as Document No. 95616148 (as amended, the "Operating Declaration"), against Cite,

LLC, upon the property described on the attached legal description and commonly known as

505 North Lake Shore Drive, Suite 207, Suite 209, Suite 209-A, Suite 223 and Suite 7000,

Chicago, Illinois 60611.

The property is subject to the Operating Declaration. Sections 7 and 13 provide for a

creation of a lien for unpaid common expenses or the amount of any unpaid fines or charges

imposed pursuant thereto, together with interest, late charges, costs, and reasonable attorneys'

fees necessary for collection. The balance due to the Association for said amounts, unpaid

LP 15549974.1 \30493-115513                1

FILED DATE: 2/11/2020 2:20 PM   2020CH01705

and owing pursuant to the aforesaid Operating Declaration after allowing all credits, is the sum of $138,163.81 through November 11, 2019.  Each monthly assessment thereafter shall be in the sum of $3,456.24, or in the amount of such other assessments and charges which may be determined under the Operating Declaration.  Said assessments, together with interest, late charges, costs and reasonable attorneys' fees constitute a lien on the aforesaid real estate.

LAKE POINT TOWER CONDOMINIUM
ASSOCIATION, an Illinois not-for-profit
corporation

Attorney for LAKE POINT TOWER
CONDOMINIUM ASSOCIATION

STATE OF ILLINOIS       )
                        ) SS.
COUNTY OF COOK )

Subscribed and Sworn to before me this

17th day of December, 2019.

NOTARY PUBLIC

OFFICIAL SEAL
TIMOTHY I. MASSAT
Notary Public - State of Illinois
My Commission Expires 6/09/2022

PREPARED BY AND RETURN TO:
Christopher M. Heintskill
Levenfeld Pearlstein, LLC
Attorneys for Lake Point Tower Condominium Association
2 N. LaSalle Street, Suite 1300
Chicago, Illinois  60602

FILED DATE: 2/11/2020 2:20 PM    2020CH01705

# LEGAL DESCRIPTION

**PARCEL 207 (2ND FLOOR):**

ALL THAT PART OF LOT 7 IN CHICAGO DOCK AND CANAL COMPANY'S PESHTIGO DOCK ADDITION IN SECTION 10, TOWNSHIP 39 NORTH, RANGE 14, EAST OF THE THIRD PRINCIPAL MERIDIAN, WHICH LIES SOUTH OF THE SOUTH LINE OF GRAND AVENUE EXTENDED EAST; NORTH OF THE NORTH LINE OF A STRIP OF LAND 74.00 FEET IN WIDTH NOW USED AS EAST ILLINOIS STREET; WEST OF THE WEST LINE OF STREETER DRIVE AND EAST OF THE EAST LINE OF NORTH LAKE SHORE DRIVE, ESTABLISHED BY DEED DATED JULY 25, 1929 IN CONDEMNATION PROCEEDINGS GENERAL NUMBER B-177476 IN CIRCUIT COURT OF COOK COUNTY, ILLINOIS, BOUNDED AND DESCRIBED AS FOLLOWS:

COMMENCING AT A POINT ON THE SOUTH LINE OF THE NORTH 74.00 FEET OF SAID LOT 7, WHICH IS THE SOUTH LINE OF EAST GRAND AVENUE ACCORDING TO DOCUMENT NO. 5249665, SAID POINT BEING 357.76 FEET EAST OF THE WEST OF SAID LOT 7; THENCE NORTH 89 DEGREES, 43 MINUTES, 30 SECONDS EAST, ALONG SAID SOUTH LINE, 252.87 FEET TO A POINT, SAID POINT BEING 610.63 FEET EAST OF THE WEST LINE OF SAID LOT 7; THENCE CONTINUING NORTH 89 DEGREES,43 MINUTES, 30 SECONDS EAST, ALONG SAID SOUTH LINE, 155.46 FEET; THENCE SOUTH 0 DEGREES, 17 MINUTES, 18 SECONDS EAST, 61.82 FEET; THENCE SOUTH 59 DEGREES 42 MINUTES 42 SECONDS WEST, 2.27 FEET; THENCE SOUTH 89 DEGREES, 42 MINUTES, 42 SECONDS WEST, 17.88 FEET; THENCE NORTH 85 DEGREES, 02 MINUTES, 58 SECONDS WEST, 1.09 FEET; THENCE SOUTH 29 DEGREES, 42 MINUTES, 42 SECONDS WEST, 13.90 FEET; THENCE SOUTH 60 DEGREES, 17 MINUTES, 18 SECONDS EAST, 0.42 FEET; THENCE SOUTH 29 DEGREES, 42 MINUTES, 42 SECONDS WEST, 14.15 FEET TO THE POINT OF BEGINNING OF THE FOLLOWING DESCRIBED PARCEL:

THENCE SOUTH 29 DEGREES, 42 MINUTES, 42 SECONDS WEST, 21.07 FEET; THENCE NORTH 60 DEGREES, 17 MINUTES, 18 SECONDS WEST, 27.86 FEET TO A POINT, SAID POINT BEING 86.21 FEET EAST (AS MEASURED PERPENDICULARLY) OF THE HEREINAFTER DEFINED LINE "A", BEING A LINE DRAWN FROM A POINT ON THE NORTH LINE OF A STRIP OF LAND 74.00 FEET IN WIDTH NOW USED AS EAST ILLINOIS STREET 611.17 FEET EAST OF THE WEST LINE OF LOT 7 AFORESAID TO A POINT ON THE SOUTH LINE OF EAST GRAND AVENUE AFORESAID 610.63 FEET EAST OF THE WEST LINE OF SAID LOT 7 AND 91.70 FEET (AS MEASURED PERPENDICULARLY) SOUTH OF THE SOUTH LINE OF EAST GRAND AVENUE AFORESAID; THENCE NORTH 29 DEGREES, 42 MINUTES, 42 SECONDS EAST, 10.64 FEET; THENCE NORTH 60 DEGREES, 17 MINUTES, 18 SECONDS WEST, 1.59 FEET TO A POINT ON A CURVE; THENCE NORTHEASTERLY 10.10 FEET ALONG THE ARC OF A CIRCLE, CONVEX TO THE EAST, HAVING A RADIUS OF 36.80 FEET AND WHOSE CHORD BEARS NORTH 4 DEGREES 55 MINUTES 50 SECONDS EAST, 10.07 FEET TO A POINT, SAID POINT BEING 91.07 FEET EAST (AS MEASURED PERPENDICULARLY) OF LINE "A" HERETOFORE DEFINED AND 71.66 FEET (AS MEASURED PERPENDICULARLY) SOUTH OF THE SOUTH LINE OF EAST GRAND AVENUE AFORESAID; THENCE NORTH 89 DEGREES, 42 MINUTES, 42 SECONDS EAST, 2.58 FEET; THENCE SOUTH 60 DEGREES, 17 MINUTES, 18 SECONDS EAST, 31.44 FEET TO THE POINT OF BEGINNING OF THE PARCEL HEREIN DESCRIBED;

SAID PARCEL HAVING AS A LOWER LIMIT A HORIZONTAL PLANE OF ELEVATION +28.91 FEET (CHICAGO CITY DATUM) AND HAVING AS AN UPPER LIMIT A HORIZONTAL PLANE OF ELEVATION +42.89 FEET (CHICAGO CITY DATUM), ALL IN COOK COUNTY. ILLINOIS.

**PARCEL 209 (2ND FLOOR):**

LP 15549974.1\30493-115513

3

FILED DATE: 2/11/2020 2:20 PM   2020CH01705

ALL THAT PART OF LOT 7 IN CHICAGO DOCK AND CANAL COMPANY'S PESHTIGO DOCK ADDITION IN SECTION 10, TOWNSHIP 39 NORTH, RANGE 14, EAST OF THE THIRD PRINCIPAL MERIDIAN, WHICH LIES SOUTH OF THE SOUTH OF THE SOUTH LINE OF GRAND AVENUE EXTENDED EAST; NORTH OF THE NORTH LINE OF A STRIP OF LAND 74.00 FEET IN WIDTH NOW USED AS EAST ILLINOIS STREET; WEST OF THE WEST LINE OF STREETER DRIVE AND EAST OF THE EAST LINE OF NORTH LAKE SHORE DRIVE, ESTABLISHED BY DEED DATED JULY 25, 1929 IN CONDEMNATION PROCEEDINGS GENERAL NUMBER B-177476 1N CIRCUIT COURT OF COOK COUNTY. ILLINOIS, BOUNDED AND DESCRIBED AS FOLLOWS:

COMMENCING AT A POINT ON THE SOUTH LINE OF THE NORTH 74.00 FEET OF SAID LOT 7, WHICH IS THE SOUTH LINE OF EAST GRAND AVENUE PER DOCUMENT NO. 5249665, SAID POINT BEING 397.76 FEET EAST OF THE WEST LINE OF SAID LOT 7; THENCE NORTH 89 DEGREES, 43 MINUTES, 30 SECONDS EAST ALONG SAID SOUTH LINE, 252.87 FEET TO A POINT, SAID POINT BEING 610.63 FEET EAST OF THE WEST LINE OF SAID LOT 7; THENCE CONTINUING NORTH 89 DEGREES, 43 MINUTES, 30 SECONDS EAST ALONG SAID SOUTH LINE, 289.37 FEET TO A POINT ON THE WEST LINE OF NORTH STREETER DRIVE PER DOCUMENT NO. 5249661; THENCE SOUTH 0 DEGREES, 09 MINUTES, 53 SECONDS EAST ALONG SAID WEST LINE, 217.855 FEET TO THE POINT OF INTERSECTION WITH THE NORTH LINE OF THE 74.00 FOOT STRIP OF LAND NOW USED AS EAST ILLINOIS STREET; THENCE SOUTH 89 DEGREES, 42 MINUTES, 37 SECONDS WEST ALONG SAID NORTH LINE, 72.23 FEET; THENCE NORTH 0 DEGREES, 17 MINUTES, 23 SECONDS WEST, 13.45 FEET TO THE POINT OF BEGINNING OF THE FOLLOWING DESCRIBED PARCEL;

THENCE SOUTH 89 DEGREES, 42 MINUTES, 42 SECONDS WEST, 30.90 FEET TO A POINT, SAID POINT BEING 13.45 FEET (AS MEASURED PERPENDICULARLY) NORTH OF THE NORTH LINE OF THE 74.00 FOOT STRIP OF LAND NOW USED AS EAST ILLINOIS STREET; THENCE NORTH 0 DEGREES, 17 MINUTES, 18 SECONDS WEST, 39.82 FEET; THENCE NORTH 89 DEGREES, 42 MINUTES, 42 SECONDS EAST, 7.59 FEET; THENCE SOUTH 29 DEGREES, 42 MINUTES, 42 SECONDS WEST, 0.19 FEET; THENCE SOUTH 60 DEGREES, 17 MINUTES, 18 SECONDS EAST, 4.96 FEET; THENCE NORTH 89 DEGREES, 42 MINUTES, 42 SECONDS EAST, 7.65 FEET; THENCE SOUTH 0 DEGREES, 17 MINUTES, 18 SECONDS EAST, 0.55 FEET; THENCE NORTH 89 DEGREES, 42 MINUTES, 42 SECONDS EAST, 10.01 FEET TO A POINT, SAID POINT BEING 73.79 FEET WEST (AS MEASURED PERPENDICULARLY) OF THE WEST LINE OF NORTH STREETER DRIVE AFORESAID; THENCE SOUTH 0 DEGREES, 17 MINUTES, 18 SECONDS EAST, 4.54 FEET; THENCE NORTH 89 DEGREES, 42 MINUTES, 42 SECONDS EAST, 3.20 FEET; THENCE SOUTH 0 DEGREES, 17 MINUTES, 18 SECONDS EAST, 5.32 FEET; THENCE NORTH 89 DEGREES, 42 MINUTES, 42 SECONDS EAST, 6.31 FEET; THENCE SOUTH 0 DEGREES, 17 MINUTES, 18 SECONDS EAST, 6.80 FEET; THENCE SOUTH 89 DEGREES, 42 MINUTES, 42 SECONDS WEST, 8.07 FEET; THENCE SOUTH 0 DEGREES, 17 MINUTES, 18 SECONDS EAST, 19.96 FEET TO THE POINT OF BEGINNING OF THE PARCEL HEREIN DESCRIBED;

SAID PARCEL HAVING AS A LOWER LIMIT A HORIZONTAL PLANE OF ELEVATION +28.91 FEET (CHICAGO CITY DATUM) AND HAVING AS AN UPPER LIMIT A HORIZONTAL PLANE OF ELEVATION +42.89 FEET (CHICAGO CITY DATUM), ALL IN COOK COUNTY. ILLINOIS.

PARCEL 209-A (2ND FLOOR)

ALL THAT PART OF LOT 7 IN CHICAGO DOCK AND CANAL COMPANY'S PESHTIGO DOCK ADDITION IN SECTION 10, TOWNSHIP 39 NORTH, RANGE 14, EAST OF THE THIRD PRINCIPAL MERIDIAN, WHICH

FILED DATE: 2/11/2020 2:20 PM   2020CH01705

LIES SOUTH OF THE SOUTH OF THE SOUTH LINE OF GRAND AVENUE EXTENDED EAST; NORTH OF THE NORTH LINE OF A STRIP OF LAND 74.00 FEET IN WIDTH NOW USED AS EAST ILLINOIS STREET; WEST OF THE WEST LINE OF STREETER DRIVE AND EAST OF THE EAST LINE OF NORTH LAKE SHORE DRIVE, ESTABLISHED BY DEED DATED JULY 25, 1929 IN CONDEMNATION PROCEEDINGS GENERAL NUMBER B-1774761 IN CIRCUIT COURT OF COOK COUNTY, ILLINOIS, BOUNDED AND DESCRIBED AS FOLLOWS:

COMMENCING AT A POINT ON THE SOUTH LINE OF THE NORTH 74.00 FEET OF SAID LOT 7, WHICH IS THE SOUTH LINE OF EAST GRAND AVENUE PER DOCUMENT NO. 5249665, SAID POINT BEING 397.76 FEET EAST OF THE WEST LINE OF SAID LOT 7; THENCE NORTH 89 DEGREES, 43 MINUTES, 30 SECONDS EAST ALONG SAID SOUTH LINE, 252.87 FEET TO A POINT, SAID POINT BEING 610.63 FEET EAST OF THE WEST LINE OF SAID LOT 7; THENCE CONTINUING NORTH 89 DEGREES, 43 MINUTES, 30 SECONDS EAST ALONG SAID SOUTH LINE, 289.37 FEET TO A POINT ON THE WEST LINE OF NORTH STREETER DRIVE PER DOCUMENT NO. 5249661; THENCE SOUTH 0 DEGREES, 09 MINUTES, 53 SECONDS EAST ALONG SAID WEST LINE, 217.855 FEET TO THE POINT OF INTERSECTION WITH THE NORTH LINE OF THE 74.00 FOOT STRIP OF LAND NOW USED AS EAST ILLINOIS STREET; THENCE SOUTH 89 DEGREES, 42 MINUTES, 37 SECONDS WEST ALONG SAID NORTH LINE, 138.34 FEET; THENCE NORTH 0 DEGREES, 17 MINUTES, 23 SECONDS WEST, 1.79 FEET TO THE POINT OF BEGINNING OF THE FOLLOWING DESCRIBED PARCEL:

THENCE NORTH 0 DEGREES, 17 MINUTES, 18 SECONDS WEST, 10.61 FEET; THENCE NORTH 89 DEGREES, 42 MINUTES, 42 SECONDS EAST, PERPENDICULAR TO THE LAST DESCRIBED LINE, 21.24 FEET; THENCE SOUTH 0 DEGREES, 17 MINUTES, 18 SECONDS EAST, 2.47 FEET; THENCE NORTH 89 DEGREES, 42 MINUTES, 42 SECONDS EAST, 9.86 FEET; THENCE NORTH 0 DEGREES, 17 MINUTES, 18 SECONDS WEST, 0.05 FEET; THENCE NORTH 89 DEGREES, 42 MINUTES, 42 SECONDS EAST, 0.20 FEET TO A POINT, SAID POINT BEING 107.06 FEET WEST (AS MEASURED PERPENDICULARLY) OF THE WEST LINE OF NORTH STREETER DRIVE AFORESAID; THENCE SOUTH 0 DEGREES, 17 MINUTES, 18 SECONDS EAST, 8.34 FEET TO A POINT, SAID POINT BEING 1.64 FEET (AS MEASURED PERPENDICULARLY) NORTH OF THE NORTH LINE OF THE 74.00 FOOT STRIP OF LAND NOW USED AS EAST ILLINOIS STREET; THENCE SOUTH 89 DEGREES, 42 MINUTES, 42 SECONDS WEST, 30.55 FEET TO A POINT, SAID POINT BEING 1.64 FEET (AS MEASURED PERPENDICULARLY) NORTH OF THE NORTH LINE OF EAST ILLINOIS STREET AFORESAID; THENCE NORTH 0 DEGREES, 17 MINUTES, 18 SECONDS WEST, PERPENDICULAR TO THE LAST DESCRIBED LINE, 0.15 FEET; THENCE SOUTH 89 DEGREES, 42 MINUTES, 42 SECONDS WEST, 0.75 FEET TO THE POINT OF BEGINNING OF THE PARCEL HEREIN DESCRIBED;

SAID PARCEL HAVING AS A LOWER LIMIT A HORIZONTAL PLANE OF ELEVATION +28.91 FEET (CHICAGO CITY DATUM) AND HAVING AS AN UPPER LIMIT A HORIZONTAL PLANE OF ELEVATION +42.89 FEET (CHICAGO CITY DATUM), ALL IN COOK COUNTY, ILLINOIS.

PARCEL 224 (2ND FLOOR):

ALL THAT PART OF LOT 7 IN CHICAGO DOCK AND CANAL COMPANY'S PESHTIGO DOCK ADDITION IN SECTION 10, TOWNSHIP 39 NORTH, RANGE 14, EAST OF THE THIRD PRINCIPAL MERIDIAN, WHICH LIES SOUTH OF THE SOUTH LINE OF GRAND AVENUE EXTENDED EAST; NORTH OF THE NORTH LINE OF A STRIP OF LAND 74.00 FEET IN WIDTH NOW USED AS EAST ILLINOIS STREET; WEST OF THE WEST LINE OF STREETER DRIVE AND EAST OF THE EAST LINE OF NORTH LAKE SHORE DRIVE,

LP 15549974.1\30493-115513

FILED DATE: 2/11/2020 2:20 PM   2020CH01705

ESTABLISHED BY DEED DATED JULY 25, 1929 IN CONDEMNATION PROCEEDINGS GENERAL NUMBER B-177476 IN CIRCUIT COURT OF COOK COUNTY, ILLINOIS, BOUNDED AND DESCRIBED AS FOLLOWS:

COMMENCING AT A POINT ON THE SOUTH LINE OF THE NORTH 74.00 FEET OF SAID LOT 7, WHICH IS THE SOUTH LINE OF EAST GRAND AVENUE PER DOCUMENT NO. 5249665, SAID POINT BEING 357.76 FEET EAST OF THE WEST LINE OF SAID LOT 7; THENCE NORTH 89 DEGREES, 43 MINUTES, 30 SECONDS EAST ALONG SAID SOUTH LINE, 252.87 FEET TO A POINT, SAID POINT BEING 610.63 FEET EAST OF THE WEST LINE OF SAID LOT 7; THENCE CONTINUING NORTH 89 DEGREES, 43 MINUTES, 30 SECONDS EAST ALONG SAID SOUTH LINE, 289.37 FEET TO A POINT ON THE WEST LINE OF NORTH STREETER DRIVE PER DOCUMENT NO. 5249661; THENCE SOUTH 0 DEGREES, 09 MINUTES, 53 SECONDS EAST ALONG SAID WEST LINE, 217.855 FEET TO THE POINT OF INTERSECTION WITH THE NORTH LINE OF THE 74.00 FOOT STRIP OF LAND NOW USED AS EAST ILLINOIS STREET; THENCE SOUTH 89 DEGREES, 42 MINUTES, 37 SECONDS WEST ALONG SAID NORTH LINE, 288.91 FEET TO A POINT, SAID POINT BEING 611.17 FEET EAST OF THE WEST LINE OF LOT 7 AFORESAID; THENCE NORTH 0 DEGREES, 17 MINUTES, 10 SECONDS WEST, 69.94 FEET ALONG THE HEREINAFTER DESCRIBED LINE "A", BEING A LINE DRAWN FROM A POINT ON THE NORTH LINE OF A STRIP OF LAND 74.00 FEET IN WIDTH NOW USED AS EAST ILLINOIS STREET 611.17 FEET EAST OF THE WEST LINE OF LOT 7 AFORESAID TO A POINT ON THE SOUTH LINE OF EAST GRAND AVENUE AFORESAID 610.63 FEET EAST OF THE WEST LINE OF SAID LOT 7; THENCE NORTH 89 DEGREES, 42 MINUTES. 50 SECONDS EAST, PERPENDICULAR TO THE LAST DESCRIBED LINE 0.81 FEET TO THE POINT OF BEGINNING OF THE FOLLOWING DESCRIBED PARCEL:

THENCE NORTH 0 DEGREES, 17 MINUTES, 18 SECONDS WEST, 30.68 FEET TO A POINT, SAID POINT BEING 0.81 FEET (AS MEASURED PERPENDICULARLY) EAST OF LINE "A" AFORESAID; THENCE NORTH 89 DEGREES, 42 MINUTES, 42 SECONDS EAST, PERPENDICULAR TO THE LAST DESCRIBED LINE, 27.14 FEET; THENCE SOUTH 0 DEGREES, 17 MINUTES, 18 SECONDS EAST, 5.49 FEET TO A POINT, SAID POINT BEING 27.95 FEET (AS MEASURED PERPENDICULARLY) EAST OF LINE "A" AFORESAID; THENCE SOUTH 89 DEGREES, 42 MINUTES, 42 SECONDS WEST, PERPENDICULAR TO THE LAST DESCRIBED LINE, 13.69 FEET; THENCE SOUTH 0 DEGREES, 17 MINUTES, 18 SECONDS EAST, 25.19 FEET TO A POINT, SAID POINT BEING 69.94 FEET (AS MEASURED PERPENDICULARLY) NORTH OF THE NORTH LINE OF EAST ILLINOIS STREET AFORESAID; THENCE SOUTH 89 DEGREES, 42 MINUTES, 42 SECONDS WEST, PERPENDICULAR TO THE LAST DESCRIBED LINE, 13.45 FEET TO THE POINT OF BEGINNING OF THE PARCEL HEREIN DESCRIBED;

SAID PARCEL HAVING AS A LOWER LIMIT A HORIZONTAL PLANE OF ELEVATION +28.91 FEET (CHICAGO CITY DATUM) AND HAVING AS AN UPPER LIMIT A HORIZONTAL PLANE OF ELEVATION +42.89 FEET (CHICAGO CITY DATUM), ALL IN COOK COUNTY, ILLINOIS.

PARCEL 3 - (70TH FLOOR (RESTAURANT PROPERTY):

ALL THAT PART OF LOT 7 IN CHICAGO DOCK AND CANAL COMPANY'S PESHTIGO DOCK ADDITION IN SECTION 10, TOWNSHIP 39 NORTH, RANGE 14, EAST OF THE THIRD PRINCIPAL MERIDIAN, WHICH LIES SOUTH OF THE SOUTH LINE OF GRAND AVENUE EXTENDED EAST; NORTH OF THE NORTH LINE OF A STRIP OF LAND 74.00 FEET IN WIDTH NOW USED AS EAST ILLINOIS STREET; WEST OF THE LINE OF STREETER DRIVE AND EAST OF THE EAST LINE OF NORTH LAKE SHORE DRIVE, ESTABLISHED BY DEED DATED JULY 25, 1929 IN CONDEMNATION PROCEEDINGS GENERAL NUMBER B-177476 IN CIRCUIT COURT OF COOK COUNTY, ILLINOIS, BOUNDED AND DESCRIBED AS FOLLOWS: COMMENCING

FILED DATE: 2/11/2020 2:20 PM   2020CH01705

AT A POINT ON THE SOUTH LINE OF THE NORTH 74.00 FEET OF SAID LOT 7 WHICH IS THE SOUTH LINE OF EAST GRAND AVENUE PER DOCUMENT NO. 5249665, SAID POINT BEING 357.76 FEET EAST OF THE WEST LINE OF SAID LOT 7; THENCE NORTH 89 DEGREES, 43 MINUTES, 30 SECONDS EAST ALONG SAID SOUTH LINE, 396.73 FEET; THENCE SOUTH AT RIGHT ANGLES TO SAID SOUTH LINE 8.10 FEET TO THE POINT OF BEGINNING OF THE PARCEL HEREIN DESCRIBED;

THENCE NORTH 89 DEGREES, 42 MINUTES, 29 SECONDS EAST, 7.995 FEET TO A POINT ON A CURVE; THENCE SOUTHEASTERLY 36.00 FEET ALONG THE ARC OF A CIRCLE CONVEX TO THE NORTHEAST HAVING A RADIUS OF 23.28 FEET AND WHOSE CHORD BEARS SOUTH 45 DEGREES, 59 MINUTES, 36 SECONDS EAST, 32.52 FEET; THENCE SOUTH 1 DEGREE 30 MINUTES, 24 SECONDS EAST, 39.99 FEET TO A POINT ON A CURVE; THENCE SOUTHEASTERLY 64.19 FEET ALONG THE ARC OF A CIRCLE CONVEX TO THE SOUTHWEST HAVING A RADIUS OF 68.77 FEET AND WHOSE CHORD BEARS SOUTH 30 DEGREES, 18 MINUTES, 00 SECOND EAST, 61.88 FEET; THENCE SOUTH 59 DEGREES, 04 MINUTES, 12 SECONDS EAST, 39.95 FEET TO A POINT ON A CURVE; THENCE SOUTHEASTERLY 36.01 FEET ALONG THE ARC OF A CIRCLE CONVEX TO THE NORTHEAST, HAVING A RADIUS OF 23.28 FEET AND WHOSE CHORD BEARS SOUTH 14 DEGREES, 35 MINUTES 44 SECONDS EAST, 32.52 FEET; THENCE SOUTH 29 DEGREES, 42 MINUTES 29 SECONDS WEST, 15.99 FEET TO A POINT ON A CURVE; THENCE SOUTHWESTERLY 36.01 FEET ALONG THE ARC OF A CIRCLE CONVEX TO THE SOUTHEAST HAVING A RADIUS OF 23.28 FEET AND WHOSE CHORD BEARS SOUTH 74 DEGREES, 00 MINUTES, 24 SECONDS WEST, 32.52 FEET; THENCE NORTH 61 DEGREES, 30 MINUTES, 24 SECONDS WEST 39.99 FEET TO A POINT ON A CURVE; THENCE SOUTHWESTERLY 64.19 FEET ALONG THE ARC OF A CIRCLE CONVEX TO THE NORTHWEST HAVING A RADIUS OF 68.77 FEET AND WHOSE CHORD BEARS SOUTH 89 DEGREES, 42 MINUTES, 00 SECOND WEST, 61.88 FEET; THENCE SOUTH 60 DEGREES, 55 MINUTES, 48 SECONDS WEST, 39.95 FEET TO A POINT ON A CURVE; THENCE NORTHWESTERLY 36.01 FEET ALONG THE ARC OF A CIRCLE CONVEX TO THE SOUTHWEST HAVING A RADIUS OF 23.28 FEET AND WHOSE CHORD BEARS NORTH 74 DEGREES, 35 MINUTES, 44 SECONDS WEST, 32.52 FEET; THENCE NORTH 30 DEGREES, 17 MINUTES, 31 SECONDS WEST, 15.99 TO A POINT ON A CURVE; THENCE NORTHEASTERLY 36.00 FEET ALONG THE ARC OF A CIRCLE CONVEX TO THE NORTHWEST, HAVING A RADIUS OF 23.28 FEET AND WHOSE CHORD BEARS NORTH 14 DEGREES, 00 MINUTE, 24 SECONDS EAST, 32.52 FEET; THENCE NORTH 58 DEGREES, 29 MINUTES, 41 SECONDS EAST, 39.96 FEET TO A POINT ON A CURVE; THENCE NORTHEASTERLY 64.22 FEET ALONG THE ARC OF A CIRCLE CONVEX TO THE SOUTHEAST HAVING A RADIUS OF 68.77 FEET AND WHOSE CHORD BEARS NORTH 29 DEGREES, 42 MINUTES, 42 SECONDS EAST, 61.91 FEET; THENCE NORTH 0 DEGREES, 55 MINUTES, 48 SECONDS EAST, 39.95 FEET TO A POINT ON A CURVE; THENCE NORTHEASTERLY 36.01 FEET ALONG THE ARC OF A CIRCLE CONVEX TO THE NORTHWEST, HAVING A RADIUS OF 23.28 FEET AND WHOSE CHORD BEARS NORTH 45 DEGREES, 24 MINUTES, 16 SECONDS EAST, 32.52 FEET; THENCE NORTH 89 DEGREES 42 MINUTES, 29 SECONDS EAST. 7.995 FEET TO THE HEREIN ABOVE DESCRIBED POINT OF BEGINNING; SAID PARCEL HAVING AS A LOWER LIMIT A HORIZONTAL PLANE OF ELEVATION +639.01 FEET (CHICAGO CITY DATUM), ALL IN COOK COUNTY, ILLINOIS

EXCEPTING THEREFROM THE FOLLOWING DESCRIBED PARCEL:

PARCEL 3A - (70TH FLOOR (ROOF AIR RIGHTS ABOVE RESTAURANT PROPERTY):

ALL THAT SPACE OR AREA ENCLOSED WITHIN A RIGHT CIRCULAR CYLINDER WHOSE LOWER BASE IS A CIRCLE OF 41.90 FEET RADIUS AND LIES WITHIN A HORIZONTAL PLANE OF ELEVATION +652.43

FILED DATE: 2/11/2020 2:20 PM   2020CH01705

FEET (CHICAGO CITY DATUM), SAID LOWER BASE IS A CIRCULAR PARCEL OF AIR SPACE WHOSE CENTER IS DEFINED AS FOLLOWS:

ALL THAT PART OF LOT 7 IN CHICAGO DOCK AND CANAL COMPANY'S PESHTIGO DOCK ADDITION IN SECTION 10, TOWNSHIP 39 NORTH, RANGE 14, EAST OF THE THIRD PRINCIPAL MERIDIAN, WHICH LIES SOUTH OF THE SOUTH LINE OF GRAND AVENUE EXTENDED EAST; NORTH OF THE NORTH LINE OF A STRIP OF LAND 74.00 FEET IN WIDTH NOW USED AS EAST ILLINOIS STREET; WEST OF THE WEST LINE OF STREETER DRIVE AND EAST OF THE EAST LINE OF NORTH LAKE SHORE DRIVE, ESTABLISHED BY DEED DATED JULY 25, 1929 IN CONDEMNATION PROCEEDINGS GENERAL NUMBER B-177476 IN CIRCUIT COURT OF COOK COUNTY, ILLINOIS, BOUNDED AND DESCRIBED AS FOLLOWS:

COMMENCING AT A POINT ON THE SOUTH LINE OF THE NORTH 74.00 FEET OF SAID LOT 7, WHICH IS THE SOUTH LINE OF EAST GRAND AVENUE ACCORDING TO DOCUMENT NO. 5249665, SAID POINT BEING 357.76 FEET EAST OF THE WEST LINE OF SAID LOT 7; THENCE 89 DEGREES, 43 MINUTES, 30 SECONDS EAST ALONG SAID SOUTH LINE, 252.87 FEET SAID POINT BEING 610.63 FEET EAST OF THE WEST LINE OF SAID LOT 7; THENCE CONTINUING NORTH 89 DEGREES, 43 MINUTES, 30 SECONDS EAST ALONG SAID SOUTH LINE, 143.89 FEET; THENCE SOUTH 0 DEGREES, 16 MINUTES, 30 SECONDS EAST, PERPENDICULAR TO THE LAST DESCRIBED LINE, 125.05 FEET, SAID POINT BEING THE CENTER OF THE CIRCULAR PARCEL HEREIN ABOVE DESCRIBED, IN COOK COUNTY, ILLINOIS.

NON-EXCLUSIVE EASEMENT FOR THE BENEFIT OF THE PARCELS FOR THE PURPOSE OF STRUCTURAL SUPPORT, INGRESS AND EGRESS, UTILITY SERVICES, AND OTHER SIMILAR USES, AS SET FORTH IN DECLARATION OF COVENANTS, CONDITIONS, RESTRICTIONS AND EASEMENTS MADE BY AMERICAN NATIONAL BANK AND TRUST COMPANY OF CHICAGO, AS TRUSTEE UNDER TRUST AGREEMENT DATED JANUARY 7, 1988 AND KNOWN AS TRUST NUMBER 1043-99-09 DATED JULY 13, 1988 AND RECORDED JULY 14, 1988 AS DOCUMENT 88309160 AND RERECORDED SEPTEMBER 28, 1988 AS DOCUMENT 88446237, AND AS AMENDED BY INSTRUMENT RECORDED AUGUST 19, 1992 AS DOCUMENT 92616148 AND DOCUMENT 95898506.

# EXHIBIT D

LT-505C  Lake Point Tower
505 N. Lake Shore Drive
Chicago IL  60611

| Unit | STAT# | Resident | Type | Date | CC | Description | Check | Charge Amount | Payment/Credit | Balance |
|------|-------|----------|------|------|----|-------------|-------|---------------|----------------|---------|
| 7000 | | 01 | | | | App# 58293 | Beg Bal | | | 142,282.65 |
| Cite LLC | | | Chg | 01/01/2020 | C5 | CAM EXPENSE | | 1,758.05 | | 144,040.70 |
| c/o Accounting Dept. Skyline Equities Realty | | | Chg | 01/01/2020 | C6 | ELEVATOR EXPENSE | | 69.61 | | 144,110.31 |
| 2101 Brickell Ave. Ste. 103 | | | Chg | 01/01/2020 | C7 | INSURANCE EXPENSE | | 285.44 | | 144,395.75 |
| Miami FL 33129 | | | Chg | 01/01/2020 | C8 | UTILITY EXPENSE | | 1,343.14 | | 145,738.89 |
| | | | Chg | 01/29/2020 | C8 | DEC 2019 UTIL ADJ | | 8.06 | | 145,746.95 |
| | | | Chg | 01/29/2020 | C7 | DEC 2019 INS ADJ | | 15.14 | | 145,762.09 |
| | | | Cr | 01/29/2020 | C5 | DEC 2019 CAM ADJ | | | -131.27 | 145,630.82 |
| | | | Cr | 01/29/2020 | C6 | DEC 2019 ELEV ADJ | | | -16.98 | 145,613.84 |
| | | | Chg | 02/01/2020 | C5 | CAM EXPENSE | | 1,758.05 | | 147,371.89 |
| | | | Chg | 02/01/2020 | C6 | ELEVATOR EXPENSE | | 69.61 | | 147,441.50 |
| | | | Chg | 02/01/2020 | C7 | INSURANCE EXPENSE | | 285.44 | | 147,726.94 |
| | | | Chg | 02/01/2020 | C8 | UTILITY EXPENSE | | 1,343.14 | | 149,070.08 |
| | | | Chg | 02/28/2020 | C8 | JAN 2020 UTIL ADJ | | 13.71 | | 149,083.79 |
| | | | Chg | 02/28/2020 | C7 | JAN 2020 INS ADJ | | 9.23 | | 149,093.02 |
| | | | Cr | 02/28/2020 | C5 | JAN 2019 CAM ADJ | | | -608.49 | 148,484.53 |
| | | | Cr | 02/28/2020 | C6 | JAN 2019 ELEV ADJ | | | -14.57 | 148,469.96 |
| | | | Chg | 03/01/2020 | C5 | CAM EXPENSE | | 1,758.05 | | 150,228.01 |
| | | | Chg | 03/01/2020 | C6 | ELEVATOR EXPENSE | | 69.61 | | 150,297.62 |
| | | | Chg | 03/01/2020 | C7 | INSURANCE EXPENSE | | 285.44 | | 150,583.06 |
| | | | Chg | 03/01/2020 | C8 | UTILITY EXPENSE | | 1,343.14 | | 151,926.20 |
| | | | Chg | 03/30/2020 | C8 | FEB 2020 UTIL ADJ | | 17.71 | | 151,943.91 |
| | | | Cr | 03/30/2020 | C5 | FEB 2020 CAM ADJ | | | -115.03 | 151,828.88 |
| | | | Cr | 03/30/2020 | C6 | FEB 2020 ELEV ADJ | | | -16.98 | 151,811.90 |
| | | | Cr | 03/30/2020 | C7 | FEB 2020 INS ADJ | | | -17.40 | 151,794.50 |
| | | | Chg | 04/01/2020 | C5 | CAM EXPENSE | | 1,758.05 | | 153,552.55 |
| | | | Chg | 04/01/2020 | C6 | ELEVATOR EXPENSE | | 69.61 | | 153,622.16 |
| | | | Chg | 04/01/2020 | C7 | INSURANCE EXPENSE | | 285.44 | | 153,907.60 |
| | | | Chg | 04/01/2020 | C8 | UTILITY EXPENSE | | 1,343.14 | | 155,250.74 |
| | | | Chg | 04/30/2020 | C8 | MARCH 2020 UTIL ADJ | | 14.53 | | 155,265.27 |
| | | | Chg | 04/30/2020 | C7 | MARCH 2020 INS ADJ | | 12.89 | | 155,278.16 |
| | | | Cr | 04/30/2020 | C5 | MARCH 2020 CAM ADJ | | | -396.93 | 154,881.23 |
| | | | Cr | 04/30/2020 | C6 | MARCH 2020 ELEV ADJ | | | -12.24 | 154,868.99 |
| | | | Chg | 05/01/2020 | C5 | CAM EXPENSE | | 1,758.05 | | 156,627.04 |
| | | | Chg | 05/01/2020 | C6 | ELEVATOR EXPENSE | | 69.61 | | 156,696.65 |
| | | | Chg | 05/01/2020 | C7 | INSURANCE EXPENSE | | 285.44 | | 156,982.09 |
| | | | Chg | 05/01/2020 | C8 | UTILITY EXPENSE | | 1,343.14 | | 158,325.23 |
| | | | Chg | 05/27/2020 | C8 | APRIL 2020 UTIL ADJ | | 4.75 | | 158,329.98 |
| | | | Chg | 05/27/2020 | C7 | APRIL 2020 INS ADJ | | 3.27 | | 158,333.25 |
| | | | Cr | 05/27/2020 | C5 | APRIL 2020 CAM ADJ | | | -788.78 | 157,544.47 |
| | | | Cr | 05/27/2020 | C6 | APRIL 2020 ELEV ADJ | | | -5.81 | 157,538.66 |
| | | | Chg | 06/01/2020 | C5 | CAM EXPENSE | | 1,758.05 | | 159,296.71 |
| | | | Chg | 06/01/2020 | C6 | ELEVATOR EXPENSE | | 69.61 | | 159,366.32 |
| | | | Chg | 06/01/2020 | C7 | INSURANCE EXPENSE | | 285.44 | | 159,651.76 |
| | | | Chg | 06/01/2020 | C8 | UTILITY EXPENSE | | 1,343.14 | | 160,994.90 |
| | | | Chg | 06/24/2020 | C8 | MAY 2020 UTIL ADJ | | 4.77 | | 160,999.67 |
| | | | Chg | 06/24/2020 | C7 | MAY 2020 INS ADJ | | 12.89 | | 161,012.56 |
| | | | Cr | 06/24/2020 | C5 | MAY 2020 CAM ADJ | | | -224.53 | 160,788.03 |
| | | | Cr | 06/24/2020 | C6 | MAY 2020 ELEV ADJ | | | -54.63 | 160,733.40 |
| | | | Chg | 07/01/2020 | C5 | CAM EXPENSE | | 1,758.05 | | 162,491.45 |
| | | | Chg | 07/01/2020 | C6 | ELEVATOR EXPENSE | | 69.61 | | 162,561.06 |
| | | | Chg | 07/01/2020 | C7 | INSURANCE EXPENSE | | 285.44 | | 162,846.50 |
| | | | Chg | 07/01/2020 | C8 | UTILITY EXPENSE | | 1,343.14 | | 164,189.64 |
| | | | Chg | 07/01/2020 | C6 | ELEVATOR -JULY | | 69.78 | | 164,259.42 |
| | | | Chg | 07/01/2020 | C5 | CAM -JULY | | 1,728.42 | | 165,987.84 |
| | | | Chg | 07/01/2020 | C7 | INSURANCE -JULY | | 320.86 | | 166,308.70 |
| | | | Chg | 07/01/2020 | C8 | UTILITY -JULY | | 1,357.68 | | 167,666.38 |
| | | | Cr | 07/01/2020 | C6 | REBILL-JULY ELEVATOR | | | -69.61 | 167,596.77 |
| | | | Cr | 07/01/2020 | C5 | REBILL-JULY CAM | | | -1,758.05 | 165,838.72 |
| | | | Cr | 07/01/2020 | C7 | REBILL-JULY INSURANCE | | | -285.44 | 165,553.28 |
| | | | Cr | 07/01/2020 | C8 | REBILL-JULY UTILITY | | | -1,343.14 | 164,210.14 |
| | | | Chg | 07/29/2020 | C8 | JUNE 2020 UTIL ADJ | | 12.72 | | 164,222.86 |
| | | | Cr | 07/29/2020 | C5 | JUNE 2020 CAM ADJ | | | -123.11 | 164,099.75 |
| | | | Cr | 07/29/2020 | C6 | JUNE 2020 ELEV ADJ | | | -36.57 | 164,063.18 |
| | | | Cr | 07/29/2020 | C7 | JUNE 2020 INS ADJ | | | -15.26 | 164,047.92 |
| | | | Chg | 08/01/2020 | C5 | CAM EXPENSE | | 1,728.42 | | 165,776.34 |
| | | | Chg | 08/01/2020 | C6 | ELEVATOR EXPENSE | | 69.78 | | 165,846.12 |
| | | | Chg | 08/01/2020 | C7 | INSURANCE EXPENSE | | 320.86 | | 166,166.98 |
| | | | Chg | 08/01/2020 | C8 | UTILITY EXPENSE | | 1,357.68 | | 167,524.66 |
| | | | Chg | 08/28/2020 | C8 | JULY 2020 UTIL ADJ | | 5.57 | | 167,530.23 |
| | | | Chg | 08/28/2020 | C7 | JULY 2020 INS ADJ | | 9.62 | | 167,539.85 |
| | | | Cr | 08/28/2020 | C5 | JULY 2020 CAM ADJ | | | -66.10 | 167,473.75 |
| | | | Cr | 08/28/2020 | C6 | JULY 2020 ELEV ADJ | | | -5.00 | 167,468.75 |
| | | | Chg | 09/01/2020 | C5 | CAM EXPENSE | | 1,728.42 | | 169,197.17 |
| | | | Chg | 09/01/2020 | C6 | ELEVATOR EXPENSE | | 69.78 | | 169,266.95 |
| | | | Chg | 09/01/2020 | C7 | INSURANCE EXPENSE | | 320.86 | | 169,587.81 |
| | | | Chg | 09/01/2020 | C8 | UTILITY EXPENSE | | 1,357.68 | | 170,945.49 |

LT-505C  Lake Point Tower
505 N. Lake Shore Drive
Chicago IL  60611

| Unit | STAT# | Resident | Type | Date | CC | Description | Check | Charge Amount | Payment/Credit | Balance |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Chg | 09/25/2020 | C5 | AUG 2020 CAM ADJ | | 184.80 | | 171,130.29 |
| | | | Chg | 09/25/2020 | C7 | AUG 2020 INS ADJ | | 9.62 | | 171,139.91 |
| | | | Cr | 09/25/2020 | C6 | AUG 2020 ELEV ADJ | | | -69.78 | 171,070.13 |
| | | | Cr | 09/25/2020 | C8 | AUG 2020 UTIL ADJ | | | -8.84 | 171,061.29 |
| | | | Chg | 10/01/2020 | C5 | CAM EXPENSE | | 1,728.42 | | 172,789.71 |
| | | | Chg | 10/01/2020 | C6 | ELEVATOR EXPENSE | | 69.78 | | 172,859.49 |
| | | | Chg | 10/01/2020 | C7 | INSURANCE EXPENSE | | 320.86 | | 173,180.35 |
| | | | Chg | 10/01/2020 | C8 | UTILITY EXPENSE | | 1,357.68 | | 174,538.03 |
| | | | Chg | 10/23/2020 | C8 | SEPT 2020 UTIL ADJ | | 12.25 | | 174,550.28 |
| | | | Chg | 10/23/2020 | C7 | SEPT 2020 INS ADJ | | 9.62 | | 174,559.90 |
| | | | Cr | 10/23/2020 | C5 | SEPT 2020 CAM ADJ | | | -316.96 | 174,242.94 |
| | | | Cr | 10/23/2020 | C6 | SEPT 2020 ELEV ADJ | | | -69.78 | 174,173.16 |
| | | | Chg | 11/01/2020 | C5 | CAM EXPENSE | | 1,728.42 | | 175,901.58 |
| | | | Chg | 11/01/2020 | C6 | ELEVATOR EXPENSE | | 69.78 | | 175,971.36 |
| | | | Chg | 11/01/2020 | C7 | INSURANCE EXPENSE | | 320.86 | | 176,292.22 |
| | | | Chg | 11/01/2020 | C8 | UTILITY EXPENSE | | 1,357.68 | | 177,649.90 |
| | | | Chg | 11/23/2020 | C5 | OCT 2020 CAM ADJ | | 1,209.32 | | 178,859.22 |
| | | | Chg | 11/23/2020 | C8 | OCT 2020 UTIL ADJ | | 12.86 | | 178,872.08 |
| | | | Chg | 11/23/2020 | C7 | OCT 2020 INS ADJ | | 38.63 | | 178,910.71 |
| | | | Cr | 11/23/2020 | C6 | OCT 2020 ELEV ADJ | | | -67.41 | 178,843.30 |
| | | | Chg | 12/01/2020 | C5 | CAM EXPENSE | | 1,728.42 | | 180,571.72 |
| | | | Chg | 12/01/2020 | C6 | ELEVATOR EXPENSE | | 69.78 | | 180,641.50 |
| | | | Chg | 12/01/2020 | C7 | INSURANCE EXPENSE | | 320.86 | | 180,962.36 |
| | | | Chg | 12/01/2020 | C8 | UTILITY EXPENSE | | 1,357.68 | | 182,320.04 |
| | | | Chg | 12/28/2020 | C6 | NOV 2020 ELEV ADJ | | 33.77 | | 182,353.81 |
| | | | Chg | 12/28/2020 | C8 | NOV 2020 UTIL ADJ | | 11.96 | | 182,365.77 |
| | | | Chg | 12/28/2020 | C7 | NOV 2020 INS ADJ | | 1.48 | | 182,367.25 |
| | | | Cr | 12/28/2020 | C5 | NOV 2020 CAM ADJ | | | -117.14 | 182,250.11 |
| | | | Chg | 01/01/2021 | C5 | CAM EXPENSE | | 1,728.42 | | 183,978.53 |
| | | | Chg | 01/01/2021 | C6 | ELEVATOR EXPENSE | | 69.78 | | 184,048.31 |
| | | | Chg | 01/01/2021 | C7 | INSURANCE EXPENSE | | 320.86 | | 184,369.17 |
| | | | Chg | 01/01/2021 | C8 | UTILITY EXPENSE | | 1,357.68 | | 185,726.85 |
| | | | Chg | 01/25/2021 | C5 | DEC 2020 CAM ADJ | | 70.61 | | 185,797.46 |
| | | | Chg | 01/25/2021 | C6 | DEC 2020 ELEV ADJ | | 33.77 | | 185,831.23 |
| | | | Chg | 01/25/2021 | C8 | DEC 2020 UTIL ADJ | | 13.35 | | 185,844.58 |
| | | | Chg | 01/25/2021 | C7 | DEC 2020 INS ADJ | | 26.82 | | 185,871.40 |
| | | | Chg | 02/01/2021 | C5 | CAM EXPENSE | | 1,728.42 | | 187,599.82 |
| | | | Chg | 02/01/2021 | C6 | ELEVATOR EXPENSE | | 69.78 | | 187,669.60 |
| | | | Chg | 02/01/2021 | C7 | INSURANCE EXPENSE | | 320.86 | | 187,990.46 |
| | | | Chg | 02/01/2021 | C8 | UTILITY EXPENSE | | 1,357.68 | | 189,348.14 |
| | | | Chg | 02/26/2021 | C6 | JAN 2021 ELEV ADJ | | 33.77 | | 189,381.91 |
| | | | Chg | 02/26/2021 | C8 | JAN 2021 UTIL ADJ | | 19.62 | | 189,401.53 |
| | | | Chg | 02/26/2021 | C7 | JAN 2021 INS ADJ | | 10.24 | | 189,411.77 |
| | | | Cr | 02/26/2021 | C5 | JAN 2021 CAM ADJ | | | -510.31 | 188,901.46 |
| | | | Chg | 03/01/2021 | C5 | CAM EXPENSE | | 1,728.42 | | 190,629.88 |
| | | | Chg | 03/01/2021 | C6 | ELEVATOR EXPENSE | | 69.78 | | 190,699.66 |
| | | | Chg | 03/01/2021 | C7 | INSURANCE EXPENSE | | 320.86 | | 191,020.52 |
| | | | Chg | 03/01/2021 | C8 | UTILITY EXPENSE | | 1,357.68 | | 192,378.20 |
| | | | Chg | 03/30/2021 | C6 | FEB 2021 ELEV ADJ | | 14.37 | | 192,392.57 |
| | | | Chg | 03/30/2021 | C8 | FEB 2021 UTIL ADJ | | 27.74 | | 192,420.31 |
| | | | Cr | 03/30/2021 | C5 | FEB 2021 CAM ADJ | | | -561.74 | 191,858.57 |
| | | | Cr | 03/30/2021 | C7 | FEB 2021 INS ADJ | | | -21.80 | 191,836.77 |
| | | | Chg | 04/01/2021 | C5 | CAM EXPENSE | | 1,728.42 | | 193,565.19 |
| | | | Chg | 04/01/2021 | C6 | ELEVATOR EXPENSE | | 69.78 | | 193,634.97 |
| | | | Chg | 04/01/2021 | C7 | INSURANCE EXPENSE | | 320.86 | | 193,955.83 |
| | | | Chg | 04/01/2021 | C8 | UTILITY EXPENSE | | 1,357.68 | | 195,313.51 |
| | | | Chg | 04/28/2021 | C6 | MARCH 2021 ELEV ADJ | | 14.37 | | 195,327.88 |
| | | | Chg | 04/28/2021 | C8 | MARCH 2021 UTIL ADJ | | 38.29 | | 195,366.17 |
| | | | Chg | 04/28/2021 | C7 | MARCH 2021 INS ADJ | | 10.24 | | 195,376.41 |
| | | | Cr | 04/28/2021 | C5 | MARCH 2021 CAM ADJ | | | -653.47 | 194,722.94 |
| | | | Chg | 05/01/2021 | C5 | CAM EXPENSE | | 1,728.42 | | 196,451.36 |
| | | | Chg | 05/01/2021 | C6 | ELEVATOR EXPENSE | | 69.78 | | 196,521.14 |
| | | | Chg | 05/01/2021 | C7 | INSURANCE EXPENSE | | 320.86 | | 196,842.00 |
| | | | Chg | 05/01/2021 | C8 | UTILITY EXPENSE | | 1,357.68 | | 198,199.68 |
| | | | Chg | 05/27/2021 | C6 | APRIL 2021 ELEV ADJ | | 14.37 | | 198,214.05 |
| | | | Chg | 05/27/2021 | C8 | APRIL 2021 UTIL ADJ | | 50.63 | | 198,264.68 |
| | | | Cr | 05/27/2021 | C5 | APRIL 2021 CAM ADJ | | | -108.00 | 198,156.68 |
| | | | Cr | 05/27/2021 | C7 | APRIL 2021 INS ADJ | | | -0.44 | 198,156.24 |
| | | | Chg | 06/01/2021 | C5 | CAM EXPENSE | | 1,728.42 | | 199,884.66 |
| | | | Chg | 06/01/2021 | C6 | ELEVATOR EXPENSE | | 69.78 | | 199,954.44 |
| | | | Chg | 06/01/2021 | C7 | INSURANCE EXPENSE | | 320.86 | | 200,275.30 |
| | | | Chg | 06/01/2021 | C8 | UTILITY EXPENSE | | 1,357.68 | | 201,632.98 |
| | | | Chg | 06/21/2021 | C6 | MAY 2021 ELEV ADJ | | 14.37 | | 201,647.35 |
| | | | Chg | 06/21/2021 | C8 | MAY 2021 UTIL ADJ | | 50.63 | | 201,697.98 |
| | | | Chg | 06/21/2021 | C7 | MAY 2021 INS ADJ | | 10.24 | | 201,708.22 |
| | | | Cr | 06/21/2021 | C5 | MAY 2021 CAM ADJ | | | -464.09 | 201,244.13 |
| | | | Chg | 07/01/2021 | C5 | CAM EXPENSE | | 1,728.42 | | 202,972.55 |

LT-505C  Lake Point Tower
505 N. Lake Shore Drive
Chicago IL  60611

| Unit | STAT# | Resident | Type | Date | CC | Description | Check | Charge Amount | Payment/Credit | Balance |
|------|-------|----------|------|------|----|-----|-------|-------|-------|-------|
| | | | Chg | 07/01/2021 | C6 | ELEVATOR EXPENSE | | 69.78 | | 203,042.33 |
| | | | Chg | 07/01/2021 | C7 | INSURANCE EXPENSE | | 320.86 | | 203,363.19 |
| | | | Chg | 07/01/2021 | C8 | UTILITY EXPENSE | | 1,357.68 | | 204,720.87 |
| | | | Chg | 07/01/2021 | C6 | July Elevator Adj | | 0.94 | | 204,721.81 |
| | | | Chg | 07/01/2021 | C7 | July Insurance Adj | | 22.00 | | 204,743.81 |
| | | | Chg | 07/01/2021 | C8 | July Utility Adj | | 27.76 | | 204,771.57 |
| | | | Cr | 07/01/2021 | C5 | July CAM Adjust | | | -351.23 | 204,420.34 |
| | | | Chg | 07/26/2021 | C8 | JUNE 2021 UTIL ADJ | | 76.93 | | 204,497.27 |
| | | | Cr | 07/26/2021 | C5 | JUNE 2021 CAM ADJ | | | -520.87 | 203,976.40 |
| | | | Cr | 07/26/2021 | C6 | JUNE 2021 ELEV ADJ | | | -18.69 | 203,957.71 |
| | | | Cr | 07/26/2021 | C7 | JUNE 2021 INS ADJ | | | -17.40 | 203,940.31 |
| | | | Chg | 08/01/2021 | C5 | CAM EXPENSE | | 1,377.19 | | 205,317.50 |
| | | | Chg | 08/01/2021 | C6 | ELEVATOR EXPENSE | | 70.72 | | 205,388.22 |
| | | | Chg | 08/01/2021 | C7 | INSURANCE EXPENSE | | 342.86 | | 205,731.08 |
| | | | Chg | 08/01/2021 | C8 | UTILITY EXPENSE | | 1,385.44 | | 207,116.52 |
| | | | Chg | 09/01/2021 | C5 | CAM EXPENSE | | 1,377.19 | | 208,493.71 |
| | | | Chg | 09/01/2021 | C6 | ELEVATOR EXPENSE | | 70.72 | | 208,564.43 |
| | | | Chg | 09/01/2021 | C7 | INSURANCE EXPENSE | | 342.86 | | 208,907.29 |
| | | | Chg | 09/01/2021 | C8 | UTILITY EXPENSE | | 1,385.44 | | 210,292.73 |
| | | | Chg | 09/01/2021 | C5 | JULY 2021 CAM ADJ | | 209.05 | | 210,501.78 |
| | | | Chg | 09/01/2021 | C7 | JULY 2021 INS ADJ | | 25.49 | | 210,527.27 |
| | | | Cr | 09/01/2021 | C6 | JULY 2021 ELEV ADJ | | | -70.72 | 210,456.55 |
| | | | Cr | 09/01/2021 | C8 | JULY 2021 UTIL ADJ | | | -22.19 | 210,434.36 |
| | | | Chg | 10/01/2021 | C5 | CAM EXPENSE | | 1,377.19 | | 211,811.55 |
| | | | Chg | 10/01/2021 | C6 | ELEVATOR EXPENSE | | 70.72 | | 211,882.27 |
| | | | Chg | 10/01/2021 | C7 | INSURANCE EXPENSE | | 342.86 | | 212,225.13 |
| | | | Chg | 10/01/2021 | C8 | UTILITY EXPENSE | | 1,385.44 | | 213,610.57 |
| | | | Chg | 10/28/2021 | C6 | AUG-SPT 2021 ELV ADJ | | 36.35 | | 213,646.92 |
| | | | Chg | 10/28/2021 | C8 | AUG-SPT 2021 UTL ADJ | | 125.70 | | 213,772.62 |
| | | | Chg | 10/28/2021 | C7 | AUG-SPT 2021 INS ADJ | | 39.09 | | 213,811.71 |
| | | | Cr | 10/28/2021 | C5 | AUG-SPT 2021 CAM ADJ | | | -335.43 | 213,476.28 |
| | | | Chg | 11/01/2021 | C5 | CAM EXPENSE | | 1,377.19 | | 214,853.47 |
| | | | Chg | 11/01/2021 | C6 | ELEVATOR EXPENSE | | 70.72 | | 214,924.19 |
| | | | Chg | 11/01/2021 | C7 | INSURANCE EXPENSE | | 342.86 | | 215,267.05 |
| | | | Chg | 11/01/2021 | C8 | UTILITY EXPENSE | | 1,385.44 | | 216,652.49 |
| | | | Chg | 12/01/2021 | C5 | CAM EXPENSE | | 1,377.19 | | 218,029.68 |
| | | | Chg | 12/01/2021 | C6 | ELEVATOR EXPENSE | | 70.72 | | 218,100.40 |
| | | | Chg | 12/01/2021 | C7 | INSURANCE EXPENSE | | 342.86 | | 218,443.26 |
| | | | Chg | 12/01/2021 | C8 | UTILITY EXPENSE | | 1,385.44 | | 219,828.70 |